# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father,

      Plaintiffs,

    v.

BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY III, in his official capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, in his official capacity as Director of the Wilson County Schools; and DOES 1–10,

      Defendants.

Civil No. _____

## COMPLAINT

Plaintiffs A.S., a minor, by his next friends Amy A., mother, and Jeff S., father, and A.B., a minor, by her next friends Julie B., mother, and Ross B., father, by and through their undersigned counsel, file this Complaint against Bill Lee, in his official Capacity as Governor of Tennessee; Herbert Slatery III, in his official capacity as Attorney General of Tennessee; the Wilson County Board of Education; Jeff Luttrell, in his official capacity as Director of the Wilson County Schools; and DOES 1 through 10 (collectively, the "**Defendants**") as follows:

## INTRODUCTION

1. This lawsuit challenges a Tennessee law, the "Tennessee Accommodations for All Children Act," 2021 Tenn. Pub. Ch. 452 (the "**School Facilities Law**" or "**Law**" or "**TAACA**"), which bans transgender public school students from accessing restrooms and other facilities

consistent with their gender identity. A true and correct copy of the School Facilities Law is attached hereto as Exhibit A. By singling out transgender students for disfavored treatment and explicitly writing discrimination against transgender people into State law, the School Facilities Law violates the most basic guarantees of equal protection under the U.S. Constitution and Title IX of the Education Amendments of 1972.

2.      A.S. is a 14-year-old boy entering the ninth grade at a high school near Nashville, Tennessee. He is a boy who is transgender, which means that he was designated female at birth, but he knows himself to be male. After meeting with a professional therapist that specializes in working with LGBTQ youth, the therapist found A.S. to be experiencing feelings typically associated with gender dysphoria. Gender dysphoria is a medical condition characterized by clinically significant distress caused by an incongruence between a person's gender identity and the person's assigned sex at birth.

3.      With the support of his family, A.S. began his "social transition" in the spring of 2019, a critical element of treatment for gender dysphoria, meaning that A.S. began living in accordance with his gender identity as a boy in all aspects of his life. This was following a period in which he was unhappy and upset, consistent with the distress experienced as a result of gender dysphoria. In seventh grade, his first year in school after beginning his transition, A.S. was singled out by school administrators and forced to use the nurse's office bathroom. This caused him such significant distress that he would not drink all day in order to limit the need to use the bathroom. To the extent he needed to use the bathroom, he would delay while at school, and would run home from the bus stop as soon as school was over, or otherwise ask his mom to drive directly to the nearest public restroom if she picked him up to attend after-school activities, so that he could finally go to the bathroom.

2

4.    A.B. is a six-year-old girl entering the first grade at an elementary school near Nashville, Tennessee.  She is a girl who is transgender, which means that she was designated male at birth but she knows herself to be female.  She has been diagnosed by medical professionals as having gender dysphoria.  A.B. has attended and continues to attend sessions with a local therapist in the Nashville area who specializes in working with LGBTQ youth.  A.B. has received treatment for gender dysphoria, in accordance with the widely recognized standards of care for that condition.  A.B. began her social transition shortly after beginning sessions with her therapist, and A.B. lives in accordance with her gender identity as a girl in all aspects of her life.

5.    An anonymized picture of A.B. is below.



6.    Since around the age of five, A.B. has expressed the desire to her parents to present and be treated as a girl, including dressing in a manner typical of other girls and being referred to by using female pronouns.  A.B. enrolled in kindergarten as a girl and was treated by her peers and teachers as a girl.  The school district where A.B. will attend the first grade was made aware of the need for A.B. to: (a) be treated as the girl that she is; (b) be referred to using female pronouns; and (c) have access to the girls' restrooms at school along with her friends.

## JURISDICTION AND VENUE

7.      This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("**Title IX**").

8.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under Title IX, the Constitution of the United States, and 42 U.S.C. § 1983.  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

9.      Venue lies in this District pursuant to 28 U.S.C. § 1391 as the Plaintiffs and Defendants are located in this District and all events or omissions giving rise to this action occurred in this District.

## PARTIES

10.     Plaintiff A.S. is a typical 14-year-old teen who likes videogames like Minecraft, music including the band Gorillaz, reading young adult fantasy novels, and making collages and digital art.  A.S. is a resident of Tennessee, and will begin ninth grade on August 5, 2021.  A.S. is also a transgender boy.

11.     Plaintiff Amy A. is A.S.'s mother and Plaintiff Jeff S. is A.S.'s father and both sue as his next friends.

12.     Plaintiff A.B. is a typical six-year-old who loves animated movies from Disney and DreamWorks like "Frozen," "Trolls," and "Raya and the Last Dragon," as well as playing dress up.  A.B. is a resident of Tennessee, and will begin first grade on August 5, 2021.  A.B. is also a transgender girl.

