# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

-------------------------------------------------x

A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father,

Plaintiffs,

v.

Civil No. _____

BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY III, in his official capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, in his official capacity as Director of the Wilson County Schools; and DOES 1–10,

Defendants.

-------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
## <u>TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**Pages(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    Sex, Gender Identity, and Gender Dysphoria ............................................... 3

    B.    The Plaintiffs ................................................................................................ 7

    C.    The School Facilities Law .............................................................................. 9

LEGAL STANDARD .......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ...................................................................................................................... 12

    A.    Plaintiffs are Likely to Succeed on Their Title IX Claim ........................... 12

    B.    Plaintiffs are Likely to Succeed on Their Equal Protection Claim ............. 15

        1.    Heightened Scrutiny Applies to Plaintiffs' Equal Protection Claim ............... 16

        2.    The School Facilities Law does not Survive Heightened Scrutiny ................. 16

II.    PLAINTIFFS WILL SUFFER SIGNIFICANT IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF ........................................................................................ 21

III.   THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS' FAVOR ...................... 23

IV.   THE PUBLIC INTEREST STRONGLY FAVORS GRANTING A TRO ....................... 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty., Fla.*,
No. 18-13592, __ F.4th __, 2021 WL 2944396 (11th Cir. 2021)............................1, 16, 18, 19

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015).................................................................................16

*Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*,
208 F. Supp. 3d 850 (S.D. Ohio 2016) ........................................................................... *passim*

*Bernal v. Fainter*,
467 U.S. 216 (1984).................................................................................................................17

*Bongo Prods., LLC v. Lawrence*,
Case No. 3:21-cv-00490, 2021 WL 2897301 (M.D. Tenn. July 9, 2021) ..............4, 11, 18, 24

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020)......................................................................................................13, 14

*Cohen v. Brown Univ.*,
991 F.2d 888 (1st Cir.1993)...................................................................................................24

*Dodds v. United States Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) ...................................................................................1, 13, 23, 25

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018)...................................................................................................20

*Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) .................................................................................................13

*Evancho v. Pine-Richland Sch. Dist.*,
237 F. Supp. 3d 267 (W.D. Pa. 2017)........................................................................20, 22, 25

*FemHealth, USA, Inc. v. City of Mount Juliet*,
458 F. Supp. 3d 777 (M.D. Tenn. 2020)................................................................................25

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*,
822 F.3d 709 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239
(2017)........................................................................................................................................12

*Grimm v. Gloucester Cnty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), *cert. denied*, 2021
WL 2637992 (June 28, 2021) ........................................................................................ *passim*

ii

*I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*,
   No. 3:19-CV-00981, 2019 WL 6050283 (M.D. Tenn. Nov. 15, 2019) ................................ 11

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
   323 F. Supp. 3d 1030 (S.D. Ind. 2018) .......................................................... *passim*

*Jones v. Caruso*,
   569 F.3d 258 (6th Cir. 2009) ................................................................... 24

*Legatus v. Sebelius*,
   988 F. Supp. 2d 794 (E.D. Mich. 2013) ......................................................... 23

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
   55 F.3d 1171 (6th Cir. 1995) .................................................................. 25

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) .................................................................. 11

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999) ........................................................................... 13

*Parents for Privacy v. Barr*,
   949 F.3d 1210 (9th Cir. 2020) ................................................................. 20

*Ray v. McCloud*,
   507 F. Supp. 3d 925 (S.D. Ohio 2020) .......................................................... 16

*Smith v. City of Salem, Ohio*,
   378 F.3d 566 (6th Cir. 2004) ............................................................... 12, 13

*Sullivan v. Benningfield*,
   920 F.3d 401 (6th Cir. 2019) .................................................................. 16

*Tumminello v. Father Ryan High Sch., Inc.*,
   678 Fed. Appx. 281 (6th Cir. 2017) ............................................................ 13

*United States v. Virginia*,
   518 U.S. 515 (1996) ........................................................................... 17

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017) ............................................................. *passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................. 11

*Zagorski v. Haslam*,
   Case No. 3:18-cv-01205, 2018 WL 5454148 (M.D. Tenn. Oct. 29, 2018),
   *aff'd*, 741 F. App'x 320 (6th Cir. 2018) ...................................................... 11

iii

## Statutes

20 U.S.C. § 1681 (2021) ........................................................................... *passim*

42 U.S.C. § 1983 (West 2021)...................................................................13

N.J. Stat. Ann. § 26:8-40.12 (2021).........................................................18

Tenn. Code Ann. § 68-3-203(d)...............................................................19

*Tennessee Accommodations for All Children Act*, 2021 Tenn. ALS 452, 2021
    Tenn. Pub. Ch. 452, 2021 Tenn. HB 1233 (2020) ........................... *passim*

## Other Authorities

Brian S. Barnett et al., *The Transgender Bathroom Debate at the Intersection of
    Politics, Law, Ethics, and Science*, 46 J. of the Am. Academy of Psychiatry
    and the Law 232 (Nov. 2, 2018),
    http://jaapl.org/content/jaapl/46/2/232.full.pdf......................................23

Brief for Am. Academy of Pediatrics et al. as *Amicus Curiae*, *Grimm v.
    Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), ECF No. 32-1...........................4, 6

Daniel Trotta, *U.S. transgender people harassed in public restrooms: landmark
    survey*, REUTERS (Dec. 8, 2016), https://www.reuters.com/article/us-usa-lgbt-
    survey/u-s-transgender-people-harassed-in-public-restrooms-landmark-
    survey-idUSKBN13X0BK .......................................................................23

David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender,
    and Questioning Youth*, 132 AM. ACADEMY OF PEDIATRICS e297 (July 2013),
    https://pediatrics.aappublications.org/content/pediatrics/132/1/e297.full.pdf.....................3, 5

*Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, Substance
    Abuse and Mental Health Servs. Admin. (2015),
    https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf........................................4

Enforcement of Title IX of the Educ. Amendments of 1972 with Respect to
    Discrimination Based on Sexual Orientation and Gender Identity in Light of
    *Bostock v. Clayton Cnty.*, 86 Fed. Reg. 32637-01 (Jun. 22, 2021).........................................14

Eric Yarbrough et al, *Gender Dysphoria Diagnosis*, Am. Psychiatric Ass'n
    (2017), https://www.psychiatry.org/psychiatrists/cultural-
    competency/education/transgender-and-gender-nonconforming-
    patients/gender-dysphoria-diagnosis.........................................................................5

