# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father,<br><br>       Plaintiffs,<br><br>    v.<br><br>BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY III, in his official capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, in his official capacity as Director of the Wilson County Schools; and DOES 1–10,<br><br>       Defendants. | Case No. _____ |

## DECLARATION OF AMY A.

I, Amy A., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Plaintiff as well as the mother of A.S., also a Plaintiff in the above-captioned case. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. I make the statements herein of my own personal knowledge and if called upon to testify thereto I could and would so truthfully.

  **A.**  **Background About my Family and our Move to the Nashville Area in 2018**

2. My husband, Jeff S., and I have been married for 23 years.

3. We are parents to two children, including A.S., a Plaintiff in this action.

4. Our family moved to the Nashville area from Pennsylvania in 2018 so that my husband could pursue an exciting career opportunity. My husband is currently the Vice President of Marketing for a popular national restaurant chain. My husband's current role in the company

1

is very important to him and to his company. His goals include moving the company towards being a more inclusive and modern organization, both internally and for consumers.

5. I am a teacher by training and spent my career as a middle and high school French and Spanish teacher, beginning in private schools in 1990. I took a break from teaching to attend graduate school and then returned. I stopped working after the birth of our first child in 2003 and stayed home with our children until 2014. I then taught middle school French and Spanish until 2018, when our family moved to the Nashville area.

6. Although my husband and I are both originally from the Northeast and raised our children in Pennsylvania for most of their lives prior to moving to the Nashville area, we love the area and our neighborhood here.

7. When we moved here, we built our "forever" home because we can imagine living in this house for the rest of our lives.

8. Like many parents, we chose our community and neighborhood in large part because of the great public-school district that the Wilson County School District is considered to be. We are a very tight-knit community, love to be involved as much as we can, and A.S. has many friends in the neighborhood. For example, when the COVID-19 pandemic began in the spring of 2020, a group of neighbors and I produced thousands of masks in a crafting assembly line where each person had a different task before passing the incomplete mask materials to the next person. This is the sort of caring and selfless community in which I want to raise my children.

**B.     Our Son A.S. Came Out as Transgender in 2019, When he was 12 Years Old**

9. Our son A.S. was born in 2007 in New Jersey, and assigned female sex at birth.

10. A.S. is currently 14 years old.

2

Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 2 of 14 PageID #: 75

11. A.S. loves reading and art. He enjoys making collages, and creates digital art with the Procreate app on his iPad. A.S. recently finished the young adult fantasy series, "The Raven Cycle," by Maggie Stiefvater.

12. A.S. enjoys listening to music, including the band Gorillaz, Mitski (a Japanese-American singer-songwriter), Destroy Boys (a punk rock band), and Hatsune Miku (a virtual voice synthesizer software turned virtual pop idol).

13. Like many children his age, A.S. also enjoys video games. Some of his favorites are the popular open world crafting and creation game, Minecraft; Omori, a role-playing game with psychological thriller elements; and Splatoon, a team-based "turf war" style game for the Nintendo Switch.

14. When we first moved to the Nashville area, A.S. was preparing to enter the 6th grade.

15. In the spring of 2019, at the end of his 6th grade year, A.S. came out as transgender. Before A.S. came out, I noticed that he had seemed upset for a few days and was not acting like his normal self. One day while driving in the car, I tried to coax him into telling me what was bothering him, and he eventually told me: "I feel more comfortable thinking of myself as a boy."

16. My husband and I were of course supportive albeit taken aback at first. But as a mother, my first job is to protect, support, and love my child. That unconditional mother's love means that I will stand behind A.S. and do whatever needs to be done to provide him with the best life I can.

17. My husband and I initially had some difficulty with adjusting to A.S.'s desire to be referred to with "he/him" pronouns, as many people do when interacting with a transgender person for the first time, and we certainly slipped up on occasion. It was hard at first to get used to changing the way we thought about our child after years of seeing A.S. as female. But my husband

3

Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 3 of 14 PageID #: 76

and I love A.S., as any parent loves their child, and we've put in the work to relearn how to think of A.S.'s gender and to learn about raising a transgender child, so that A.S. can have as happy and normal of a life as a young teen as we can provide for him.

18. As a part of that process, my husband and I learned about gender dysphoria, transitioning, microaggressions, misgendering, and deadnaming. Some of this I had previously learned about when I once had a transgender student in one of my classes when I taught French and Spanish. I made a point at the time to educate myself on the issues young transgender people face so that I could be supportive of and best serve my student.

