# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

A.S., a minor, by his next friends, AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends, JULIE B., mother, and ROSS B., father,

      Plaintiffs,

v.

BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY III, in his official capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, in his official capacity as Director of the Wilson County Schools; and DOES 1–10,

      Defendants.

Case No. _____

## DECLARATION OF JULIE B.

I, Julie B., pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Plaintiff as well as the mother of A.B., also a Plaintiff in the above-captioned case. I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. I make the statements herein of my own personal knowledge and if called upon to testify thereto I could and would so truthfully.

  **A.**  **Background About my Family and our Move to the Nashville Area**

2. My husband, Ross B., and I have been married for 19 years.

3. We are parents to one child, A.B., a Plaintiff in this action.

4. I'm originally from Florida, and my husband is originally from southern Illinois. We moved to the Nashville area in 2003 because I have family in Knoxville, Tennessee, and Nashville is about equidistant between Knoxville and where Ross' family is located in Illinois.

5. My husband is a pilot for a private airline and travels frequently. I work in commercial real estate and while I am able to work from home and be with A.B., various site visits and meetings with clients are a necessary component of the job that would likely be impossible to do if we had to move out of state.

6. My husband and I built a home in Wilson County three years ago, which we call our "forever home" because of our love for our house and neighborhood. We chose our neighborhood in large part because of the great reputation of the Wilson County School District.

7. My husband and I feel happy in our community in the Nashville area. We have lived in the area for nearly 20 years and have stayed for so long because of the friendships we have made in the community. I also like to be involved in the community. For instance, I volunteered with the Tennessee Equality Project to contact our local legislators to help advocate for the equal rights of LGBTQ people in Tennessee in response to the recent slate of anti-LGBTQ (and in particular anti-transgender) legislation the state has passed. I similarly participated in a Human Rights Campaign roundtable discussion addressing this so-called "slate of hate" bills the state has recently enacted.

**B. Our Daughter A.B. Came Out as Transgender in 2019, When she was 4 Years Old**

8. Our daughter A.B. was born in Nashville and assigned male sex at birth.

9. A.B. is currently 6 years old.

2

10. An anonymized picture of A.B. is below:



11. When she was around 2 years old, we noticed that A.B. always played the female character when she played dress-up. She only identified with the female characters in the children's movies she watched. She insisted on roleplaying as Elsa from the popular Disney movie, "Frozen," even after I told her "no, you're [A.B.]"[1] She would respond, "no, Momma, A.B. is Elsa." A.B. has also always loved Princess Poppy from DreamWorks' "Trolls," and has had a long running obsession with American dancer, singer, actress, and YouTube personality JoJo Siwa. To this day, A.B. loves to dress up as a princess.

12. When A.B. was nearing 5 years old, I looked for ways to give her the words to express what she was feeling because I could tell she identified as a girl. I bought lots of children's

---

[1] This occurred before I knew of A.B.'s gender identity but it can nevertheless be seen as an example of deadnaming or misgendering. Deadnaming is when someone, intentionally or not, refers to a transgender person by their birth name after they have started using a new name with which they identify. Misgendering is referring to a transgender person as the gender with which they do not identify. A.B. had not gone by another name at this point but in this instance, I referred to her as the name and gender with which she did not identify. Deadnaming or misgendering, even if accidental, can be very harmful to a transgender person, including because it indicates to them that their true gender identity is somehow "wrong."

books on transgender issues, including a popular one called "I am Jazz," which tells the story of a transgender girl. When I read her one of the lines of the book, where the main character explains in essence that she has the body of a boy, but the mind of a girl, A.B. lit up. She looked up at me excitedly and told me that the main character of the book was like her, and that she too had a "boy body with a girl brain." She kept telling me, "that's me, Momma!"

13. After A.B. told me this, my husband and I brought A.B. to a child therapist at the end of 2019 so that we could better understand what A.B. needed and wanted. After her meeting with her child therapist, I asked A.B. what pronoun she wanted us to use and she said "she." I also asked her whether she wanted us to call her our daughter or son and she said "daughter." I could tell that A.B. was expressing her true self in the only way she knew how. A.B.'s therapist also diagnosed A.B. with gender dysphoria.

### C. A.B.'s Experience as a Transgender Girl

14. Because A.B. came out as transgender at 4 years old, she has always attended school as a girl.

15. I previously attempted to enroll A.B. in the elementary school in the district zoned for our neighborhood. On February 23, 2020, I reached out to the school Principal, in anticipation of A.B. starting kindergarten in the fall of 2020. I wanted to discuss the school's student support policies with respect to gender identity, and in particular with respect to accommodating transgender children. Due to the Principal pushing back our meeting over the course of a few months, we made the decision to not register A.B. for kindergarten in the Wilson County School District.

16. Accordingly, we enrolled A.B. at a private kindergarten and had a great experience there. When A.B. enrolled in kindergarten, we asked the school to use "she/her" pronouns when referring to her and that A.B. use the girls' restroom. The private school was very understanding and agreed to do so, which did not cause any issues for A.B., the other students, or their parents. This protected A.B. from any negativity from others that comes with her expressing her true gender identity.