13.     Plaintiff Julie B. is A.B.'s mother and Plaintiff Ross B. is A.B.'s father and both and sue as her next friends.

14.     Defendant Bill Lee ("**Defendant Lee**" or "**Governor Lee**" or the "**Governor**") is sued in his official capacity as the Governor of Tennessee. Pursuant to Article III, Section 1 of the Tennessee State Constitution, "the Supreme Executive power of this State" is vested in Defendant Lee in his capacity as Governor. Tenn. Const. art. III, § 1. Article III, Section 10 also provides that it is the duty of Defendant Lee in his capacity as Governor to "take care that the laws be faithfully executed." *Id.* § 10. Governor Lee is a person within the meaning of 42 U.S.C. § 1983 and at all times relevant has acted and continues to act under color of State law.

15.     Defendant William Slatery III ("**Defendant Slatery**" or "**Mr. Slatery**") is sued in his official capacity as the Attorney General of Tennessee. It is Defendant Slatery's duty in his capacity as Attorney General of Tennessee to defend the constitutionality of all legislation of statewide applicability. *Am. Civ. Liberties Union of Tennessee v. State of Tenn.*, 496 F. Supp. 218, 220–21 (M.D. Tenn. 1980) (holding the state Attorney General is a proper defendant in an attack on the validity of a Tennessee statute). It is also the duty of Defendant Slatery to defend and enforce the laws of Tennessee. Mr. Slatery is a person within the meaning of 42 U.S.C. § 1983 and at all times relevant has acted and continues to act under color of State law.

16.     Defendant Wilson County Board of Education (the "**School Board**") is an elected body responsible for the operation of the Wilson County Schools, including the promulgation of policies. At all times relevant, the School Board has acted and continues to act under color of State law.

17.     Defendant Jeff Luttrell ("**Defendant Luttrell**") is the Director of the Wilson County Schools. As Director, Defendant Luttrell has a duty to "[a]ct for the board in seeing that the laws relating to the schools and rules of the state and the local board of education are faithfully

executed." Tenn. Code Ann. § 49-2-301(b)(1)(A). At all times relevant, Defendant Luttrell has acted and continues to act under color of State law.

18.     The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, are unknown to Plaintiffs, who sue those Defendants by fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously-named Defendants is responsible for the unlawful conduct alleged herein, which proximately caused Plaintiffs' injuries and damages. When Plaintiffs ascertain the true names and capacities of DOES 1 through 10, this Complaint will be amended to include those Defendants' true names and other relevant information.

19.     Defendants, through their respective duties and obligations, are responsible for enforcing the School Facilities Law. Each Defendant, and those subject to their direction, supervision, and control, has or intentionally will perform, participate in, aide and/or abet in some manner the acts alleged in this Complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure Plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant, as well as all persons under their supervision, direction, or control, including but not limited to their officers, employees, and agents.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A.     A.S. is a Transgender Boy Who Will be Starting Ninth Grade This Year

20.     A.S. is a 14-year-old boy who will be starting as a high school freshman in the ninth grade on August 5, 2021.

21.     A.S. is transgender. Thus, although A.S. was assigned female sex at birth, he has a male gender identity. Upon information and belief, A.S. is one of few transgender students who will be attending a high school in the Wilson County School District in the fall of 2021.

22.     A.S. came out as transgender in the spring of 2019 at the age of 12.  Prior to coming out, he had been uncharacteristically upset for days and not acting like his normal self.  His mother, Amy A., noticed his behavior and asked him questions about his mental and emotional health during a car ride home.  He originally refused to share the cause of his distress with his parents.  Even after opting to share, he first told only his mother and required that she maintain his privacy.  Only later did he share with his father that he was transgender.

23.     The fact of being transgender is not a mental disorder.  According to the American Psychiatric Association, being transgender "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities."  Jack Dresher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals* at 1, APA Official Actions (July 2018).[1]  The incongruence between an individual's gender identity and sex assigned at birth can manifest in clinically significant and disabling distress which the American Psychiatric Association calls "gender dysphoria."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) (hereinafter, "**DSM-5**").  As described in the DSM-5, gender dysphoria can result in anxiety, depression, and impairment of daily functioning.  *Id.* at 451–53.  This distress can be greatly exacerbated by external influences, such as discrimination, stereotyping, and social expectations, but it is the incongruence between one's physical body and internal gender identity that drives gender dysphoria.  *Id.* at 453.

24.     Transgender children are often distressed by the onset of puberty, which initiates the development of secondary physical characteristics.  *Id.* at 455.  The development of irreversible secondary-sex characteristics inconsistent with gender identity can cause transgender adolescents

---

[1]     *Available at* https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf (Last accessed July 26, 2021).

7

tremendous psychological pain, often leading to depression, anorexia, social phobias, and suicidality. Bethany Gibson & Anita J. Catlin, *Care of the Child with the Desire to Change Gender – Part 1*, 36 Pediatric Nursing 53, 54 (2010).