Gabriel Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, J. of the Am.Academy of Pediatrics (2018), https://pediatrics.aappublications.org/content/pediatrics/143/6/e20182902.full.pdf ................................................................................................................................21

Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, APA Official Actions (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf.................................................................4

Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378, 1388–89 (2016), https://scholarworks.gsu.edu/cgi/viewcontent.cgi?article=1065&context=ssw_facpub ..................................................................................................................6

*The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality 134 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf ..................................................................................................................6

*Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Sch.*, Am. Psychiatric Ass'n 1 (2020), https://www.apa.org/about/policy/orientation-diversity ...........................................6

*Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, World Prof'l Ass'n for Transgender Health (7th Version 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=1613669341 .......................................................................5

U.S. Const. Amend. 14 ..................................................................................... *passim*

U.S. Dep't of Just., Civ. Rights Div., Memorandum on the Application of *Bostock v. Clayton Cnty.* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://www.justice.gov/crt/page/file/1383026/download...........................14

v

# INTRODUCTION

Plaintiffs A.S. and A.B. will start school on August 5, 2021 in the Wilson County School District ("**WCSD**"). Both Plaintiffs are transgender students. A.S. is a 14-year-old teenager who "just wants to be a regular kid, a regular boy." *See* Declaration of Amy A. in Support of Plaintiffs' Motion for a Temporary Restraining Order ¶ 27 ("**Amy A. Decl.**"). A.B. is six years old and repeatedly reminds her friends and family that she is just a kid with "a boy body with a girl brain." *See* Declaration of Julie B. in Support of Plaintiffs' Motion for a Temporary Restraining Order ¶¶ 12, 17 ("**Julie B. Decl.**").

The federal government, by way of both Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (2021), *et seq.* ("**Title IX**"), and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, recognizes and protects A.S.'s and A.B.'s right to be treated like any other boy or girl, respectively. And yet, on May 14, 2021, Tennessee Governor Bill Lee signed into law the so-called "Tennessee Accommodations for All Children Act," 2021 Tenn. Pub. Ch. 452, (the "**School Facilities Law**" or "**Law**" or "**TAACA**"). *See* Declaration of Adam S. Lurie in Support of Plaintiffs' Motion for a Temporary Restraining Order ("**Lurie Decl.**"), Ex. A. The School Facilities Law requires public schools to segregate individuals who are transgender, including students and faculty, when it comes to the use of certain facilities, including school bathrooms. Consistent with many harmful laws that courts have repeatedly struck down across the country, the School Facilities Law represents an unmistakably discriminatory act towards people who are transgender, despite purporting to provide "accommodations" to them.

Indeed, every federal appellate court to have considered a law or policy similar to the School Facilities Law has found that it violates Title IX, the Equal Protection Clause, or both. *See Dodds v. United States Dep't of Educ.*, 845 F.3d 217 (6th Cir. 2016); *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty., Fla.*, No. 18-13592, __ F.4th __, 2021 WL 2944396, at *4 (11th Cir. 2021);

*Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), as amended (Aug. 28, 2020), *cert. denied*, 2021 WL 2637992 (June 28, 2021); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017). There is no reason to depart from these and related precedents from across the country.

Even more offensive, the School Facilities Law achieves enforcement by creating a private cause of action for cisgender students, their parents, or legal guardians against any school that refuses to segregate transgender students on the notion that merely being in the same restroom as a transgender student causes psychological and emotional harm, warranting monetary damages. It is a bold declaration to say that A.S.'s and A.B.'s mere presence in a bathroom or locker room with non-transgender persons necessarily entitles those non-transgender persons to monetary damages, and attorneys' fees, for the emotional and psychological harm they would allegedly suffer from having to share space with A.S. or A.B. It is even more offensive that this legislation creates a perverse financial incentive for a student's cisgender peers or teachers to monitor the effective segregation of transgender people. This law does not attempt to hide its disdain for transgender people. Instead, it seeks to segregate them through the force of law and otherwise fosters a hostile environment.

As a result of Defendants' actions, Plaintiffs are deprived of full and equal access and enjoyment of WCSD's educational programs, activities and opportunities on the basis of their sex, and have suffered and continue to suffer educational, emotional, and physical harms, in violation of both Title IX and the Equal Protection Clause. Defendants' violation of Plaintiffs' constitutional and statutory rights have caused and will continue to cause Plaintiffs to suffer irreparable harm. A.B. – who is a girl – will be forced to use the boys' restroom or a private restroom away from her peers. She has been granted a brief respite of approximately 30 days during which she will be able

2

to use the girls' restroom, but must decide now whether to even start using the girls' restroom if that will end and further highlight her actions at the end of that period. A.S. will immediately need to use a private restroom or the girls' bathroom, despite being a boy. This discriminatory Law risks Plaintiffs' health and wellbeing – as already evidenced during the 2019-2020 school year by A.S. avoiding drinking liquids and only going to the restroom off-site after school in order to avoid the stigmatizing option he was given of using the nurse's bathroom during school when he was in the seventh grade. No student should be forced to undergo such discomfort and distress. Indeed, through their actions, Defendants diminish Plaintiffs' dignity, isolate them from their peers, stigmatize their identity, and attempt to force them to conform to their own ideas of sex and gender – at the cost of Plaintiffs' safety.

Plaintiffs sue to vindicate their statutory and constitutional rights, and thereby their dignity. As shown below, Plaintiffs are likely to succeed on their claims. Plaintiffs will suffer irreparable harm absent a temporary restraining order ("**TRO**") prohibiting the enforcement of the School Facilities Law. Defendants will not suffer any harm; in fact, granting Plaintiffs' requested TRO would serve the public interest, including by preventing the enforcement of a discriminatory and unconstitutional law. Accordingly, Plaintiffs respectfully request that the Court grant a TRO enjoining Defendants' enforcement of the School Facilities Law, and permitting Plaintiffs to use the school facilities that correspond with their gender identity, until such time as further provisional relief or final judgement is entered in this case.