19. For example, I learned that students are usually registered with the school administration using their birth names, and that these official lists may not necessarily be updated to reflect a transgender student's new name. Most teachers with "out" transgender students are aware of their students' new names and will use those names in class. However, if a substitute teacher is needed at any point during the school year, the school will provide the substitute with an attendance list pulled from the official register, which may reflect a transgender student's old birth name. Thus, the teacher may (even if unintentionally), "deadname" a transgender student by using his/her birth name, rather than their new name that comports with their gender identity, or misgender a transgender student by referring to them with pronouns that are inconsistent with their gender identity. Even when done accidentally, deadnaming and misgendering can be perceived as communicating to a transgender person disapproval of their gender identity. For this reason, whenever I had a substitute teacher, I made a point to always replace the student's deadname on the attendance sheet generated from the school's registration system with their preferred name, so that the substitute teacher could avoid deadnaming or misgendering the student.

20. After A.S. came out to us as transgender, I started to look for a therapist that specializes in gender identity development issues. I scheduled an appointment in March and A.S. had his first session with the therapist on April 10, 2019. The therapist found A.S. to be experiencing feelings typically associated with gender dysphoria, which is a medical condition characterized by clinically significant distress caused by an incongruence between a person's gender identity and the person's assigned sex at birth. The therapist also hosts several support groups for kids and young adults struggling with gender identity issues. The monthly group sessions meet for an hour and a half and typically around a dozen kids attend.

C. **A.S.'s Experience as a Transgender Boy**

21. The first school year that A.S. was fully "out" as transgender was the 7th grade, which began in the fall of 2019. That means that A.S. began to use a name associated with males, dressed in typically male clothing, and asked to be referred to with "he/him" pronouns. At that time, A.S. expressed to me that he felt like he was "the trans kid" to his peers and that that was largely how he was perceived, which made him feel isolated and "othered." Despite wanting to be just a "regular" boy, A.S. seemed to feel that others viewed him as first and foremost a transgender person, rather than as an individual with unique desires, interests, and beliefs. It made him uncomfortable and anxious to feel like he stood out so much – especially at that age – but thankfully A.S. has always had a supportive group of friends and was comforted by them.

22. Compounding A.S.'s difficulties in transitioning to live in accordance with his new gender identity, the middle school that A.S. attended for 7th grade did not allow him to use the boys' bathroom, because that was not the bathroom that corresponded to the sex he was assigned at birth. There was no statewide legislation in effect in Tennessee at the time that prohibited A.S. from using the boys' bathroom. Instead, this was a decision made by the school administration with respect to A.S. when I raised the issue about which bathroom A.S. would use at school.

5

Instead of using the boys' bathroom, A.S. was given the choice of the nurse's office bathroom, the guidance office bathroom, or a locked faculty bathroom. None of these bathrooms were close to any of A.S.'s classrooms and using them made A.S. feel like he stood out, "different," and further alienated.

23. What's more, I quickly realized how this affected A.S. and his everyday experience at school, and that the school's "policy" with respect to my son would be unworkable. For example, rather than using any of the "alternative" bathrooms the school offered, A.S. would stop drinking liquids throughout the school day altogether so that he wouldn't have to use the bathroom at all. A.S. usually rode the bus to and from school, and most days would race home from the bus stop to get to the bathroom. On days that I would pick him up to take him to after-school activities, he would often ask to stop at a Starbucks nearby to use the restroom. It was very difficult for me to see this as a mother (and a teacher), knowing that my son was depriving himself of any liquids throughout the day and resisting the urge to go to the bathroom just to avoid the stigma associated with his being the only boy not allowed to use the boys' bathroom. I want my son to feel comfortable at school and to focus on his learning, which was impeded by the school administration's policy that prevented my son from using the boys' bathroom.

24. It is also clear to me that this experience heightened A.S.'s feelings of gender dysphoria. I could tell that my child was in pain and there seemed to be very little, if anything, I could do to help A.S.

25. The COVID-19 pandemic began during the spring of 7th grade, which meant that A.S. was attending school remotely full-time from home. This avoided these kinds of issues.

26. When A.S. began 8th grade in the fall of 2020, we enrolled him in a private school. He attended that school both remotely and in-person, as COVID-19 restrictions began to ease. The private school was very accommodating, happily agreeing to use "he/him" pronouns, to use

6

Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 6 of 14 PageID #: 79

his traditionally male name, and to allow A.S. to use the boys' bathroom, which he did without issue.