17. During A.B.'s kindergarten year, my husband and I were able to shield A.B. from overt transphobic incidents. A.B. is friends with many of the children from our neighborhood and the ones that have known her from before she expressed her gender identity have sometimes used the wrong pronouns. This has not affected A.B. yet. When this occurs, A.B. explains to her friends that her correct pronoun is "she" and reminds them – just like the protagonist in "I am Jazz" – that she is "a girl in a boy's body."

18. A.B. also attends gymnastics classes at a facility associated with USA Gymnastics and enjoys it immensely. There, she is enrolled in the girls' gymnastics class and is also able to use the girls' bathroom, and there have been no problems with her doing so.

**D. We are Very Concerned About the Effect of the New Discriminatory School Facilities Law**

19. On August 5, 2021, A.B. will enter 1st grade at the elementary school zoned for our neighborhood. This is the same school in which I attempted to enroll her for kindergarten. Although we were very happy with the private kindergarten A.B. attended, that school does not enroll students beyond kindergarten.

20. We were excited for A.B. to start 1st grade and attend school in the Wilson County School District – the great public school system is the main reason we chose to live in our neighborhood.

21. However, in May 2021, Tennessee enacted a bill that restricts my daughter's ability to use the restroom in her school building according to her gender identity (the "School Facilities Law") and instead forces her to choose between using the boys' restroom despite being a girl and being accepted by her peers and teachers as a girl, stand out even more by only using a single-occupancy restroom, or avoid using a restroom at school altogether.

22. As far as we are aware, A.B. is the only transgender student who will be attending her elementary school in the fall of 2021.

23. I had reached out to my representative for the Tennessee House of Representatives, John Ray Clemmons, when voting on the School Facilities Law occurred in March 2021, sharing my distress over the prospect of the School Facilities Law passing and that it would result in directly harming transgender students, like my daughter, by forcing schools in my daughter's school district to not provide accommodations for transgender students and thus further stigmatize them.

24. I also attempted to contact a number of other Tennessee legislators using an online mail form set up by the Tennessee Equality Project regarding the School Facilities Law. I added personalized messages to the legislators using the web form and asked them as the parent of a transgender child not to support the bill. I exchanged emails with one state legislator who was shocked by their colleagues' rushed efforts to pass the School Facilities Law and refusal to educate

themselves about the issues involved or consider opposing views. The state legislator I spoke with told me via email that they were "very upset that [other legislators] refuse to even answer questions or take the time to consider the perspective of our children." The legislator went on to say that:

> Not one person on [the relevant] subcommittee even knew what I was talking about when I mentioned gender dysphoria. The truth of the matter is that they don't care enough to even learn. I don't think any of them are going to change their perspective or opinion, but I would ask you to try to educate them. Also, they think they can just sit up here and discriminate against kids with no repercussions. I would be sure and make sure they know that you are watching. Thanks for reaching out. I am very sad and disappointed that this is moving forward and that I couldn't do more.

25. In anticipation of A.B. starting first grade in the fall of 2021, and while the School Facilities Law was still pending, I reached out to the Principal at the elementary school she will attend on January 27, 2021 to speak to her about accommodations they can provide for my daughter. I finally met with the Principal on March 5, 2021 after following up with her for weeks. At this meeting, the Principal agreed to use A.B.'s "she/her" pronouns but mentioned they did not have a transgender inclusion plan in place. She said that A.B. will have to use the boys' bathroom even though she used the girls' bathroom in her previous school without incident. As an alternative, the Principal offered that A.B. use the nurse's bathroom, which is located at the front of the school and is far away from the classrooms. The Principal stated she would refer me to the school's legal counsel because they were waiting for direction from the state legislature on whether the School Facilities Law would be enacted.

26. After the School Facilities Law was enacted, the Principal said that the only accommodation they can provide for A.B. is a "Student Inclusion and Support Plan," which would consist of A.B. being able to use the girls' bathroom for the first month of school, from August 5,

7

2021 through August 31, 2021. After that time, however, the Student Inclusion and Support Plan will be "reviewed," and A.B. may be forced to either use the boys' bathroom (since that corresponds to the gender she was assigned at birth, in accordance with the School Facilities Law), or to use the nurse's bathroom. The Plan also explicitly notes that it "may be modified prior to [its expiration date] if necessary." Due to her young age, A.B. does not fully understand the ramifications of the School Facilities Law. When I explained to her that she may have to use the boys' bathroom, she told me that she finds it odd that she will have to use the boys' restroom because she likes to sing girl songs in the bathroom which she thinks the boys may not like.

27. I am very concerned with my daughter having to use the boys' restroom because she is small and classmates will visually identify her as a little girl. I am fearful for her safety if she has to use the boys' bathroom after August 31 as the school has proposed because I know that bullying of transgender youth often happens in bathrooms and A.B. will be a target as the only transgender child at the school. The alternative to use the nurse's bathroom does not alleviate my concerns because these restrooms are located far away from A.B.'s classroom and I am unsure whether A.B. will be supervised when she has to use these restrooms. Usually, the only kids who use the nurse's restroom are children who have had an accident and need to change. A.B. will be stigmatized if she has to use the nurse's restroom and I do not want A.B. to be further ostracized by her peers due to this association.