25.     The distress that transgender individuals may experience can be eased with appropriate treatment. Established medical consensus regarding the appropriate treatment and support for transgender individuals seeks to alleviate the distress that transgender individuals may experience, rather than attempting to eliminate or realign an individual's gender identity. Past efforts to realign gender identity with sex assigned at birth have caused extraordinary harm and anguish to transgender individuals. *See* Substance Abuse & Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 1 (2015).[2]

26.     Thus, proper support for transgender youth, according to leading authorities, focuses on "alleviating the distress associated with the incongruence between gender identity and birth-assigned sex," with the ultimate goal being "for individuals with gender dysphoria to experience 'identity integration,' where 'being transgender is no longer the most important signifier of one's identity' and the individual can refocus on their relationships, school, jobs, and other life activities." Brief for the World Professional Association for Transgender Health, et al. *as Amicus Curiae*, at 12–17, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (2020) (ECF No. 32-1).

27.     Established medical consensus dictates that the provision of social, and, where appropriate, medical support for gender transition and the affirmation of the individual's gender

---

[2]     *Available at* https://store.samhsa.gov/product/Ending-Conversion-Therapy-Supporting-and-Affirming-LGBTQ-Youth/SMA15-4928 ("[C]onversion therapy—efforts to change an individual's sexual orientation, gender identity, or gender expression—is a practice that is not supported by credible evidence and has been disavowed by behavioral health experts and associations.")

identity is the only effective treatment for the disabling experience of gender dysphoria. *Id.* Support for transgender adolescents can include psychotherapy support and counseling, support for social transition, and hormone therapy (including hormone blockers at the appropriate age). *See generally* World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People* (2012) (7th Version).[3] Transgender status, however, does not depend on the presence or absence of any aspects of social or medical transition. Transgender people are transgender because their identity does not align with the sex they were assigned at birth.

28. A.S. was born in New Jersey, and thus has a New Jersey birth certificate.

29. A.S. first moved to the Nashville area with his family in 2018.

30. A.S. came out to his family as transgender at the end of his 6th grade year, in 2019.

31. A.S. was "out" as transgender for his 7th grade year beginning in the fall of 2019. This means that A.S. began publicly living in his gender identity, using a name typically associated with males, asked to be referred to using "he/him" pronouns, and dressing in clothing typical of other boys his age. The middle school A.S. attended did not allow A.S. to use the boys' bathroom because it did not correspond with the gender he was assigned at birth. A.S. was given the choice of using the girls' bathroom, the nurse's office bathroom, the guidance office bathroom, or a locked faculty bathroom. None of these bathrooms were close to any of A.S.'s classrooms, and using them made A.S. feel like he stood out, seemed "different," and made him feel further alienated.

32. Because A.S. was anxious and uncomfortable with the "accommodations" offered by his middle school, A.S. did not drink liquids throughout the school day altogether so that he could avoid using the restroom at school. A.S. usually rode the bus to and from school, and most

---

[3] *Available at* https://www.wpath.org/publications/soc.

days would race home from the bus stop to get to the bathroom. On days that his mother would pick him up to take him to after-school activities, he would often ask to stop at a coffee shop nearby to use the restroom.

**B.    A.B. is a Transgender Girl Who Will be Starting First Grade This Year**

33.    A.B. is a six-year-old girl who will be starting first grade on August 5, 2021.

34.    A.B. is transgender. Thus, although A.B. was assigned male sex at birth, she has a female gender identity. Upon information and belief, A.B. is the only transgender student at her elementary school.

35.    A.B. has identified as female for as long as she has been able to articulate her feelings. For example, her parents recall that beginning around age two or three, A.B. expressed a strong preference for assuming roles traditionally associated with girls when playing by herself or with her friends. She also enjoyed dressing up in clothing associated with girls, and identified with popular female characters in children's TV shows and movies, such as Elsa from the Disney film "Frozen," and Princess Poppy from DreamWorks' "Trolls."

36.    Recognizing that their child was consistently identifying as female, A.B.'s parents began researching gender identity development and identifying age-appropriate resources to support her. For example, they purchased a number of children's books that address gender identity development, including a particularly popular book entitled "I am Jazz."

37.    Her mother, Julie, vividly recalls reading "I am Jazz" to her daughter before bed one night in late 2019, when A.B. was just about three and a half years old. There is a line in which the main character expresses the sentiment that she has the body of a boy, but the mind of a girl.

38.    When her mother read this line to her, A.B.'s eyes grew big and she looked up and exclaimed, "Mama, that's just like me!"

10

39.     To this day, whenever A.B. is misgendered and referred to as a boy or by male pronouns, she proudly explains that she has the body of a boy, but the mind of a girl.

40.     Because A.B. came out as transgender at four years old, she has always attended school as a girl.

41.      A.B. attended kindergarten at a private school where her peers and teachers referred to her using "she/her" pronouns, and where A.B. was allowed to use the girls' restroom. Neither A.B. nor her peers reported experiencing any adverse issues related to her use of the girls' restroom during this time.