## FACTUAL BACKGROUND

### A. Sex, Gender Identity, and Gender Dysphoria

Gender identity refers to one's innate sense of belonging to a particular gender. One's gender identity emerges at a young age and, by age four, "gender identity is stable." *See* David A. Levine, *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132

3

Am. Academy of Pediatrics e297, e299 (July 2013), https://pediatrics.aappublications.org/content/pediatrics/132/1/e297.full.pdf; *see also Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*, Substance Abuse and Mental Health Servs. Admin. 16 (2015), https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf. All people have a gender identity; for most, their gender identity conforms with their sex assigned at birth. Transgender people, however, experience a gender identity that is incongruent with their assigned sex. This Court has recognized that "gender identity, as a type of internally experienced phenomenon, *exists* [and] is supported by both medical research and, at least for many people, confirmed by the ordinary experience of being a human." *Bongo Prods., LLC v. Lawrence*, Case No. 3:21-cv-00490, 2021 WL 2897301, at *4 (M.D. Tenn. July 9, 2021) (emphasis in original).[1]

The American Psychiatric Association explains that being transgender is not an affliction to be fixed; it will not go away, and it "implies no impairment in [a person's] judgment, stability, reliability, or general social or vocational capabilities." Jack Drescher et al., *Position Statement on Discrimination Against Transgender and Gender Diverse Individuals*, APA Official Actions (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Discrimination-Against-Transgender-and-Gender-Diverse-Individuals.pdf. Numerous other leading representatives of the health care community, including the American Academy of Pediatrics, the American College of Physicians, and the American Academy of Child and Adolescent Psychiatry, join in this consensus. *See, e.g.*, Brief for Am.

---

[1] Unless otherwise indicated, all internal citations, quotation marks, ellipses, other modifications, and subsequent case history have been omitted from all case citations.

4

Academy of Pediatrics et al. as *Amicus Curiae*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), ECF No. 32-1 (hereinafter "**Academy of Pediatrics Amicus Br.**").

Many transgender people experience a condition known as "gender dysphoria," which the American Psychiatric Association recognizes as "the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people." Eric Yarbrough et al, *Gender Dysphoria Diagnosis*, Am. Psychiatric Ass'n (2017), https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis. Transgender children often begin to experience this dysphoria in the preschool period. Levine, *supra* at e298. The international consensus throughout the healthcare community is that the appropriate treatment for gender dysphoria is to support the transgender person in living in accordance with their gender identity. This process of "transitioning" may take several forms, not limited to: counselling, use of a new name and pronouns, new clothes and grooming, and age-appropriate medical care such as hormone blockers, hormone therapy and gender-confirming surgery. *See Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, World Prof'l Ass'n for Transgender Health 15–16, 18 (7th Version 2012), https://www.wpath.org/media/cms/Documents/SOC%20v7/SOC%20V7_English2012.pdf?_t=16 13669341. The primary goal for individuals experiencing gender dysphoria is "'identity integration,' where 'being transgender is no longer the most important signifier of one's identity' and the individual can refocus on their relationships, school, jobs, and other life activities." Academy of Pediatrics Amicus Br., *supra* at 16–17. "Transgender children who live in accordance with their gender identity in all aspects of life have lower rates of depression compared to transgender children who have not socially transitioned." *Id.* at 14.

In contrast to those supportive measures, forcing a transgender person to use a bathroom that does not align with their gender identity exacerbates gender dysphoria. Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378, 1388–89 (2016), https://scholarworks.gsu.edu/cgi/viewcontent.cgi?article=1065&context=ssw_facpub. This is especially true for transgender children, who "often experience intensified gender dysphoria and worsening mental health as the hormonal and anatomical changes associated with puberty cause the body to develop in ways that diverge from the child's gender identity." Academy of Pediatrics Amicus Br. at 10. Transgender children are already more likely to experience bullying and rejection from peers, which would be exacerbated by having to use a restroom that does not reflect the gender consistent with their sense of self and public identity, thereby potentially revealing their transgender status in the process. *See The Report of the 2015 U.S. Transgender Survey*, Nat'l Ctr. for Transgender Equality 134 (2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf. Given that transgender youth are particularly vulnerable for these reasons and spend so much of their time at school, schools have a responsibility to create protective environments that do not create additional risks for gender dysphoria. Indeed, multiple studies have found that school policies and programs intended to prevent bullying of LGBTQ students reduce rates of depression, suicidality, and other negative outcomes. *See Resolution on Gender and Sexual Orientation Diversity in Children and Adolescents in Sch.*, Am. Psychiatric Ass'n 1, 3 (2020) (recommending that schools allow students "to have access to the sex-segregated facilities, activities, and programs that are consistent with their gender identity, including, but not limited to, bathrooms, locker rooms, sports teams, and classroom activities"), https://www.apa.org/about/policy/orientation-diversity.

### B. The Plaintiffs

Plaintiffs are a six-year-old girl (A.B.) and 14-year-old boy (A.S.) who are both transgender. Julie B. Decl. ¶¶ 9–13; Amy A. Decl. ¶¶ 10, 15.

A.B. began using female pronouns when she was nearing five years old. Julie B. Decl. ¶¶ 12–13. From as young as two, A.B. preferred to play as female characters during dress-up. *Id.* ¶ 11. When A.B. was nearing five, her parents could tell she identified as a girl, and she expressed to them that she "has a boy body with a girl brain." *Id.* ¶. At her previous private school where she attended kindergarten, A.B. was not only able to use pronouns consistent with her gender identity, but also used the girls' restroom with no issues. *Id.* ¶ 16. A.B.'s parents built a home within WCSD near Nashville in 2018 because of the school system's great reputation. *Id.* ¶ 6. A.B., while fully expressing her gender identity, has many friends from the neighborhood and enjoys taking gymnastics classes (where she is enrolled in the girls' gymnastics class and uses the girls' bathroom). *Id.* ¶¶ 17–18. However, with the enactment of the School Facilities Law, optimism has turned to fear as the A.B.'s family now has to send their daughter to public elementary school in WCSD, where she will be the first and only transgender student. *Id.* ¶¶ 20–22.

A.B. will be entering first grade this year. *Id.* ¶ 19. In reaction to the new School Facilities Law, the Principal at A.B.'s elementary school has prepared a "Student Inclusion and Support Plan" for A.B. (the "**Support Plan**"). *Id.* ¶ 26. Under this Support Plan, A.B. will be allowed to use the girls' bathroom for the first month of the new school year. *Id.* However, notwithstanding this respite for the first month, A.B. will likely have to use the boys' bathroom or the private bathroom in the nurse's office after that first month, even though she always used the girls' bathroom at her previous school without incident. *Id.* ¶¶ 16, 26, 28. The Support Plan also explicitly notes that it "may be modified prior to [its expiration date] if necessary." *Id.* ¶ 26. A

7

decision for A.B.'s family is therefore imminent if they want to provide any semblance of consistency for A.B.