27. As A.S. has gotten older, he has told me that he "just wants to be a regular kid, a regular boy." A.S. seems to me to be getting worn down by standing out among his peers as a transgender person, and just wants to be seen and treated like any other young boy without any special attention, and without being subject to politically motivated legislation that specifically targets his everyday life based on things about himself that he can't change. Recently, he seems to have tried to "blend in" with less colorful clothing, and it hurts me to watch him struggle with fitting in, as it would hurt any mother to watch their child struggle.

28. As part of his effort to be perceived and treated as a "typical 14-year-old boy," A.S. has recently expressed interest in trying out for soccer and baseball. My husband and I have of course tried to support him as best we can, but because my husband isn't terribly athletic or coordinated, it's been a running joke in the family that we're not much help with sports. Unfortunately, Tennessee recently passed a bill limiting transgender students' right to participate in school sports, dictating that a student's gender must be determined according to their gender at birth. Thus, no matter where my son turns, the state legislature is prepared to thwart his efforts to be just a "typical 14-year-old boy."

29. A.S.'s efforts to be a "typical boy" may also be being thwarted by his atypical intelligence that has had him placed in gifted programs since the 1st grade, his being an avid reader, and being a part of a family that frequently engages in lively political discussion *ad nauseum*. While A.S. faces many of the same struggles to "fit in" as other boys his age, his transgender status only amplifies these challenges.

30. A.S.'s attempts to find male friends have on occasion been abruptly cut short when A.S. has heard his male peers casually throw out homophobic slurs. A.S. seems to feel that the

social climate of Tennessee is becoming increasingly homophobic and transphobic, and that the legislature's agenda is both a cause and effect of that change. As a mother who knows her child, I can see that A.S. is afraid in Tennessee, and that breaks my heart.

### D. We are Very Concerned About the Effect of the New Discriminatory School Facilities Law

31. On August 5, 2021, A.S. will begin high school as a freshman in the 9th grade. Unfortunately, unlike most boys his age, A.S. is not looking forward to beginning high school.

32. In May 2021, Tennessee enacted a bill that restricts my son's ability to use the restroom in his school building consistent with his gender identity (the "School Facilities Law") and instead forces him to choose between using the girls' restroom despite being a boy and accepted as being a boy by his peers and teachers, stand out even more by only using a single-occupancy restroom, or avoid using a restroom at school altogether. In addition to attacking my son's basic human dignity, this Law threatens my son's safety and life.

33. As far as we are aware, A.S. is one of few transgender students who will be attending a high school in the Wilson County School District in the fall of 2021.

34. I am worried that if A.S. is forced to use the girls' restroom or a single-occupancy restroom, he will feel pressure to conform to a gender identity that does not reflect his true self. I am also worried that A.S. will react the same way he did in 7th grade, and just stop drinking liquids altogether and not use the bathroom at all while at school. Thus, in addition to exacerbating A.S.'s feelings of being different, marginalized, and "othered," I worry about his health in the long term if he doesn't hydrate or go to the bathroom for hours on end, and his ability to focus on his primary job while at school: learning. If A.S. does not have the option of using the boys' bathroom like the other boys at his school, it will have a negative psychological impact on A.S. at a critical stage in his development as a young teen. Transgender students have high suicide rates brought on by gender dysphoria and resultant social pressure, and I am worried that A.S.'s being precluded from

8

Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 8 of 14 PageID #: 81

using the boys' bathroom, and instead forced to use the girls' bathroom, a single-occupancy bathroom, or just not go to the bathroom at all, will negatively impact his health and wellbeing. A.S. may also be subject to bullying or other physical threats if he is the only boy who uses the girls' bathroom, or is targeted because he has to use a single-occupancy restroom just because he's transgender.

35. In July 2021, I emailed the administration at the school where A.S. will attend 9th grade about restroom and locker room accommodations for A.S. as a transgender student. The Principal responded that the campus will allow students who need accommodations to use single-occupancy restrooms. He was not sure about policies for transgender students using locker rooms for P.E. classes. I worry that the school will require A.S. to use a single-occupancy bathroom or other facility to change for P.E. classes rather than the boys' locker-room, which will no doubt set A.S. apart from his peers and further alienate him for all of the same reasons associated with his being precluded from using the boys' bathroom.

36. A.S. has repeatedly expressed extreme discomfort with the recent bout of transphobic bills that have passed through the state legislature, including the School Facilities Law. He seems to feel that the State of Tennessee, and as a direct result many of the people in it, hate him for something about himself he can't change. I wish I could shield my son from that enormous weight, and I worry every day what effects that weight has on his mental and emotional wellbeing.