28. I shared my concerns with the Principal on the "Support Plan" being inadequate. The Principal mentioned that there are no guarantees that A.B. will be able to use the girls' restroom, and even if the school allows her to use the girls' restroom for some time, the school

8

may change its mind at any time. Further, as discussed above, the Principal has indicated that after the Plan expires, A.B. will likely have to use the boys' bathroom in light of the new law. This policy is bound to confuse and upset my daughter. In kindergarten, there were no issues with A.B. using the girls' bathroom. In her gymnastics class, A.B. uses the girls' bathroom and has done so without incident. For the first month of 1st grade, she will also be able to use the girls' bathroom. But then suddenly A.B. will no longer be able to do so, and will have to either use the boys' bathroom or the nurse's bathroom. Suddenly being forced to use the boys' bathroom in 1st grade, and being the only girl in the school who uses the boys' bathroom, or the only student in school who is required to use the nurse's bathroom at all times, will be very confusing and alienating to a 6 year old, and will make her feel "different" from her friends and peers. I'm afraid these feelings at such a young age may have significant and long-lived, irreversible effects on A.B.'s psychological and emotional wellbeing. I'm also afraid that A.B. may decide to avoid using the bathroom while at school altogether if she isn't allowed to use the girls' restroom, which will impact not only her physical health, but impair her ability to focus on her lessons while at school.

29. I am also worried that if A.B. is forced to use the boys' restroom, she risks the disclosure of her transgender status, bullying, and that she will feel pressure to conform to a gender identity she does not identify with, thereby exacerbating her gender dysphoria. This will have a negative psychological impact on A.B. at the very young age of 6 years old. Transgender students have high suicide rates brought on by gender dysphoria and resultant social pressure and

I am worried that A.B. being forced to use the boys' bathroom or the nurse's bathroom will have an adverse mental impact on her.

30. My hope and dream for my daughter is for her to grow up happy and accepted like other children are. I want her to have the same rights and protections as other children. If she is not afforded the same right to use the bathroom of her gender identity, I am afraid of the negative impact it will have on A.B.'s childhood.

31. Although we love our community and moved to this school district because of its stellar reputation, we have considered moving out of state due to the school's refusal to accommodate A.B.'s use of the girls' bathroom at her school and because of our fear for our daughter's safety at school. Moving would be heartbreaking for our whole family, including A.B., because of all the friendships we have made in our neighborhood that we would have to leave behind. Importantly, we would also have to find a new gender-affirming pediatrician and a child therapist for A.B.

32. My job situation would also make it difficult for me to move. While I have the option of working remotely at times, I work in property management which entails that I visit buildings and sites often. It is essential for me to be physically located in Tennessee for my job because of these on-site requirements, and I would also need the approval of my clients to move, which is not guaranteed. Similarly, given that there are limited job opportunities at the present time for private pilots like my husband, moving would also jeopardize my husband's ability to secure consistent employment.

33. If we decide to move, it would only be because we no longer believe that it is tenable to raise A.B as the girl that she is in Tennessee in light of the recent slate of anti-transgender legislation that has been passed, and which clearly signals to us – and A.B – that our family and families like ours are not welcome in this state. In particular, this will signal to A.B that she is unacceptably "different," or alternatively, that her fundamental identity – which she cannot change – is wrong.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 2, 2021.

_____
Julie B.

11

Dated: August 2, 2021

Respectfully submitted,

By: /s/ Tricia Herzfeld
Tricia Herzfeld (BPR #26014)
BRANSTETTER STRANCH &
JENNINGS PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
T: (615) 254-8801
F: (615) 255-5419
triciah@bsjfirm.com

Adam S. Lurie*
Erez Liebermann*
Andrew Pak*
Sean Mooney*
Andreane Reynolds*
Kunal Kanodia*
Rebecca Zeldin*
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
T: (212) 903-9000
F: (212) 903-9100
adam.lurie@linklaters.com
erez.liebermann@linklaters.com
andrew.pak@linklaters.com
sean.mooney@linklaters.com
andy.reynolds@linklaters.com
kunal.kanodia@linklaters.com
rebecca.zeldin@linklaters.com

Sarah Warbelow*
Jason Starr*
HUMAN RIGHTS CAMPAIGN FUND
1640 Rhode Island Avenue NW
Washington, D.C. 20036
T: (202) 628-4160
F: (202) 628-0517
Sarah.Warbelow@hrc.org
Jason.Starr@hrc.org

* Motions for admission *pro hac vice* forthcoming

*Attorneys for Plaintiffs A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father*

# **CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of August, 2021 a true and exact copy of the foregoing document has been served via Electronic Mail upon the following:

Mike Jennings
326 North Cumberland
Lebanon, TN, 37087
mjenningslaw@aol.com
*Counsel for Wilson County Schools*
*and Jeff Luttrell*

Alex Rieger
Rainey Lankford
Office of Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202
alex.rieger@ag.tn.gov
rainey.lankford@ag.tn.gov

                                                          */s/ Tricia Herzfeld*
                                                          Tricia Herzfeld