42.     A.B. is also enrolled in gymnastics classes at a facility associated with USA Gymnastics where she attends the girls' classes and uses the girls' restroom. Again, neither A.B. nor her peers have reported experiencing any adverse issues related to her use of the girls' restroom.

**C.     The New School Facilities Law Unfairly Discriminates Against Transgender Students**

43.     On May 14, 2021, Governor Lee signed the School Facilities Law into law, which took effect on July 1, 2021.

44.     The School Facilities Law was just one of several laws restricting the rights of transgender people enacted in Tennessee around the same time. Governor Lee also signed a bill to prevent transgender students from participating in high school and middle school sports,[4] a bill that prevents physicians from prescribing hormone treatment for prepubertal transgender youth,[5] a bill that requires public schools to notify parents before offering any curriculum about sexual

---

[4]     2021 Tenn. Pub. Ch. 40.

[5]     2021 Tenn. Pub. Ch. 460.

orientation and gender identity,[6] and a bill that requires businesses with bathrooms open to the public to post a notice at the entrance of each public restroom if the business allows transgender individuals to use the restrooms corresponding with their gender identity.[7]

45.     This Court recently granted a preliminary injunction enjoining enforcement of the last of these laws in *Bongo Prods., LLC v. Lawrence*, No. 3:21-CV-00490, 2021 WL 2897301 (M.D. Tenn. July 9, 2021).  In *Bongo*, this Court noted that the "legislative history of the Act shows that it was devised, quite consciously and explicitly, as a direct response to social and political trends involving transgender people."  *Id.* at *11.

46.     The School Facilities Law states in relevant part that public schools are required, "to the extent practicable," to provide a "reasonable accommodation" to a student, teacher, or employee who:

> Desires greater privacy when using a multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex and located within a public school building, or when using multi-occupancy sleeping quarters designated for the student's, teacher's, or employee's sex while the student, teacher, or employee is attending a public school-sponsored activity.

TAACA § 4(a)(1).

47.     The School Facilities Law strictly defines "sex" to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth.  Evidence of a person's biological sex includes, but is not limited to, a government-issued identification document that accurately reflects a person's sex listed on the person's *original* birth certificate." TAACA § 3(4) (emphasis added).

---

[6]     2021 Tenn. Pub. Ch. 281.

[7]     2021 Tenn. Pub. Ch. 453.

48.     Notably, Tennessee is the only U.S. state or territory that prohibits amending a gender marker on a birth certificate.  And this narrow definition of "sex" obviates even the amending of birth certificates to reflect an individual's gender identity in accordance with recognized treatments for gender dysphoria by referring to "the person's original birth certificate" and by declaring a person's sex to be "immutable."  Indeed, while allowing individuals to change the gender marker on their birth certificate is commonplace across the United States, Tennessee is the *only* U.S. state or territory that does not allow for amending the gender marker on a birth certificate under any circumstances.  *See* Tenn. Code Ann. § 68-3-203(d); *see also* Movement Advancement Project, *Identity Document Laws and Policies*.[8]  And because the extremely narrow definition of "sex" in the School Facilities Law only takes into account the sex listed on a person's "original" birth certificate, this means that even for students (like A.S.) who were born out-of-state and are able to change the gender marker on their birth certificate under another State's law, but now live and attend school in Tennessee, they are still prohibited from using a multi-occupancy restroom or changing facility associated with their gender identity.

49.     The School Facilities Law therefore makes it legally impossible for an individual to change gender for purposes of school even when an individual has changed gender in the eyes of the State in which they were born or in the eyes of the federal government.[9]

---

[8]     *Available at* https://www.lgbtmap.org/equality-maps/identity_document_laws (Last accessed July 26, 2021).

[9]     Federal law generally permits an individual to change their gender identity on federally-issued records.  For example, the U.S. State Department permits individuals to choose their gender on their passport, even where it does not match the gender on "supporting documentation," such as a birth certificate. *See Selecting your Gender Marker*, U.S. Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/need-passport/selecting-your-gender-marker.html.

50.     The School Facilities Law also provides in relevant part that a "reasonable accommodation" "includes, but is not limited to, access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility."  TAACA § 3(2).

51.     However, expressly excluded from the definition of "reasonable accommodation" is any "[a]ccess to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present."  TAACA § 3(2)(A).  Similarly excluded from the scope of a "reasonable accommodation" is any "[r]equest[] that a school construct, remodel, or in any way perform physical or structural changes to a school facility; or [r]equest[] that a school limit access to a restroom or changing facility that is designated for use by members of the opposite sex."  TAACA § 3(2)(B)–(C).

52.     The School Facilities Law's "reasonable accommodation" is therefore anything but reasonable or accommodating, leaving transgender students no choice but to use bathrooms corresponding with their assigned sex at birth or being singled out, and outed as transgender, by requesting to use single-occupancy bathrooms such as employee bathrooms or nurse's bathrooms.