A.S. was assigned female sex at birth, but in 2019, at the end of his sixth-grade year, he came out as transgender. Amy A. Decl. ¶¶ 9, 15. His family moved to the Nashville area in 2018 and built their "forever home" they would love to live in for the rest of their lives. *Id.* ¶¶ 4, 7. In seventh grade A.S. socially transitioned at school. *Id.* ¶ 21. At that time, A.S. felt like he was "the trans kid" to his peers and it made him uncomfortable standing out so much. *Id.* The middle school that A.S. attended for seventh grade did not allow him to use the boys' bathroom even though there was no statewide legislation in effect at the time that prohibited him from doing so. *Id.* ¶ 22. A.S. was given the choice of the nurse's office bathroom, the guidance office bathroom, or a locked faculty bathroom, none of which were close to any of A.S.'s classrooms. *Id.* This made A.S. feel "different" and further alienated. *Id.* In response, A.S. stopped drinking liquids altogether throughout the school day so that he would not have to use the bathroom. *Id.* ¶ 23.

After coming out as transgender, A.S. attended eighth grade at a private school in the Nashville area, where the school agreed to use "he/him" pronouns, to use A.S.'s traditionally male name, and to allow A.S. to use the boys' bathroom, which he did without incident. *Id.* ¶ 26. As A.S. approaches entering ninth grade in a public high school, his parents are worried he will be forced to use the girls' restroom and feel pressured to hide his true gender identity, since the school has indicated that the only option for him (besides using the girls' bathroom) is to use a single-occupancy restroom. *Id.* ¶¶ 34–35. This will have a negative psychological impact on A.S. at a critical stage in his development as a young teen. *Id.* ¶¶ 34, 36. A.S. has told his mother that he "just wants to be a regular kid, a regular boy." *Id.* ¶ 27.

8

Both families are happy in Tennessee and plan to remain residents, if not for the new School Facilities Law. *See* Julie B. Decl. ¶¶ 31, 33; Amy A. Decl. ¶¶ 39, 42. They do not want to move, but if the Tennessee State Legislature continues to pursue this anti-transgender agenda, they worry they will have no choice but to leave. *Id.* Both will be negatively affected by having to leave their homes as the only viable solution to the School Facilities Law. This in turn will increase anxiety and the feeling of being singled out. A.B. would be negatively affected by this move as she would not only leave behind the only home she has ever known and many great friendships, but would also need to search for a new gender-affirming pediatrician and child therapist. Julie B. Decl. ¶ 31. Similarly, A.S. would leave behind his relationships and would need to find another gender-affirming pediatrician and therapist that specializes in gender identity issues. Amy A. Decl. ¶ 39.

C.     **The School Facilities Law**

In May 2021, Tennessee enacted the School Facilities Law, which restricts transgender students from using restrooms and locker rooms at schools that align with their gender identity. Under this law, public schools are required, "to the extent practicable," to provide a "reasonable accommodation" to a student, teacher, or employee who "[d]esires greater privacy [1] when using a multi-occupancy restroom or changing facility designated for [their] sex and located within a public school building, or [2] when using multi-occupancy sleeping quarters designated for [their] sex while [they are] attending a public school-sponsored activity." Lurie Decl., Ex. A § 4(a)(1).

The School Facilities Law provides in relevant part that a "reasonable accommodation" "includes, but is not limited to, access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility." *Id.* § 3(2). However, expressly excluded from the definition of "reasonable accommodation" is any "[a]ccess to a restroom or changing facility that

9

is designated for use by members of the opposite sex while members of the opposite sex are present or could be present." *Id.* § 3(2)(A).

The School Facilities Law strictly defines "sex" to mean "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth. Evidence of a person's biological sex includes, but is not limited to, a government-issued identification document that accurately reflects a person's sex listed on the person's *original* birth certificate." *Id.* § 3(4) (emphasis added). This narrow definition of "sex" obviates even the amending of birth certificates to reflect an individual's gender identity.

Finally, the new Law provides students (as well as their parents or legal guardians), teachers, and employees a private right of action to sue public school systems for "psychological, emotional, and physical harm," including monetary damages and "reasonable attorney fees and costs," if they encounter a transgender person in a multi-occupancy restroom or changing facility at a school that has "intentionally allowed a member of the opposite sex to enter the multi-occupancy restroom or changing facility while other persons were present." *Id.* § 6.

The School Facilities Law is a part of the "Slate of Hate" bills recently enacted by Tennessee, including laws: (1) preventing transgender students from participating in high school and middle school sports, *see* 2021 Tenn. Pub. Ch. 40; (2) preventing physicians from prescribing hormone treatment for prepubertal transgender youth, *see* 2021 Tenn. Pub. Ch. 460; (3) requiring public schools to notify parents before offering any curriculum about sexual orientation and gender identity, *see* 2021 Tenn. Pub. Ch. 281; and (4) requiring businesses with bathrooms open to the public to post a notice at the entrance of each public restroom if the business allows transgender individuals to use the restrooms corresponding with their gender identity, *see* 2021 Tenn. Pub. Ch. 453. This Court very recently issued a preliminary injunction against the last of these laws, and

questioned why the General Assembly felt the need to adopt this law "more than two centuries into the State's existence and after seemingly many decades of public restrooms being commonplace in Tennessee, and in America, without the need for such signage?" *Bongo*, 2021 WL 2897301, at \*3. Similarly, there has never been a need to deny transgender individuals the right to use the bathroom or other school facilities consistent with their gender identity in Tennessee. Consistent with this and other precedent, the Plaintiffs respectfully request the Court grant them a TRO enjoining enforcement of the School Facilities Law, and permitting them to use multi-occupancy restrooms and changing facilities at school consistent with their gender identity.

## LEGAL STANDARD

A TRO or preliminary injunction is properly granted where the plaintiff demonstrates that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (same). This Court considers the same factors when determining whether to issue a TRO or preliminary injunction. *Zagorski v. Haslam*, Case No. 3:18-cv-01205, 2018 WL 5454148, at \*2 (M.D. Tenn. Oct. 29, 2018), *aff'd*, 741 F. App'x 320 (6th Cir. 2018). These are "factors to be balanced, not prerequisites that must be met." *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC*, No. 3:19-CV-00981, 2019 WL 6050283, at \*3 (M.D. Tenn. Nov. 15, 2019). And where a party moves for a TRO "on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Husted*, 697 F.3d at 436.