37. My husband and I worry that this initial slate of transphobic legislation, including the School Facilities Law, is only the beginning. We seriously worry that Tennessee will continue to pursue a legislative agenda that makes my son feel like he doesn't belong. As a mother, I want to—and need to—do everything I can to fight to protect my son and make him feel safe and loved. A.S. just wants to be a typical boy, and I won't sit back and let anyone attack him for that.

9
Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 9 of 14 PageID #: 82

38. I have already begun the process of advocating for my son's rights in the legislature, but to no avail. For instance, I tried to set up a Zoom call with State Representative Susan Lynn, got a confirmation email, and then on the day of the meeting no one showed up. I called her office, but no one answered. I left a message but did not receive any replies. I also contacted Governor Lee and emailed his Chief Counsel, Lang Wiseman, twice with no results. The only representative I successfully reached was Representative John Ray Clemmons, who was one of the few who voted against the School Facilities Law. I am trying to speak with the Tennessee legislature to help illustrate and explain the effects of these bills on families in their state, but feel completely unheard.

39. Because of this and to protect A.S. and our family, we have considered moving away from Tennessee and our beloved community and leaving our dream home behind because of our fear for our son's safety at school as well as his mental and emotional wellbeing. It would be very difficult to move because of all the new relationships we would have to build from scratch, including finding a gender-affirming pediatrician and a therapist specializing in transgender issues for A.S.

40. A.S. has often expressed to us his discomfort with feeling "othered" in Tennessee, and has gone as far as to ask my husband and I to send him to boarding school in California. My husband and I found this striking, as the two of us met while working at a boarding school and have shared with A.S. some of the challenges to the students and families that we observed while working there.

41. A.S. has nonetheless continued to suggest going to boarding school in California to get away from the transphobic legislation in Tennessee. A.S., who never texts his parents, has even gone as far as to find and then text a job posting in California for a Vice President of Marketing position for a ballet company to my husband in hopes that he could get us to move out of Tennessee and away from the discrimination.

10

Case 3:21-cv-00600   Document 4   Filed 08/02/21   Page 10 of 14 PageID #: 83

42. My husband and I are very happy in Tennessee, and I believe A.S. could be too if it weren't for the cultivation of a social climate that makes him feel hated and rejected. My husband loves his job that is based here in the Nashville area. His current role as Vice President of Marketing for a national restaurant chain is a rare opportunity that may not present itself again if we are forced to move to another state. Jeff has spoken to his supervisor about the possibility of moving, but has not yet spoken with the CEO about moving or working remotely. All of the discussions Jeff has been able to have were inconclusive, and it's not yet clear if he would be able to keep his job if we were forced to move out of state. In addition, I love the house that we built here when we moved. We don't want to move, and we don't want to send A.S. away from us, but if the Tennessee state legislature continues to pursue an agenda that hurts my child, I worry that we won't have any choice but to abandon everything we've built here in the Nashville area.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 2, 2021.

*Amy A.*

Dated: August 2, 2021  Respectfully submitted,

By: /s/ Tricia Herzfeld
Tricia Herzfeld (BPR #26014)
BRANSTETTER STRANCH &
JENNINGS PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
T: (615) 254-8801
F: (615) 255-5419
triciah@bsjfirm.com

Adam S. Lurie*
Erez Liebermann*
Andrew Pak*
Sean Mooney*
Andreane Reynolds*
Kunal Kanodia*
Rebecca Zeldin*
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
erez.liebermann@linklaters.com
andrew.pak@linklaters.com
sean.mooney@linklaters.com
andy.reynolds@linklaters.com
kunal.kanodia@linklaters.com
rebecca.zeldin@linklaters.com

Sarah Warbelow*
Jason Starr*
HUMAN RIGHTS CAMPAIGN FUND
1640 Rhode Island Avenue NW
Washington, D.C. 20036
T: (202) 628-4160
F: (202) 628-0517
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org

* Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father*

**CERTIFICATE OF SERVICE**

       I hereby certify that on the 2nd day of August, 2021 a true and exact copy of the foregoing document has been served via Electronic Mail upon the following:

Mike Jennings
326 North Cumberland
Lebanon, TN, 37087
mjenningslaw@aol.com
*Counsel for Wilson County Schools
and Jeff Luttrell*

Alex Rieger
Rainey Lankford
Office of Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
alex.rieger@ag.tn.gov
rainey.lankford@ag.tn.gov

                                                          */s/ Tricia Herzfeld*
                                                          Tricia Herzfeld