53.     In other words, the School Facilities Law forces transgender students into the position of using a multi-occupancy bathroom inconsistent with their gender identity, or being singled out and required to ask for a purported "reasonable accommodation."

54.     The School Facilities Law's provisions requiring use of single-sex facilities in accordance with the sex stated on one's original birth certificate not only disproportionately burdens transgender people, but intentionally targets them for differential treatment.  The School Facilities Law tells transgender individuals in no uncertain terms that they are different and less valuable.

14

55. The School Facilities Law further provides a student, teacher or employee a "private right of action against the LEA ["Local Education Agency"] or public school" if they "encounter[] a member of the opposite sex in a multi-occupancy restroom or changing facility" while using such a facility associated with their designated "sex," and the LEA or public school "intentionally allowed a member of the opposite sex to enter the multi-occupancy restroom or changing facility while other persons were present." TAACA § 6(a)(1). Successful plaintiffs may recover "monetary damages, including . . . reasonable attorney fees and costs." TAACA § 6(c).

56. Thus, Tennessee public schools are not free to enact policies more inclusive of transgender students allowing them to use restrooms consistent with their gender identity, as doing so opens them up to lawsuits by other individuals.

57. Under the School Facilities Law, then, transgender students like A.S. and A.B. are precluded from using bathrooms and changing facilities consistent with their gender identity.

58. In other words, A.S., a boy, cannot use the boys' bathroom or changing facilities because he was assigned "female" at birth.

59. Similarly, A.B., a girl, cannot use the girls' bathroom or changing facilities because she was assigned "male" at birth.

60. Although portrayed as a law that protects "all children," it is anything but. The School Facilities Law is widely recognized and condemned as an effort intended to single out and force transgender students to use the bathroom associated with the gender they were assigned at birth, even though that is not consistent with their gender identity, or otherwise face the stigmatizing and harmful effect of being one of the only students in the entire school who must use a "different" bathroom from everyone else.

**D.** **In Only the Last Year, the U.S. Supreme Court has Twice Prohibited Discrimination on the Basis of Gender Identity, and the Department of Justice has Issued Guidance that Title IX Prohibits Discrimination on the Basis of Gender Identity and Sexual Orientation**

61.     On June 15, 2020, the Supreme Court of the United States ruled in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), that Title VII of the Civil Rights Act of 1964 protects employees against discrimination based on their sexual orientation or gender identity.  The Court held that discrimination on the basis of gender identity is necessarily also discrimination "because of sex" as prohibited by Title VII.  *Id*. at 1740–43.

62.     In June 2015, Gavin Grimm, a boy who is transgender, through his parent, sued the Gloucester County School Board for a policy it enacted preventing him from using the boys' bathroom because it did not correspond with the gender he was assigned at birth.[10]  The District Court held for Grimm in August 2019 on both his Title IX and Equal Protection claims against the School Board.[11]  On August 26, 2020, the Fourth Circuit Court of Appeals upheld the decision of the District Court and held that the Supreme Court's reasoning in *Bostock* applied to the plaintiff's Title IX and Equal Protection claims in *G.G.*[12]  The Supreme Court denied certiorari on June 28, 2021, supporting the Fourth Circuit's holding that Title IX prohibits discrimination on the basis of gender identity.[13]

---

[10]     *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 132 F. Supp. 3d 736 (E.D. Va. 2015), *rev'd in part*, *vacated in part*, 822 F.3d 709 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239, 197 L. Ed. 2d 460 (2017).

[11]     *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019).

[12]     *Grimm*, 972 F.3d at 586.

[13]     *Gloucester Cnty. Sch. Bd. v. Grimm*, No. 20-1163, 2021 WL 2637992 (June 28, 2021).

63.     On March 26, 2021, the U.S. Department of Justice's ("**DOJ**") Civil Rights Division issued a Memorandum on the "Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972" (the "**DOJ Memorandum**").[14]

64.     The DOJ Memorandum notes that both before and following *Bostock*, numerous federal appellate courts have reached the conclusion that Title IX protects transgender students from discrimination on the basis of gender identity.  DOJ Memorandum at 2 (citing cases).

65.     Accordingly, the DOJ Memorandum explains the DOJ's view that Title IX "prohibit[s] discrimination on the basis of gender identity and sexual orientation," *id.* at 1, explaining that:

> After considering the text of Title IX, Supreme Court caselaw, and developing jurisprudence in this area, the Division has determined that the best reading of Title IX's prohibition on discrimination "on the basis of sex" is that it includes discrimination on the basis of gender identity and sexual orientation.

*Id.* at 2.

66.     The DOJ Memorandum concludes with hopes that "this memorandum provides a starting point for [Federal Agency Civil Rights Directors and General Counsels] to ensure the consistent and robust enforcement of Title IX, in furtherance of the commitment that every person should be treated with respect and dignity."  *Id.* at 3.