11

**ARGUMENT**

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

### A. Plaintiffs are Likely to Succeed on Their Title IX Claim

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To establish a violation of Title IX, Plaintiffs must show that: (1) they were excluded from participation in an education program because of their sex; (2) the educational institution received federal financial assistance at the time of the exclusion; and (3) the discrimination harmed them. *Bd. of Educ. of the Highland Loc. Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 865 (S.D. Ohio 2016); *see also G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 718 (4th Cir. 2016), *vacated on other grounds*, 137 S. Ct. 1239 (2017). Plaintiffs satisfy all three elements.

First, because the School Facilities Law precludes Plaintiffs from using a multi-occupancy bathroom or changing facility that comports with their gender identity, they are excluded from an education program and suffer discrimination on the basis of sex. As the Sixth Circuit has held, "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004). Accordingly, at least one District Court in the Sixth Circuit has concluded that "*Smith* . . . supports a reading that under Title IX[,] discrimination on the basis of a transgender person's gender non-conformity constitutes discrimination 'because of sex.'" *Highland*, 208 F. Supp. 3d at 869. In *Highland* – which is virtually indistinguishable from the present case – the court granted a preliminary injunction

requiring a school district to allow an eleven-year-old transgender girl to use the girls' restroom, holding that "[a]ccess to the bathroom is . . . an education program or activity under Title IX," and that the transgender student was likely to prevail on her Title IX claim because she was "denied access to the communal girls' restroom 'on the basis of [her] sex.'" 208 F. Supp. 3d at 865, 870. Notably, the Sixth Circuit denied the defendants' motion to stay the preliminary injunction issued in *Highland*, holding in relevant part that defendants were unlikely to succeed on the merits of their appeal in light of the "settled law in this Circuit," as established in *Smith*, that discrimination "based on a person's gender non-conforming behavior is impermissible." *Dodds* 845 F.3d at 221. The Sixth Circuit later reaffirmed in *Equal Emp. Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, that "discrimination on the basis of transgender status necessarily entails discrimination on the basis of sex." 884 F.3d 560, 578 (6th Cir. 2018).

The U.S. Supreme Court's recent decision in *Bostock v. Clayton Cnty.*, which affirmed the Sixth Circuit's decision in *Harris Funeral Homes*, further supports the conclusion that Plaintiffs here have suffered impermissible discrimination "on the basis of sex." 140 S. Ct. at 1741 (noting that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex").[2] Indeed, in addition to *Highland* and *Dodds*, federal courts both pre- and post-*Bostock*, including several appellate courts, have held that excluding transgender students from using restrooms and related school facilities that comport with their gender identity is impermissible discrimination on the basis of

---

[2] Although *Smith*, *Harris Funeral Homes*, and *Bostock* involved interpretation of Title VII, courts consistently rely on Title VII caselaw in interpreting Title IX cases. *See, e.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX"); *Tumminello v. Father Ryan High Sch., Inc.*, 678 Fed. Appx. 281, 284 (6th Cir. 2017) ("[W]e turn to prior Title VII decisions to aid our interpretation of Title IX's 'on the basis of sex' requirement"); *Highland*, 208 F. Supp. 3d at 868 & n.7.

13

sex under Title IX.  *See Grimm*, 972 F.3d at 616–17 ("[T]he Board could not exclude Grimm from the boys bathrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate . . . . Therefore, the Board's policy excluded Grimm from the boys restrooms 'on the basis of sex.'"); *Whitaker*, 858 F.3d at 1049 (requiring "an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX"); *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1037 (S.D. Ind. 2018) (applying *Whitaker* and holding plaintiff likely to succeed on Title IX claim challenging exclusionary restroom policy).[3]

Second, the School Board receives federal financial assistance and is under Title IX's mandate.  *See* Lurie Decl., Ex. B at 2 (noting for fiscal year 2021 that the School Board will receive over $7.8 million in federal funding).

Third, the School Facilities Law causes the Plaintiffs numerous irreparable harms, including stigma, ostracization, anxiety, and distress during the formative years of their school education.  Under the Law, Plaintiffs are categorically barred from using a multioccupancy bathroom or changing facility associated with their gender identity.  Instead, they are forced to use bathrooms and changing facilities that correspond to what the Law deems their "immutable biological sex as determined by anatomy and genetics existing at the time of birth."  Lurie Decl.,

---

[3]     In light of *Bostock* and related federal precedents, both the U.S. Department of Justice's Civil Rights Division and the U.S. Department of Education have recently issued guidance that Title IX's prohibition on discrimination "on the basis of sex" includes discrimination on the basis of gender identity.  *See* U.S. Dep't of Just., Civ. Rights Div., Memorandum on the Application of *Bostock v. Clayton Cnty.* to Title IX of the Education Amendments of 1972 (Mar. 26, 2021), https://www.justice.gov/crt/page/file/1383026/download; Enforcement of Title IX of the Educ. Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton Cnty.*, 86 Fed. Reg. 32637-01 (Jun. 22, 2021).

14

Ex. A § 3(4).  Thus, A.B., a girl, is compelled to use the boys' bathroom, and A.S., a boy, must use the girls' bathroom.  Being one of few, if not the only, students in their respective schools who cannot use facilities that correspond with their gender identities threatens both psychological harm as well as the threat of physical harm.  Julie B. Decl. ¶¶ 22, 27–30; Amy A. Decl. ¶¶ 23, 33–37.  And the "alternative" of using a single-occupancy facility is just as harmful, as it singles Plaintiffs out as being among the only students in school who are not permitted to use a multi-occupancy facility, which is humiliating, ostracizing, and stigmatizing.  *See Grimm*, 972 F.3d at 617–18 (holding that the "stigma of being forced to use a separate restroom" constitutes harm under Title IX because it brands all transgender students with a "scarlet 'T'"); *Whitaker*, 858 F.3d at 1050 ("Providing a gender-neutral alternative is not sufficient to relieve the School District from liability, as it is the policy itself which violates the Act."); *Highland*, 208 F. Supp. 3d at 870–71 (harm established where plaintiff felt "stigmatized and isolated when she [wa]s forced to use a separate bathroom and otherwise not treated as a girl").  This is particularly true where the single-occupancy alternative for A.B. is located far from her classrooms, Julie B. Decl. ¶ 25, and in response to the Law, both A.S. and A.B. may adapt by simply not using the bathroom at all, threatening their health and their ability to focus on learning while at school.  Julie B. Decl. ¶ 28; Amy B. Decl. ¶ 34; *see Whitaker*, 858 F.3d at 1045, 1050.