**E.     The U.S. Department of Education Has Also Recently Issued an Official Notice of Interpretation Supporting the Enforcement of Title IX with Respect to Discrimination Based on Gender Identity**

67.     On June 22, 2021, the Department of Education ("**ED**") similarly issued an official interpretation to clarify its enforcement authority over discrimination based on sexual orientation

---

[14]     *Available at* https://www.justice.gov/crt/page/file/1383026/download.

and gender identity under Title IX in light of the Supreme Court's decision in *Bostock* (the "**ED Notice**").[15]

68.      According to the ED Notice, the ED's Office for Civil Rights "has long recognized that Title IX protects all students, including students who are lesbian, gay, bisexual, and transgender, from harassment and other forms of sex discrimination."  ED Notice at 3.

69.      The ED Notice concludes that Title IX "encompass[es] discrimination on the basis of sexual orientation and gender identity," *id.* at 4, and that the ED's Office for Civil Rights "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department," *id.* at 11.

**F.      Plaintiffs' Families Made Repeated Efforts to Reach out to Their Elected Representatives About the School Facilities Law, but were Rebuffed and Ignored**

70.      Prior to the enactment of the School Facilities Law, both Amy A. and Julie B. made repeated attempts to contact state legislators regarding the School Facilities Law to discuss the impacts the Law would have on their transgender children, family, and community and state their opposition to the proposed legislation.

71.      Despite multiple attempts to speak with various legislators, neither Ms. A. nor Ms. B. was able to discuss the Law with a single legislator in favor of the Law.

72.      For example, Ms. A. and Ms. B. reached out on February 23, 2021 to Tennessee State Representative Susan Lynn, to schedule a meeting with her to explain their opposition to the School Facilities Law.

---

[15]      *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-noi.pdf.

73.     Representative Lynn confirmed receipt of the email and scheduled a meeting with them for March 2, 2021 to be conducted by Zoom.

74.     On the day of the meeting, Ms. A. and Ms. B. logged into the Zoom meeting and waited patiently for Representative Lynn or someone from her office to join the virtual meeting room, but no one ever joined.

75.     After it was clear no one from Representative Lynn's office would be attending the virtual meeting, Ms. A. called Representative Lynn's office, but received no answer.

76.     Ms. A. left a voicemail with Representative Lynn's office regarding the missed meeting, but received no answer.

77.     In April and early May 2021, Amy A. sent two emails to Lang Wiseman, Deputy to the Governor and Chief Counsel, seeking a virtual meeting to discuss the School Facilities Law with herself and her son A.S.

78.     Amy A. received no reply from Mr. Wiseman.

79.     Legislators' refusal to discuss the effects of the Law with Plaintiffs, combined with the plain language of the School Facilities Law's defining sex to be "immutable," underscores the State's moral disapproval of transgender people, and the improper and unlawful stigma and discrimination that results from such disapproval.

80.     Indeed, other State legislators were shocked by their colleagues' rushed efforts to pass the School Facilities Law and refusal to educate themselves about the issues involved or consider opposing views.  For example, on February 9, 2021, Ms. B. exchanged emails with a State representative that opposed the then-proposed School Facilities Law.

81.     The representative told Ms. B. via email that he was "very upset that [other legislators] refuse to even answer questions or take the time to consider the perspective of our children."

82.     The representative went on to say that (emphasis added):

*Not one person on [the relevant] subcommittee even knew what I was talking about when I mentioned gender dysphoria. The truth of the matter is that they don't care enough to even learn*. I don't think any of them are going to change their perspective or opinion, but I would ask you to try to educate them. Also, *they think they can just sit up here and discriminate against kids with no repercussions*. I would be sure and make sure they know that you are watching. Thanks for reaching out. I am very sad and disappointed that this is moving forward and that I couldn't do more.

83.     On March 4, 2021, Ms. B. sent another email to this representative, encouraging them to vote "No" on the School Facilities Law.

84.     The representative replied to Ms. B. on March 8, 2021, saying that the representative would "be voting against this legislation as currently drafted because of its *clearly discriminatory intent*, as well as its increased costs for already underfunded public schools" (emphasis added).

85.     In the Tennessee Senate Floor Session on April 21, 2021 to consider the School Facilities Law, Senator Heidi Campbell asked the sponsor of the Law, Senator Mike Bell, if Senator Bell had "contacted any trans[gender] families or trans[gender] people about this bill." Senator Bell admitted, "No I did not."[16]  Both Senator Heidi Campbell and Senator Jeff Yarbro discussed the disparate impact of the School Facilities Law on transgender students at length.

---

[16]     *Tennessee Accommodations for All Children Act*, H.B. 1233 Before the Senate Sess. – 26th Legislative Day at 1:51:38 (Mar. 21, 2021), https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24710&meta_id=596449.

Senator Mike Bell did not at any point respond or comment on the Law's effects on transgender students.