Accordingly, Plaintiffs are likely to succeed on their Title IX claims.

**B.**     **Plaintiffs are Likely to Succeed on Their Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Thus, "the Equal Protection Clause prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than

15

others similarly situated without any rational basis for the difference." *Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019).

### 1. Heightened Scrutiny Applies to Plaintiffs' Equal Protection Claim

Numerous courts have held that "heightened scrutiny" applies in analyzing state laws that target transgender individuals. *See Adams*, 2021 WL 2944396, at *4 (applying heightened scrutiny to equal protection claim challenging school policy requiring transgender students to use single-occupancy restrooms or the restrooms that corresponded to the gender on their enrollment documents on grounds that policy constituted sex-based discrimination); *Grimm*, 972 F.3d at 608–14 (applying heightened scrutiny to school policy barring transgender students from using facilities associated with their gender identity, both because the policy constituted sex-based discrimination and because transgender persons are a "quasi-suspect" class); *Ray v. McCloud*, 507 F. Supp. 3d 925, 937–38 (S.D. Ohio 2020) (collecting cases and holding that "[u]pon review, the Court finds that transgender individuals are a quasi-suspect class entitled to heightened scrutiny."); *Highland*, 208 F. Supp. 3d at 874 (applying heightened scrutiny and concluding that transgender people are a quasi-suspect class because they have historically been subject to discrimination, there is no relationship between transgender status and the ability to contribute to society, transgender people are a "discrete group" defined by immutable and distinguishing characteristics, and they are a politically powerless minority group); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 140 (S.D.N.Y. 2015) (same).

For these reasons, the School Facilities Law is subject to heightened scrutiny.

### 2. The School Facilities Law does not Survive Heightened Scrutiny

To survive heightened scrutiny, Defendants must show that the School Facilities Law "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Highland*, 208 F. Supp. 3d at 871

(quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)) (other internal citations and quotation marks omitted). "The governmental interests enumerated must be real, as opposed to merely speculative." *Id.* (quoting *Bernal v. Fainter*, 467 U.S. 216, 227–28 (1984)) (internal quotation marks omitted). The justification must be "exceedingly persuasive," and "[t]he burden of justification . . . rests entirely on the State." *Virginia*, 518 U.S. at 533.

Here, there is no legitimate governmental objective – let alone an important one – served by the School Facilities Law, and the discriminatory means used in the Law are not "substantially related" to achieving those interests.

The text of the School Facilities Law is entirely silent on the legislature's reasons for passing the Law. There are no legislative findings or declarations of intent, and no evidence that might demonstrate why it was necessary to enact this particular law at this particular time. However, the subtext is unmistakably clear: the School Facilities Law is aimed at protecting *non-transgender* persons who are "aggrieved" by sharing a multi-occupancy bathroom or changing facility with a transgender person, including where they suffer "psychological, emotional, and physical harm" from doing so. Lurie Decl., Ex. A § 6. Indeed, the School Facilities Law's legislative history demonstrates that it was enacted principally to "remove[] the burden and stress from teachers, administrators, parents and students." *Tennessee Accommodations for All Children Act*, H.B. 1233 Before the House Floor Sess. - 25th Legislative Day (statement of Rep. Jason Zacary, Apr. 19, 2021), https://tnga.granicus.com/MediaPlayer.php?view_id=610&clip_id=24699. Representative Gloria Johnson also noted that "this bill offers separate but unequal accommodations for transgender students . . . we're talking about the safety of students but we're not talking about the safety of *all* students." *Id*. (statement of Rep. Gloria Johnson, Apr. 19, 2021) (emphasis added).

17

In rejecting a similar law recently enacted by Tennessee requiring businesses to post a notice if they permit transgender persons to use public restrooms, this Court in *Bongo* considered legislative history and held that when the law was properly considered "in context and against the existing cultural backdrop, . . . of course the signs required by the Act are statements about the nature of sex and gender and the role of transgender individuals in society. Justice is blind, but the court does not have to play dumb." 2021 WL 2897301, at *10.

Similarly, the School Facilities Law "was devised, quite consciously and explicitly, as a direct response to social and political trends involving transgender people." *Id.* at *11. It is also "impermissibly arbitrary" and not substantially related to achieving any important governmental interests (whatever Defendants might claim those are), and thus violates the Equal Protection Clause. *Adams*, 2021 WL 2944396, at *6. Indeed, as noted above, the Law defines "sex" as one's "immutable biological sex as determined by anatomy and genetics *existing at the time of birth*," including but not limited to "the person's *original* birth certificate." Lurie Decl., Ex. A § 3(4) (emphasis added). Thus, for students like A.S. who were born outside of Tennessee and are able to change their birth certificate,[4] the Law ignores (without justification) the legal effect of such documents. In *Adams*, the Eleventh Circuit found a similar school policy arbitrary for a similar reason, noting "[t]he policy [at issue there] requires, without justification, that the School District reject information on current government records in favor of outdated information provided at the time the student enrolled," and that the School District provided "no explanation for why a birth certificate provided at the time of enrollment takes priority over the same document provided at the time the bathroom policy is applied to the student." *Adams*, 2021 WL 2944396, at *6.

---

[4]     A.S. was born in New Jersey. Amy A. Decl. ¶ 9. Under New Jersey law, A.S. is able to change his birth certificate to reflect his gender identity. *See* N.J. Stat. Ann. § 26:8-40.12.

18

Similarly here, the Law requires schools to "reject" current information in favor of evidence establishing one's sex "at the time of birth," including as reflected on an "original" birth certificate. Lurie Decl., Ex. A § 3(4). There is no justification for the Law's requirement that schools reject "government-issued documents [that] constitute controlling identification for any other purpose." *Adams*, 2021 WL 2944396, at *6.

And even for students like A.B. who were born in Tennessee and are thus unable to change their birth certificates, *see* Tenn. Code Ann. § 68-3-203(d), there is no "exceedingly persuasive" justification for the Law. To the extent the Defendants might suggest that the Law serves the important interest of protecting cisgender students' right of "privacy" not to share multi-occupancy restrooms or changing facilities with transgender students, this rationale has been roundly rejected by numerous federal courts that have considered nearly identical laws and policies. Indeed, the notion that Plaintiffs' presence in facilities consistent with their gender identity would somehow invade the bodily privacy of other students in a way that the presence of cisgender students of the same gender identity in those very same areas would not, is egregious. Like similarly-situated plaintiffs in related cases, Plaintiffs here do "not challenge the existence of sex-segregated bathrooms and do[] not question the ubiquitous societal practice of separate bathrooms for men and women." *Adams*, 2021 WL 2944396, at *4. However, by barring transgender students from using the bathrooms and related school facilities that correspond to their gender identity, the Law does not pass heightened scrutiny under the Equal Protection Clause.