**G.   A.S.'s High School will Require him to use Single-Occupancy Restrooms, and Has Not Provided Guidance as to Where A.S. will be Allowed to Change for Physical Education Classes**

86.   In July 2021, Amy A. emailed the administration at A.S.'s high school about restroom and locker room accommodations for A.S.  The Principal indicated that students who need accommodations are permitted to use single-occupancy restrooms, but could not clarify whether accommodations would be available for the use of locker rooms for physical education ("**P.E.**") classes.

87.   The Principal indicated that for P.E. classes, A.S. would likely have to use the single-occupancy restrooms to change.  This would inevitably out A.S. as transgender to the rest of the school as soon as his other male classmates use the boys' locker room to change and notice that A.S. is required to use a single-occupancy restroom.  This will undoubtedly exacerbate the stress and anxiety A.S. experiences while trying to fit in and be treated as the normal teenage boy he is, and further stigmatize him on the basis of sex and gender identity.

88.   The Principal at A.S.'s school indicated the administration intends to consult with the students in the school's LGBT club, "GLSEN," for advice on how the administration "can make it as comfortable as possible for all of [its] students."  The factor limiting those possibilities is, of course, the School Facilities Law itself, as the school is constrained by the possibility of litigation should the administration opt to allow transgender students to use the restrooms and changing facilities corresponding with their gender identities.

**H.     A.B.'s Elementary School has Offered to Allow Her to Use the Girls' Bathroom for the First Month of School, After Which Time That Privilege Will be Revoked**

89.     In anticipation of her daughter entering the first grade under the new School Facilities Law, A.B.'s mother has reached out to the school to understand how, if at all, they will accommodate A.B.

90.     The school Principal has said that, from August 5, 2021 through August 31, 2021, A.B. may use the girls' bathroom as part of a "Student Inclusion and Support Plan." The Plan explicitly notes that it "may be modified prior to [its expiration date] if necessary."

91.     After that time, however, the Student Inclusion and Support Plan will be "reviewed," and A.B. may be forced to either use the boys' bathroom (since that corresponds to the gender she was assigned at birth, in accordance with the School Facilities Law), or to use the nurse's bathroom.

92.     Neither the Principal nor anyone else affiliated with the school has explained why A.B. may use the girls' bathroom for the first month of first grade, but then abruptly may no longer be able to do so.

93.     This "accommodation" is no accommodation at all, and for a child of six will just reinforce the differential treatment and likely trauma of living under the School Facilities Law.

94.     Furthermore, even the school's Student Inclusion and Support Plan for A.B. may open the school up to litigation brought by a private plaintiff under the School Facilities Law. This, combined with the Plan's explicit mention of the possibility of modification even during the time that it is effective, provides A.B. no guarantees she will receive any "inclusion" or "support" at all.

## CAUSES OF ACTION

### COUNT I

**Deprivation of Equal Protection**

**U.S. Const. Amend. XIV**

**(Against All Defendants)**

95.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 94 as though fully set forth herein.

96.     Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge the School Facilities Law both facially and as applied to them.

97.     The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Defendants are all governmental actors and/or employees acting under color of state law for purposes of 42 U.S.C. § 1983 and the Fourteenth Amendment.

98.     Transgender people have suffered a long history of extreme discrimination in Tennessee and across the country and continue to suffer such discrimination to this day.

99.     Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

100.    A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

101.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

102.    Gender identity generally is fixed at an early age and highly resistant to change through intervention.

103.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny. Discrimination based on sex includes but is not limited to discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

104.    The School Facilities Law facially classifies people based on sex, gender identity, and transgender status.

105.    The School Facilities Law discriminates against transgender people on the basis of sex.

106.    The School Facilities Law treats transgender people differently than non-transgender people who are similarly situated.

107.    Under the School Facilities Law, non-transgender people are able to access restrooms and other single-sex facilities consistent with their gender identity, but transgender people are banned from restrooms and other single-sex facilities consistent with their gender identity.

108.    The School Facilities Law discriminates against transgender people based on gender nonconformity. For example, although A.S. is a boy and is perceived as a boy in public, he has a birth certificate with a female gender marker that does not conform to the School Facilities Law's expectations for boys. Furthermore, if boys such as A.S. had been assigned male at birth, they would not be banned by the School Facilities Law from the restrooms and other single-sex facilities consistent with their gender identity. Similarly, although A.S. is a girl and is perceived as a girl in public, she has a birth certificate with a male gender marker that does not conform to

the School Facilities Law's expectations for girls. Furthermore, if girls such as A.S. had been assigned female at birth, they would not be banned by the School Facilities Law from the restrooms and other single-sex facilities consistent with their gender identity. No person has any control over the sex that person is assigned at birth.

109.    By prohibiting A.S. and A.B. – a transgender boy and a transgender girl, respectively – from using the restrooms and other facilities corresponding to their gender identities because the State does not deem them to be of the gender they identify, the Defendants treated and continue to treat A.S. and A.B. differently from similarly situated students based on their gender identity.

110.    The School Facilities Law's discrimination against transgender people based on sex is not necessary and narrowly tailored to the achievement of a compelling government interest. Indeed, it is not substantially related to an important government interest, nor even rationally related to any legitimate government interest.