For example, in *Grimm*, the court found the school board's policy was not substantially related to its purported goal of protecting non-transgender students' privacy because "bodily privacy of cisgender boys using the boys restrooms did not increase when Grimm was banned from those restrooms." *Grimm*, 972 F.3d at 614. In support, it noted that Grimm had previously

19

used the boys' bathroom for seven weeks "without incident." *Id*. At their prior schools, both A.S. and A.B. used the bathrooms that corresponded with their gender identity, and similarly did so without incident. Amy A. Decl. ¶ 26; Julie B. Decl. ¶ 16. There is no basis on which to conclude that their use of the boys' and girls' bathrooms, respectively, when they enroll in school this fall will suddenly create issues that have never surfaced before. *See Whitaker*, 858 F.3d at 1052 (rejecting privacy argument based upon "sheer conjecture and abstraction" and finding school's policy did "nothing to protect the privacy rights of each individual student vis-à-vis students who share similar anatomy"); *Highland*, 208 F. Supp. 3d at 874 ("There is no evidence that Jane herself, if allowed to use the girls' restroom, would infringe upon the privacy rights of any other students."); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 293 (W.D. Pa. 2017) (likelihood of success established where there was "insufficient record evidence of any actual threat to any legitimate privacy interests of any student by the Plaintiffs' use of such restrooms consistent with their gender identity"); *see also Grimm*, 972 F.3d at 614 (noting that "both the Third and Ninth Circuits have now rejected privacy-related challenges brought by cisgender students to the shared use of restrooms with transgender students of the opposite biological sex) (citing *Parents for Privacy v. Barr*, 949 F.3d 1210 (9th Cir. 2020); *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518 (3d Cir. 2018)).

To the extent Defendants might justify the Law on the basis of protecting cisgender students' safety, this argument has also been rejected, particularly in light of the safety issues that *transgender* students can face when forced to use a bathroom or other facility that does not correspond to their gender identity. Here, both plaintiffs' parents have well-founded concerns for their children's physical safety if they are forced to use a bathroom that does not correspond to their children's gender identity, including because it may exacerbate the already high suicide rates

experienced by transgender youth. *See* Amy A. Decl. ¶¶ 32, 34, 39; Julie B. Decl. ¶¶ 27, 29, 31. Thus, any justification Defendants might offer that the Law protects student "safety" fails. *Highland*, 208 F. Supp. 3d at 876–77; *J.A.W.*, 323 F. Supp. 3d at 1039 (holding that neither "student safety [n]or the need to prevent 'disruption' [wa]s an exceedingly persuasive justification for [the school's] transgender restroom policy"); *see also* Gabriel Murchison et al., *School Restroom and Locker Room Restrictions and Sexual Assault Risk Among Transgender Youth*, J. of the Am.Academy of Pediatrics 1 (2018) (concluding that "[y]outh whose restroom and locker room use was restricted were more likely to experience sexual assault compared with those without restrictions"), https://pediatrics.aappublications.org/content/pediatrics/143/6/e20182902.full.pdf.

In short, the Law does not serve any important governmental objective, and the means used are not substantially related to any interest the Defendants might proffer.

## II. PLAINTIFFS WILL SUFFER SIGNIFICANT IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF

 "Irreparable harm is presumed as a matter of law when a moving party shows that a constitutional right is being threatened or impaired. And there is likewise a presumption of an irreparable injury when a plaintiff has shown a violation of a civil rights statute." *Highland*, 208 F. Supp. 3d at 877–78. Thus, Plaintiffs "can show irreparable injury simply because both [their] Title IX claim and constitutional claim are likely to succeed on the merits." *Id.* at 878.

Presumption aside, Plaintiffs will suffer irreparable harm as a result of the School Facilities Law for several reasons. First, being precluded from using the bathroom that comports with their gender identity will results in feelings of marginalization, isolation, distress, anxiety, and discomfort, because it separates Plaintiffs from the rest of the entire student body and brands them as being "different" or "Other." Amy A. Decl. ¶¶ 34–37, 40; Julie B. Decl. ¶¶ 27–30. *See Whitaker*, 858 F.3d at 1045 (irreparable harm established where exclusionary bathroom policy,

which identified student as transgender and therefore "different," caused plaintiff "significant psychological distress and place[d] [him] at risk for experiencing life-long diminished well-being and life-functioning"); *Highland*, 208 F. Supp. 3d at 878 ("The stigma and isolation Jane feels when she is singled out and forced to use a separate bathroom . . . is a clear case of irreparable harm to an eleven-year-old girl."); *Evancho*, 237 F. Supp. 3d at 294 (similar holding); *J.A.W.*, 323 F. Supp. 3d at 1039 (similar holding).

Moreover, any "alternative" of using a single-occupancy restroom, such as a restroom in the nurse's office, is just as stigmatizing and may lead Plaintiffs to avoid using the restroom at all, at the expense of their health and ability to focus on their education. Amy A. Decl. ¶ 34; Julie B. Decl. ¶ 28. Indeed, A.S. has already lived under a school bathroom policy similar to but preceding enactment of the School Facilities Law, which led him to avoid drinking liquids during the day and avoid bathroom use at school completely. Amy A. Decl. ¶ 23. With the Law now in place, A.S. will likely revert to doing the same when he enters ninth grade, and A.B. may adopt a similar coping mechanism. Amy A. Decl. ¶ 34; Julie B. Decl. ¶ 28. Courts have recognized that such "alternatives" to inclusive policies are not reasonable and further establish irreparable harm. *See Whitaker*, 858 F.3d 1045 (irreparable harm established where student "was faced with the unenviable choice between using a bathroom that would further stigmatize him and cause him to miss class time, or avoid use of the bathroom altogether at the expense of his health"); *J.A.W.*, 323 F. Supp. 3d at 1039 (similar holding).

Similarly, the so-called "Support Plan" that A.B.'s school has offered, which would allow her to use the girls' bathroom for the first month of school, will *exacerbate* A.B.'s harm by confusing a six-year-old girl who might be, one month into first grade, suddenly told she has to start using the boys' bathroom or the bathroom all by herself in the nurse's office. Julie B. Decl.