111.    The School Facilities Law endangers the safety, privacy, security, and well-being of transgender individuals. For example, if a transgender girl were to use the boys' restroom, she would be exposed to potential harassment and assault by students who believe that she should not be in the boys' restroom. Similarly, if a transgender boy were to use the girls' restroom, he likely would be similarly exposed to potential harassment and assault by students who believe he should not be in the girls' restroom.

112.    The School Facilities Law does not promote the safety, privacy, security, or well-being of non-transgender people. In fact, the Law invites potential harassment and assault of non-transgender students who may not fit gender expectations or stereotypes associated with their

gender identity by giving private persons a right of action to sue under the Law, and thereby encouraging independent policing of everyone who uses a multi-occupancy restroom.

113.     The School Facilities Law deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

114.     The School Facilities Law's intentional and inherent discrimination against transgender people based on sex denies them the equal protection under the law, in violation of the Equal Protection Clause of the Fourteenth Amendment.  Forcing transgender individuals to use a restroom that is incongruent with their gender identity communicates the State's moral disapproval of their identity, which the Constitution and federal law protect. *See Lawrence v. Texas*, 539 U.S. 558, 583 (2003) ("Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause.").

115.     The School Board is the final policymaker for Wilson County Public Schools.

116.     The Defendants' discrimination against A.S. and A.B. based on their gender identity denies them equal protection under the law, in violation of the Fourteenth Amendment to the United States Constitution.

117.     The Defendants are liable for their violation of A.S.'s and A.B.'s Fourteenth Amendment rights under 42 U.S.C. § 1983.

**COUNT II**

**Violation of Title IX**

**20 U.S.C. § 1681**

**(Against Wilson County School Board and Defendant Luttrell)**

118.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 117 as though fully set forth herein.

119.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

120.     Under Title IX, discrimination "on the basis of sex" encompasses both discrimination based on biological differences between men and women and discrimination based on gender nonconformity.

121.     Both of the public schools that A.S. and A.B. attend are education programs receiving Federal financial assistance.

122.     By requiring A.S. and A.B. – a transgender boy and a transgender girl, respectively – to use separate restrooms and related facilities because the School Board does not deem them to be of the gender they identify, the School Board and Defendant Luttrell have and continue to exclude A.S. and A.B. from participation in, deny them the benefits of, and subject them to discrimination in education programs and activities at their respective Wilson County schools "on the basis of sex," which violates A.S.'s and A.B.'s rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that proper process issue and be served upon Defendants, requiring them to answer the Complaint within the time prescribed by law and further Plaintiffs request an order and judgment:

1.  Declaring that the provisions of and enforcement by Defendants of the School Facilities Law as discussed above violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

27

2. Declaring that the provisions of and enforcement by the School Board and Defendant Luttrell of the School Facilities Law as discussed above violate Plaintiffs' rights under Title IX;

3. Preliminarily and permanently enjoining enforcement by Defendants of the School Facilities Law;

4. Preliminary and permanently requiring Defendants to permit A.S. and A.B. to use: (i) multi-occupancy restrooms and changing facilities located within a public school building that correspond with their gender identity, rather than their gender assigned at birth; and (ii) multi-occupancy sleeping quarters while attending a public school-sponsored activity that correspond with their gender identity, rather than their gender assigned at birth;

5. Preliminary and permanently requiring Defendants in their official capacities to allow individuals, including transgender people, to use: (i) multi-occupancy restrooms and changing facilities located within a public school building that correspond with their gender identity, rather than their gender assigned at birth; and (ii) multi-occupancy sleeping quarters while attending a public school-sponsored activity that correspond with their gender identity, rather than their gender assigned at birth; and requiring Defendants in their official capacities to allow local governments to enact and to continue to enforce anti-discrimination protections for LGBTQ people;

6. Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

7. Awarding nominal damages as well as Plaintiffs' costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

8. Such other relief as the Court deems just and proper.

9. The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

Dated:      August 2, 2021                    Respectfully submitted,

By: */s/ Tricia Herzfeld*
Tricia Herzfeld (BPR #26014)
BRANSTETTER STRANCH & JENNINGS PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
T: (615) 254-8801
F: (615) 255-5419
triciah@bsjfirm.com

Adam S. Lurie*
Erez Liebermann*
Andrew Pak*
Sean Mooney*
Andreane Reynolds*
Kunal Kanodia*
Rebecca Zeldin*
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
erez.liebermann@linklaters.com
andrew.pak@linklaters.com
sean.mooney@linklaters.com
andy.reynolds@linklaters.com
kunal.kanodia@linklaters.com
rebecca.zeldin@linklaters.com

Sarah Warbelow*
Jason Starr*
HUMAN RIGHTS CAMPAIGN FUND
1640 Rhode Island Avenue NW
Washington, D.C. 20036
T: (202) 628-4160

F: (202) 628-0517
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org

\* Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father*