¶ 28. *See Dodds*, 845 F.3d at 221–22 (holding that staying preliminary injunction "would disrupt the significant improvement in Doe's health and well-being that has resulted from the injunction, further confuse a young girl with special needs who would no longer be allowed to use the girls' restroom, and subject her to further irreparable harm").

Further, using the restroom that is inconsistent with their gender identity will lead to the disclosure of Plaintiffs' transgender status to others, and may subject Plaintiffs to bullying if they use a bathroom that does not match their gender identity. Amy A. Decl. ¶¶ 34–35; Julie B. Decl. ¶¶ 27–29. *See J.A.W.*, 323 F. Supp. 3d at 1039.[5]

Accordingly, Plaintiffs will suffer irreparable harm absent a TRO because the damaging effects of the Law during Plaintiffs' formative years will be long-lasting and cannot be adequately compensated.

## III.    THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS' FAVOR

The balance of equities favors granting the requested TRO. "The degree of likelihood of success that need be shown to support a preliminary injunction varies inversely with the degree of injury the plaintiff might suffer." *Legatus v. Sebelius*, 988 F. Supp. 2d 794, 815 (E.D. Mich. 2013). As stated above, it is highly likely that Plaintiffs will ultimately prevail in this matter. Plaintiffs have demonstrated that, absent the granting of a TRO, they will continue to suffer irreparable

---

[5]     *See also* Brian S. Barnett et al., *The Transgender Bathroom Debate at the Intersection of Politics, Law, Ethics, and Science*, 46 J. of the Am. Academy of Psychiatry and the Law 232, 235 (Nov. 2, 2018) ("[T]ransgender individuals are often victims of sexual assault."), http://jaapl.org/content/jaapl/46/2/232.full.pdf; Daniel Trotta, *U.S. transgender people harassed in public restrooms: landmark survey*, REUTERS (Dec. 8, 2016) ("Almost 60 percent of transgender Americans have avoided using public restrooms for fear of confrontation."), https://www.reuters.com/article/us-usa-lgbt-survey/u-s-transgender-people-harassed-in-public-restrooms-landmark-survey-idUSKBN13X0BK.

23

harms. In turn, Defendants cannot point to any possible harms should the TRO be granted. This factor clearly weighs in Plaintiffs' favor.

In addition, the experience of school districts across the country with inclusive policies and practices demonstrates that allowing transgender students to use the sex-designated facilities consistent with their gender identity will not cause any disruption, but rather will result in positive outcomes. *See Whitaker*, 858 F.3d at 1054–55 (school district did not demonstrate that it would suffer harm from complying with injunction, particularly in light of evidence from school administrators throughout the country which demonstrated that "all students' needs are best served when students are treated equally"). The State of Tennessee will not suffer any hardship from an injunction enjoining the enforcement of this patently discriminatory law, or permitting Plaintiffs to use the school facilities corresponding to their gender identities. Indeed, "enforcing the United States Constitution against a state government is a vindication, not a derogation, of the enduring importance of state autonomy." *Bongo*, 2021 WL 2897301, at \*14. It is highly unlikely that injunctive relief would impede any powers held by the State of Tennessee. *See id.* (granting a preliminary injunction and holding that "[b]ecause the court finds a high likelihood of success with regard to the plaintiffs' constitutional challenges, it finds a low likelihood that the injunctive relief would intrude on any powers legitimately retained by the State of Tennessee.").

## IV. THE PUBLIC INTEREST STRONGLY FAVORS GRANTING A TRO

As the Sixth Circuit has explained, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009). Furthermore, "'the overriding public interest lays in the firm enforcement of Title IX.'" *Highland*, 208 F. Supp. 3d at 878 (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir.1993)). Accordingly, courts have consistently held that it is in the public interest to enjoin enforcement of a discriminatory law that prevents transgender students from using the bathroom and related school

24

facilities that correspond to their gender identity. *See Dodds*, 845 F.3d 222 (denying motion to stay preliminary injunction requiring school to permit transgender girl to use the girls' bathroom, and holding that the injunction was in the public interest); *see also Whitaker*, 858 F.3d at 1054–55; *J.A.W.*, 323 F. Supp. 3d at 1041–42; *Evancho*, 237 F. Supp. 3d at 294–95.

Accordingly, the public interest strongly favors granting the requested TRO[6].

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant a temporary restraining order and a preliminary injunction, in the form submitted herewith.

Dated:     August 2, 2021

<div style="margin-left:40%">

Respectfully submitted,


By:  */s/ Tricia Herzfeld*
Tricia Herzfeld (BPR #26014)
BRANSTETTER STRANCH & JENNINGS PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
T: (615) 254-8801
F: (615) 255-5419
triciah@bsjfirm.com

Adam S. Lurie*
Erez Liebermann*
Andrew Pak*
Sean Mooney*
Adreane Reynolds*
Kunal Kanodia*
Rebecca Zeldin*

</div>

---

[6]    The Court should exercise its discretion and not require Plaintiffs to post any bond in connection with the TRO. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court properly exercised its discretion in waiving bond requirement under Fed. R. Civ. P. 65(c) given the "the strength of *Eagle–Picher*'s case and the strong public interest involved"); *FemHealth, USA, Inc. v. City of Mount Juliet*, 458 F. Supp. 3d 777, 805 n.27 (M.D. Tenn. 2020) (similarly declining to require a bond in light of the "the strength of the movant's case and . . . strong public interest . . . present").

LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
erez.liebermann@linklaters.com
andrew.pak@linklaters.com
sean.mooney@linklaters.com
andy.reynolds@linklaters.com
kunal.kanodia@linklaters.com
rebecca.zeldin@linklaters.com

Sarah Warbelow*
Jason Starr*
HUMAN RIGHTS CAMPAIGN FUND
1640 Rhode Island Avenue NW
Washington, D.C. 20036
T: (202) 628-4160
F: (202) 628-0517
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org

* Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of August, 2021 a true and exact copy of the foregoing document has been served via Electronic Mail upon the following:

Mike Jennings
326 North Cumberland
Lebanon, TN, 37087
mjenningslaw@aol.com
*Counsel for Wilson County Schools*
*and Jeff Luttrell*

Alex Rieger
Rainey Lankford
Office of Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
alex.rieger@ag.tn.gov
rainey.lankford@ag.tn.gov

*/s/ Tricia Herzfeld*
Tricia Herzfeld