**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

|  |  |
|---|---|
| A.S., a minor, by his next friends AMY A., mother, and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother, and ROSS B., father, | |
| *Plaintiffs*, | |
| v. | Hon. William L. Campbell, Jr. Civil No. 3:21-cv-00600 |
| BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY III, in his official capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, in his official capacity as Director of the Wilson County Schools; and DOES 1–10, | |
| *Defendants*, | |

---

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

---

Defendants Bill Lee, as Governor of Tennessee, and Herbert H. Slatery III, as Attorney General for the State of Tennessee, in their official capacities only ("State Defendants"), oppose Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. The Motion should be denied because Plaintiffs unreasonably delayed in seeking injunctive relief and have not carried their heavy burden to establish an entitlement to the "extraordinary and drastic remedy" of preliminary relief. *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1977) (per curiam)).

## BACKGROUND

In April of 2021, the General Assembly passed House Bill 1233/Senate Bill 1376 by overwhelming majorities in both Houses. Governor Lee signed House Bill 1233 into law on May

1

14, 2021, as Public Chapter 452, the Tennessee Accommodations for All Children Act (the "Act"). The Act furthers the State's interests in protecting the bodily integrity and privacy interests of students, teachers, and employees in public schools. Plaintiffs request that a temporary restraining order be placed on the enforcement of the entire Act, which took effect on July 1, 2021.

**A.     The Challenged Statute**

As pertinent here, the Act aims to provide a "reasonable accommodation" to any public school student, teacher, or employee who:

> Desires greater privacy when using a multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex and located within a public school building, or when using multi-occupancy sleeping quarters designated for the student's, teacher's, or employee's sex while the student, teacher, or employee is attending a public school-sponsored activity.

(DE 6-1, § 4(a)(1).)

"Reasonable accommodation," as defined by the Act includes, but is not limited to, "access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility." (DE 6-1, § 3(2).) A reasonable accommodation does not include "[a]ccess to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present." (DE 6-1 § 3(2)(A).) Neither does it include "[r]equesting that a school construct, remodel, or in any way perform physical or structural changes to a school facility; or [r]equesting that a school limit access to a restroom or changing facility that is designated for use by members of the opposite sex." (DE 6-1, § 3(2)(B)–(C).)

Public schools and local education agencies ("LEA") within the State that "intentionally allow[] a member of the opposite sex to enter [a] multi-occupancy restroom or changing facility while other [students, teachers, or employees] were present" are subject to a private right of action for monetary damages within one year of the alleged violation. (DE 6-1 § 6(a)-(e).)

2

### B. Case History

Plaintiffs—two sets minors who identify as transgender and are currently enrolled in Tennessee public schools—allege by their parents as next friends that they have been subject to disfavored treatment on the basis of their gender identity and that the Act violates the Equal Protections Clause as well as Title IX. (DE 1.) Contemporaneously with the filing of their Complaint, and a mere *three days* before the start of the school year, Plaintiffs moved for a temporary restraining order and a preliminary injunction "enjoining [the State] from enforcing the [Act] . . . " (DE 2.)

### ARGUMENT

The preliminary relief Plaintiffs seek is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Glowco*, 958 F.3d at 539 (emphasis in original) (quoting *Mazurek*, 520 U.S. at 972). To determine whether such extraordinary relief is warranted, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause a substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015). Moreover, a party seeking preliminary relief must establish a *substantial* likelihood that federal jurisdiction exists before a court may award that relief. *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020); *Waskul v. Washtenaw Cnty. Community Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018). Because Plaintiffs have not made the requisite clear showing that they are entitled to preliminary relief, their motion for a temporary restraining order

and/or preliminary injunction should be denied.

**I.     Plaintiffs Are Unlikely to Succeed on the Merits.**

**A.     Plaintiffs' Sought-After Preliminary Injunctive Relief Is Barred by Laches.**

Plaintiffs' request for a temporary injunction is barred by laches. "[L]aches, the Sixth Circuit has explained, "is a negligent and unintentional failure to protect one's rights." *See United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir.1991)). A defendant asserting laches, then, must show that: (1) the plaintiff delayed unreasonably in asserting its rights, and (2) the defendant is prejudiced by this delay. *See id.* (quoting *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)). Both elements are met here.

*First*, Plaintiffs unreasonably delayed in seeking a temporary restraining order. The statute Plaintiffs challenge—the Tennessee Accommodations for All Children Act—was signed into law on May 14, 2021, and took effect on July 1, 2021. *See* 2021 Tenn. Pub. Ch. 452; *see also* Compl., DE 1, PageID# 11, ¶ 43. Plaintiffs claim that they will be harmed by this law because they will be unable to use their preferred bathrooms once the school year begins on August 5, 2021. *See* Compl., DE 1, PageID# 4, ¶ 10, 11. Plaintiffs, however, waited until August 2, 2021, to file their complaint and motion for a temporary restraining order. *See generally* Compl., DE 1; TRO Mot., DE 2. In other words, Plaintiffs waited nearly three months after the law was signed and just over one month after it went into effect to bring their suit and to move for this emergency relief, leaving only two full business days to resolve their motion.

But it's worse than that. While the law was not signed until May 14, 2021, Plaintiffs knew about it long before then. Indeed, months before the law was enacted, Plaintiffs' parents "made repeated attempts to contact state legislators regarding the [challenged] law." *See* Compl., DE 1,

PageID# 18, ¶ 70. Both parents contacted state legislators as early as February of 2021 to voice their opposition to the law. *See id.* at PageID# 18, ¶ 72; *see also id.* at PageID# 19, ¶ 80. And the parents' communications with state legislators continued through March, April, and May. *See id.* at PageID# 19–21, ¶ 73–85. Finally, in July of 2021, after the law had gone into effect, one Plaintiff's mother—Amy A.—contacted the administration of Plaintiff A.S.'s high school about the effects of the law and what it meant for her child's school experience. *Id.* at PageID# 21, ¶ 86.

All of this means that Plaintiffs knew about the law for the last six months. Plaintiffs even took affirmative steps to oppose the law's passage and, once it passed, to understand its effects. But despite their knowledge and demonstrated willingness to act, Plaintiffs declined to file suit until August 2, 2021—less than 72 hours before the start of their children's school year and thus the start of the alleged harms they seek to avoid. This "is inexcusable delay." *Advoc. Org. For Patients & Providers v. Mercy Health Servs.*, 987 F. Supp. 967, 969–970 (E.D. Mich. 1997) (concluding that a request for a TRO to stop a merger was barred by laches when the plaintiffs knew about the planned merger for three months but filed their motion "the eve of the merger"); *see also Corizon, LLC v. Wainwright*, No. 3:20-CV-00892, 2020 WL 6323134, at *7, 11 (M.D. Tenn. Oct. 28, 2020) (finding that a plaintiff failed to "act[] with diligence" when it "knew everything it needed to file the present lawsuit" for "almost three months").

*Second*, Plaintiffs' delay will prejudice Defendants. "Prejudice," some courts have recognized, "can be inferred simply from the plaintiff's delay, or from evidence of specific harm." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va.), *aff'd*, 471 F. App'x 219 (4th Cir. 2012) (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990)); *see also Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 800 (M.D. Tenn. 2020) (recognizing that "at this late stage, a certain amount of prejudice can be presumed"). And "[t]he greater the delay, the less prejudice required

to show laches." *Perry*, 840 F. Supp. 2d at 954. Given Plaintiffs' inexcusable delay here, then, Defendants need not show much prejudice. *See id.* But that is not to say that Defendants cannot show prejudice. To the contrary, Plaintiffs' eleventh-hour temporary injunction is all but certain to prejudice Defendants.

For one thing, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (recognizing that enjoining a State from enforcing its laws would "seriously and irreparably harm the State"). Here, the duly elected members of Tennessee's legislature passed the Tennessee Accommodations for All Children Act. It follows that the State would suffer "irreparable injury" if this Court were to issue Plaintiffs' requested temporary restraining order. *See Maryland*, 567 U.S. at 1303.

And this injury is compounded by the timing of Plaintiffs' request. Again, Plaintiffs waited until August 2, 2021, to request a temporary restraining order. That is less than 72 hours before Plaintiffs will return to school. *See* Compl., DE 1, PageID# 4, ¶ 10, 11. That timeframe is far too short for the "nuanced policy decisions" that their requested relief requires. *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016). Indeed, those are precisely the sort of decisions that "no one should be making at the eleventh hour." *See id.*; *see also id.* at 398 (recognizing, in the election context, that "[w]hen an election is imminent and when there is inadequate time to resolve factual disputes and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures" (cleaned up)).

In sum, both elements of laches are present here. And for that reason, this Court should exercise its discretion to conclude that laches bars Plaintiffs' eleventh-hour request for a temporary

restraining order.  *See Memphis A. Phillip Randolph Inst.*, 473 F. Supp. 3d at 800.

> **B.**     **Plaintiffs' Claims Against State Defendants Are Barred by Sovereign Immunity.**

Each "State is a sovereign entity in our federal system." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).  A "fundamental aspect" of that sovereignty is immunity from suit. *Alden v. Maine*, 527 U.S. 706, 713 (1999). The Eleventh Amendment itself "confirms" that a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe*, 517 U.S. at 54 (quoting *Hans v. Louisiana*, 134 U.S. 1, 11 (1890)).  And a "'suit against a state official in his or her official capacity is not a suit against the official,'" *see Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); it "is a suit against the State itself," *id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).  That is true "regardless of whether [the suit] seeks damages or injunctive relief." *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 444–45 (6th Cir. 2019) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)).

Here, each of the State Defendants is a State official.  *See* Tenn. Const. art. VI, § 5 (Attorney General); Tenn. Const. art. III, § 1 (Governor).  And each State Defendant has been sued in his or her official capacity. (DE 1, ¶¶ 14–15.)  So this action "is a suit against the State itself," *Russell*, 784 F.3d at 1046, which means that the Eleventh Amendment is a "true jurisdictional bar" to the suit unless an exception applies, *id.*[1]

> **1.**     **The *Ex parte Young* exception applies when a State official enforces or**

---

[1] Consistent with much Sixth Circuit and Supreme Court precedent, the State Defendants use the term "Eleventh Amendment immunity" to refer to their structural immunity from suit under the Constitution, not merely the additional immunity they enjoy based on the text of the Eleventh Amendment. *See PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2263–65 (2021) (Gorsuch, J., dissenting) (helpfully distinguishing between "structural" sovereign immunity, which is at issue here, and true "Eleventh Amendment immunity").

**has threatened to enforce an allegedly unconstitutional statute.**

The Supreme Court established an exception to a State's Eleventh Amendment sovereign immunity in *Ex parte Young*, 209 U.S. 123 (1908). There, the Court held that the plaintiffs could seek an injunction in federal court against a state official to prohibit him from enforcing an allegedly unconstitutional state law. *Id*. at 159–68. This exception to State sovereign immunity rests on the "fiction," *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997), that "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102.

The *Ex parte Young* exception, though, does not "permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought" against a state official. *Coeur d'Alene Tribe of Idaho*, 521 U.S. at 270. Such an interpretation "would be to adhere to an empty formalism" and would "undermine" the purpose of the Eleventh Amendment. *Id*.; see also *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 268 (2011) (Roberts, C.J., dissenting) (observing that while the Court has "consistently acknowledged the important role *Ex parte Young* plays in 'promot[ing] the vindication of federal rights,'" it has also been "cautious not to give that decision 'an expansive interpretation'" (quoting *Pennhurst*, 465 U.S. at 105, 102)). Instead, the *Ex parte Young* exception permits suits to proceed only where the state official has "some connection with the enforcement of the [allegedly unconstitutional statute]." *Ex parte Young*, 209 U.S. at 157. That connection "is the important and material fact" that allows the claim to proceed. *Id.*

Because a state official's connection with enforcement is essential, the Sixth Circuit has consistently held that "[g]eneral authority to enforce the laws of the state is not enough to make government officials the proper parties to litigation challenging the law." *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996) (quoting *1st Westco Corp. v.*

*Sch. Dist. Of Phila.*, 6 F.3d 108, 113 (3d Cir. 1993)). In Children's Healthcare, the Sixth Circuit held that the plaintiffs' suit against the attorney general of Ohio was barred by the Eleventh Amendment because the plaintiffs were "not complaining of any action by" the attorney general. *Id*. at 1416. The attorney general "[had] not threaten[ed] to commence and was not about to commence proceedings against the plaintiffs, much less proceedings to enforce an allegedly unconstitutional act." *Id*. (footnotes omitted). And for that reason, the court held that *Ex parte Young* did not apply. *Id*.

The Sixth Circuit reaffirmed in *Russell*, that *Ex parte Young* applies only when there is a realistic threat of adverse action by the state defendant. *See* 784 F.3d at 1046–48. Although the Sixth Circuit held in *Russell* that *Ex parte Young* applied to an action against Kentucky's attorney general, it did so because the Kentucky Attorney General's Office had jurisdiction to investigate and prosecute violations of the challenged Kentucky election laws, had "repeatedly fielded and investigated complaints of impermissible electioneering," and had "promised the public that it would pursue possible criminal sanctions." *Id*. at 1047. The Attorney General's threat of prosecution, the Sixth Circuit reasoned, was enough to satisfy the requirement of *Ex parte Young* that the state official enforce or threaten enforcement of the challenged act. *Id*. The Sixth Circuit similarly concluded that *Ex parte Young* permitted an action against the Kentucky Secretary of State and the State Board of Elections, because it found "a realistic possibility" that they would "take legal or administrative actions against the plaintiff's interests." *Id*. at 1047–49.

And just two years ago, the Sixth Circuit reiterated that the "exception to sovereign immunity created in *Ex parte Young* has been read narrowly." *EMW Women's Surgical Ctr.*, 920 F.3d at 445 (citing *Children's Healthcare*, 92 F.3d at 1415). It permits suits for prospective injunctive relief against "State officials who are 'clothed with some duty in regard to the

9

enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce against parties affected an unconstitutional act, violating the Federal Constitution.'" *Id*. (quoting *Ex parte Young*, 209 U.S. at 156). The exception does not apply, the Sixth Circuit observed, "'when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute.'" *Id*. "General enforcement authority is insufficient." *Id*. For the exception to apply, "[t]here must be 'a realistic possibility the official will take legal or administrative actions against the plaintiff's interests.'" *Id*. (quoting *Russell*, 784 F.3d at 1048).

Other courts are in accord. They have consistently held that sovereign immunity bars suits for prospective relief against state officials when those officials play no direct role in enforcing the challenged law. *Texas Democratic Party v. Hughs*, No. 20-50683, 2021 WL 1826760 (5th Cir. May 7, 2021) (suit against Texas Secretary of State to challenge voting rules was barred by sovereign immunity because the Secretary did not enforce the challenged rules); *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467-69 (5th Cir. 2020) (same for both Secretary of State and Governor); *Okpalobi v. Foster*, 244 F.3d 405, 409 (5th Cir. 2001) (en banc) (7 of 14 judges concluding that sovereign immunity barred suit against Governor and Attorney General to challenge a law that created a private cause of action but contained no public enforcement mechanism).[2]

## 2. The *Ex parte Young* exception does not apply here.

As discussed above, the *Ex parte Young* exception exists only to allow a federal court to

---

[2] This "requirement that there be some actual or threatened enforcement" has been "repeatedly applied by the federal courts" to dismiss suits against governors, attorneys general, and other state officials. *Okpalobi*, 244 F.3d at 415–16 (plurality opinion) (collecting cases). This is because "[t]he purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001); see also *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) ("[S]tate officials must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty.").

issue "an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment, to the injury of complainant." *Ex parte Young*, 209 U.S. at 159. No such injunction is possible here, though, because none of the State Defendants has taken—or even has authority to take—any "steps toward enforcement" of the challenged law against Plaintiffs. Indeed, Plaintiffs have not alleged that any State Defendant has taken an action that would constitute enforcement of the challenged law against Plaintiffs. Nor could they. The Act merely requires public schools to provide a private bathroom for persons who desire greater privacy and creates a cause of action by a student, parent, legal guardian, teacher, or employee against the school for damages related to psychological, emotional, or physical harm caused by exposure to a member of the opposite sex in a multi-occupancy restroom or changing facility. There is nothing in the Act for State Defendants to enforce against Plaintiffs, and thus the *Ex parte Young* exception cannot apply.

At bottom, *Ex parte Young* "abrogates a state official's Eleventh Amendment immunity when a suit challenges the constitutionality of a state official's action." *Children's Healthcare*, 92 F.3d at 1415 (citing *Pennhurst*, 465 U.S. at 102). Without this action requirement, the constitutionality of any State law could be tested by suits against the governor and the attorney general. *See Ex parte Young*, 209 U.S. at 157. No matter how "convenient" that might be, it is not the law. *See id*. The State official named as a defendant "must have some connection with the enforcement" of the challenged law because any other approach would "merely mak[e] . . . the state a party." *See id*. Here, neither the Attorney General nor the Governor have any "connection with the enforcement" of the challenged law against Plaintiffs, so the *Ex parte Young* exception does not apply. Thus sovereign immunity requires the dismissal of both State Defendants and

Plaintiffs, therefore, cannot demonstrate a likelihood of success on the merits.

**C.** **Plaintiffs Lack Standing to Pursue their Claims against State Defendants.**

Article III of the United States Constitution limits the jurisdiction of federal courts to cases and controversies. U.S. Const. art. 3, § 2. The doctrine of standing is "an essential and unchanging part of the case-or-controversy requirement," and defines the boundaries of jurisdiction under Article III by "identifying those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Thus, as a threshold matter, federal courts are "under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines" that a plaintiff must satisfy. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations and citation omitted); *see Copas v. Lee*, 396 F.Supp.3d 777, 786 (M.D. Tenn. 2019) ("Standing is a 'threshold determinant[ ] of the propriety of judicial intervention.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

In determining whether a plaintiff has standing, courts consider whether the plaintiff has alleged "an 'injury in fact' that is 'fairly traceable to the challenged action of the defendant' and is capable of being 'redressed' by the court." *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61). And the plaintiff bears the burden of establishing the presence of all three elements. *Id.* To establish "injury-in-fact," the plaintiff must show he suffered a *concrete* injury that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Moreover, the injury alleged must be particularized to the plaintiff—"not a generalized grievance." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

Here, the harms alleged by Plaintiffs are not "fairly traceable" to the challenged conduct of the State Defendants or redressable by a judgment against them. The reason is simple: there is nothing the State Defendants have done or might do to cause the Plaintiffs' asserted injuries, and

there is no relief this Court could order against the State Defendants that would redress those asserted injuries. *Cf. Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) (explaining that traceability and redressability often "overlap" as two sides of the same coin).

An injury is redressable if "a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). "[T]he judicial decree," then, "is not the end but the means." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987). Put just a bit differently, "[r]edress is sought *through* the court, but *from* the defendant." *Id.* (emphasis in original). The "real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" *Id.* (emphasis in original). No "judicial pronouncement" can have that effect here.

Plaintiffs ask the Court to enjoin the State Defendants from "enforcing" the challenged law. (DE 1 at 27-29). But there is no way the State Defendants—or any other state actor—could ever "enforce" the challenged law against the Plaintiffs. That means the Plaintiffs claimed injuries are not traceable to the challenged actions of the Defendants or redressable by a judgment preventing the law's enforcement. *See California v. Texas*, 141 S. Ct. 2104, 2113–20 (2021).

Federal courts have consistently found a lack of standing on similar fact patterns to the one presented here. *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1292 (11th Cir. 2019) (en banc) (plaintiffs lacked standing to sue Alabama Attorney General to challenge minimum wage law he did not enforce); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253–58 (11th Cir. 2020) (plaintiffs lacked standing to sue Florida Secretary of State to challenge voting rule that she did not enforce); *Bronson v. Swensen*, 500 F.3d 1099, 1109-11 (10th Cir. 2007) (plaintiffs lacked

standing to sue state official to challenge law the official did not enforce); *Nova*, 416 F.3d at 1156 (plaintiffs lacked standing to sue state officials to challenge law the that was enforceable only through private cause of action); *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) (plaintiffs lacked standing to sue Governor and Attorney General to challenge law that was enforceable only through a private cause of action); *Okpalobi*, 244 F.3d at 409 (en banc court holding that plaintiffs lacked standing to sue Governor and Attorney General to challenge law creating a private cause of action against abortion providers); *Planned Parenthood of Greater Texas Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 2385110, at *10 (N.D. Tex. June 1, 2021) (holding that suit challenging privately enforced law failed redressability requirement of standing because the defendants had "no authority to prevent a private plaintiff from invoking the ordinance or to tell the state courts what cases they may hear"). This court should reach the same conclusion.

Accordingly, Count I—the only count pleaded against State Defendants—should be dismissed for lack of standing and Plaintiffs therefore cannot demonstrate a likelihood of success on the merits. *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61).

### D. Plaintiffs' Claims against State Defendants Are Not Ripe.

Like the doctrine of standing, the ripeness doctrine is rooted in Article III limitations on federal-court jurisdiction. However, ripeness distinctly aims at ensuring cases or controversies filed in federal court are timely to help the court "avoid[]…premature adjudication." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). To show that the claim is ripe for review, a plaintiff must allege more than some future acts or events that "may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997).

14

Determining whether a claim is ripe for review requires a court to consider both "the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs*, 387, U.S. at 149. Specifically, the Sixth Circuit considers three factors in determining whether a claim is ripe: "(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and (3) hardship to the parties if judicial review is denied." *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002); *see also Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). In the context of a claim that relies on the threat of injury, instead of an actual one, the standing and ripeness doctrines can be difficult to distinguish. *Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Local Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003). For example, "[a] threatened or imminent injury may satisfy standing's injury-in-fact requirement, yet the claim may still be unripe if the issues are not fit for judicial review, perhaps because future events may greatly affect the outcome of the litigation and the cost of waiting is not particularly severe." *Id.*

Here, Plaintiffs' only claim against State Defendants is that the challenged Act violates the Fourteenth Amendment to the United States Constitution. (DE 1, ¶¶ 95-117.) This claim entirely rests on Plaintiffs' misperception that the portion of the Act that creates the cause of action necessarily precludes Plaintiffs from using the bathroom of their choice. (DE 1, ¶ 107.) But there is no indication that a lawsuit against a LEA or school pursuant to the statutorily created cause of action is currently pending or even threatened. As discussed *supra*, the Act does not preclude a school from choosing a bathroom policy that would satisfy Plaintiffs' demands—nor does it prevent Plaintiffs from filing suit against a school for choosing a bathroom policy they disagree with. (DE 6-1.) The only party that could arguably be directly and negatively affected by the Act's cause of action is the LEA or school that would be a defendant in a suit brought pursuant to

the Act.

Thus a constitutional challenge to the Act could only ripen in one way: a school could raise the constitutionality of the cause of action in defense of a suit brought pursuant to the Act. Only then would the Act properly operate as intended and be subject to challenge. All other alternatives, including the instant complaint, rely upon misinterpretation or misapplication of the Act and its requirements to subject the Act to constitutional suspicion. Thus Plaintiffs' challenge to the Act is not ripe and they cannot therefore demonstrate a likelihood of success on the merits.

**E.      The Act is Constitutional.**

The temporary injunction should also be denied because Plaintiffs are unlikely to succeed on their claims that the Act violates Title IX or the Equal Protection Clause.

**1.      The Act Does Not Violate Title IX.**

Title IX does not prohibit Tennessee from creating a private right of action if its public schools allow a biological boy to use a girls' restroom or a biological girl to use a boys' locker room. Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute expressly clarifies—in a provision that Plaintiffs ignore—that, "[n]otwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686.[3] If Congress or ordinary citizens had thought in 1972 that

---

[3] Congress added § 1686 for the very purpose of clarifying that Title IX does not require what Plaintiffs today claim it mandates. *See, e.g.*, 118 Cong. Rec. 5,807 (1972) (statement of Sen. Bayh, the chief Senate sponsor of Title IX) (explaining that this statutory provision ensures that covered institutions may "permit differential treatment by sex . . . in sports facilities or other instances where personal privacy must be preserved").

Title IX requires schools to allow "transgender students [to] us[e] restrooms and related school facilities that comport with their gender identity," (Mem. in Supp. of TRO Mot., PageID# 59), then Title IX would not have become law.

Indeed, that is particularly true because Congress enacted Title IX's prohibition of discrimination "on the basis of sex" at a time when "sex" indisputably meant biological sex.[4] The text of Title IX confirms that § 1686's allowance of "separate living facilities for the different sexes" permits covered institutions to provide separate restrooms, locker rooms, showers, and sleeping facilities for each of the two biological sexes regardless of a student's asserted gender identity. For example, Title IX consistently uses "sex" as meaning the two biological sexes. The statute speaks in terms of "Boy or Girl conferences," 20 U.S.C. § 1681(a)(7), "Father-son or mother-daughter activities," *id.* at § 1681(a)(8), and institutions that admit either students of "one sex" or "both sexes," *id.* at § 1681(a)(2). This understanding of sex is consistent with the Act's use of "sex" to refer to "biological sex."[5] Section 1686 expressly permits a covered institution to make distinctions in living facilities based on immutable biological sex.

Nothing in the text of Title IX requires covered institutions to accommodate students who do not identify with their biological sex. *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 677-78 (W.D. Pa. 2015) ("Title IX and its implementing regulations

---

[4] *See, e.g.*, The Random House College Dictionary 1206 (rev. ed. 1980) (defining sex as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); Webster's New Collegiate Dictionary 1054 (1979) (defining sex as "the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females").

[5] A covered institution does not, as Plaintiffs argue, impermissibly "sex stereotype based on a person's gender non-conforming behavior" in violation of Title IX by allowing a student to use a restroom, locker room, or shower that matches his biological sex. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004).

clearly permit schools to provide students with certain sex-segregated spaces, including bathroom and locker room facilities, to perform certain private activities and bodily functions consistent with an individual's birth sex.").  If anything, then, the Act's requirement that a "public school shall, to the extent practicable, provide a reasonable accommodation" goes above and beyond the obligations of Title IX.  *See* 2021 Tenn. Pub. Ch. 452.

The Supreme Court's ruling last year in *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), has no impact on this case.  In *Bostock*, the Supreme Court narrowly held that Title VII prohibits an employer from "fir[ing] someone simply for being homosexual or transgender." *Id.* at 1737.  Significantly, the Court did *not* hold that the term "sex" means gender identity.  *Id.* at 1739 ("[W]e proceed on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female.").  *Bostock*'s reasoning instead turned largely on the Court's interpretation of the phrase "because of" in Title VII.  *See id.* at 1738 (citing 42 U.S.C. § 2000e-2(a)(1)).  But Title IX employs different language—it prohibits discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  The Supreme Court expressly emphasized that Title IX and other federal statutes were not "before us" in *Bostock* and refused to "prejudge any such question" under statutes other than Title VII.  140 S. Ct. at 1753.  Even "under Title VII," the Supreme Court did "not purport to address bathrooms, locker rooms, or anything else of the kind."  *Id.*  "The only question before" the Court was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"  *Id.*

Post *Bostock*, the Sixth Circuit has recognized that "Title VII differs from Title IX in important respects."  *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).  The Sixth Circuit cited § 1686—the provision that confirms that covered institutions may "maintain[]

separate living facilities for the different sexes"—as one of the ways that Title IX differs from Title VII. *Meriwether*, 992 F.3d at 510 n.4. "Thus, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context." *Id.*[6] The Southern District of Ohio's preliminary injunction decision in *Board of Education of the Highland Local School District v. U.S. Department of Education*, 208 F. Supp. 3d 850 (S.D. Ohio 2016), predated *Meriwether* and in any event is not binding on this Court. 208 F. Supp. 3d 850 (S.D. Ohio 2016).[7] And the only post-*Bostock* appellate case that Plaintiffs cite for their Title IX argument intentionally "overlooks the fact that Congress expressly provided *in the statute* that nothing in its prohibition against discrimination 'shall be construed to prohibit' schools 'from maintaining separate living facilities for the different sexes.'" *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d

---

[6] The Sixth Circuit also noted that U.S. Department of Education regulations implementing Title IX even *require* universities to "consider sex in allocating athletic scholarships." *Meriwether*, 992 F.3d at 510 n.4 (citing 34 C.F.R. § 106.37(c)). Although Plaintiffs cite a Department of Justice memorandum and a Department of Education guidance document issued in the past few months, (*see* Mem. in Supp. of TRO Mot., PageID 59 n.3), these documents should not be considered binding. The text of Title IX contradicts the Department of Education's new interpretation of the statute as the Department has long acknowledged that covered institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex," 34 C.F.R. § 106.33, and just last year "expressly acknowledged physiological differences between the male and female sexes," 85 Fed. Reg. 30,178 (May 19, 2020). Further, the Department of Justice admitted earlier this year that "*Bostock* does not require any changes to . . . sex-specific facilities or policies." U.S. Dep't of Justice, Application of *Bostock v. Clayton County* 4 (Jan. 17, 2021) ("*Bostock* does not require any changes to . . . sex-specific facilities or policies."); *see also* U.S. Dep't of Educ., Memorandum for Kimberly M. Richey Acting Assistant Secretary of the Office for Civil Rights Re: *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020), at 9 (Jan. 8, 2021) ("[T]he plain ordinary public meaning of the controlling statutory and regulatory text requires a recipient providing 'separate toilet, locker room, and shower facilities on the basis of sex' to regulate access based on biological sex."). If the Court views the new guidance documents as attempts to impose binding interpretations of Title IX, then the documents would violate the notice-and-comment requirements of the Administrative Procedure Act. *See* 5 U.S.C. § 553. The Court should also reject the guidance as contrary to law. *Id.* § 706(2).

[7] Now-Chief Judge Sutton also would have granted the school district a stay of the preliminary injunction, and the case was voluntarily dismissed before a court could issue a final decision. *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222-23 (6th Cir. 2016) (Sutton, J., dissenting).

586, 635 (4th Cir. 2020) (Niemeyer, J., dissenting) (quoting 20 U.S.C. § 1686).[8]  "The majority's

oversight" in *Grimm* "can only be taken as a way to reach conclusions on how schools *should* treat

transgender students, rather than a determination of what the statute requires of them."  *Id.*[9]

    True, "the School Board receives federal financial assistance and," assuming Title IX is

otherwise constitutional, "is under Title IX's mandate."  (Mem. in Supp. of TRO Mot., PageID#

60).  But that marshals *against* Plaintiffs' argument that separate living facilities for the different

biological sexes constitute impermissible discrimination on the basis of sex.  That radical

interpretation of Title IX would leave the statutory scheme in violation of the Spending Clause.

*See* U.S. Const. art. I, § 8, cl. 1.  Under the Spending Clause, conditions on congressional funds

must enable the recipients to "clearly understand," from the language of the law itself, the

conditions they are agreeing to by accepting the federal funds.  *Arlington Cent. Sch. Bd. of Educ.*

*v. Murphy*, 548 U.S. 291, 296 (2006).   The federal government cannot, through novel

interpretations of Title IX, impose new obligations not in accord with the understanding that

existed when Tennessee first accepted the federal funds.  *See Bennett v. New Jersey*, 470 U.S. 632,

638 (1985) (providing that a State's obligation under cooperative federalism programs "generally

---

[8] In their Complaint, Plaintiffs allege that the Supreme Court "support[ed] the Fourth Circuit's
holding that Title IX prohibits discrimination on the basis of gender identity" by denying certiorari
in *Grimm*.  (Compl., DE 1, PageID# 5, ¶ 16); *see Gloucester Cnty. Sch. Bd. v. Grimm*, __ S. Ct.
__, 2021 WL 2637992, at *1 (June 28, 2021) (denying certiorari but noting that "Justices Thomas
and Alito would grant the petition for a writ of certiorari").  But it is well accepted that "the denial
of a writ of certiorari imports no expression of opinion upon the merits of the case."  *Teague v.
Lane*, 489 U.S. 288, 296 (1989) (quoting *United States v. Carver*, 260 U.S. 482, 490 (1923)).
[9] Similarly, the Eleventh Circuit's revised majority opinion in *Adams v. School Board of St. Johns
County, Florida*, "decline[d] to reach [the] Title IX claim" altogether.   __ F.4th __, 2021 WL
2944396, at *14 (11th Cir. July 14, 2021).  Chief Judge William Pryor, nevertheless, pointed out
in dissent that § 1686 is "an important qualification" that "tempers [Title IX's] mandate" against
sex discrimination.  *Id.* at *25 (Pryor, C.J., dissenting).  "[A]ny guidance *Bostock* might otherwise
provide about whether Title VII allows for sex-separated bathrooms does not extend to Title IX,
which permits schools to act on the basis of sex through sex-separated bathrooms."  *Id.* at *26
(citing 20 U.S.C. § 1686; 34 C.F.R. § 106.33).

should be determined by reference to the law in effect when the grants were made").  Threatening to withdraw all federal funds from Tennessee schools if they use sex-separated living facilities "is much more than 'relatively mild encouragement'—it is a gun to the head."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).  Tennessee did not "voluntarily and knowingly accept[]" the supposed obligation to allow transgender students to use whatever restroom or locker room they desire.  *Id.* at 577 (quotation omitted); *see also Adams*, 2021 WL 2944396, at *27 (Pryor, C.J., dissenting) ("Because Congress enacted Title IX under its Spending Clause power, the Board's violation must be unambiguous to trigger liability.").  By jettisoning the original understanding of Title IX in general and § 1686 in particular, Plaintiffs cast doubt on the continued constitutionality of the entire statutory scheme.

In short, Title IX does not require covered institutions to allow transgender students, teachers, or employees to use the restroom that corresponds with their gender identity.  It instead expressly allows institutions to maintain "sex-separate" facilities.  Far from violating Title IX, the Act exceeds the requirements of Title IX by requiring schools to offer transgender individuals the option of using a restroom other than one designated for their biological sex.

### 2.  The Act Does Not Violate the Equal Protection Clause.

Nor does the Act violate the Equal Protection Clause of the Fourteenth Amendment.  The Equal Protection Clause commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Under the Clause, a statute that creates a classification on account of race, alienage, or national origin or that invades a "fundamental right" will be sustained only if it is narrowly tailored to serve a compelling state

interest—what courts have called "strict scrutiny." *Koger v. Mohr*, 964 F.3d 532, 544 (6th Cir. 532, 544 (6th Cir. 2020); *see also City of Cleburne*, 473 U.S. at 440. Generally, however, legislation is presumed valid and is upheld if it passes rational-basis review—that is, if the statute's classification is rationally related to a legitimate state interest. *See id.*

Consistent with Supreme Court precedent, the Sixth Circuit has held that only two classifications—sex and illegitimacy—qualify as "quasi-suspect" classes subject to intermediate scrutiny, which requires the government to establish that the action is substantially related to achieving an important government interest. *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015) (ruling that homosexuals are not a suspect or quasi-suspect class); *see also Craig v. Boren*, 429 U.S. 190, 197 (1976). Even if the Act could be said to involve a classification based on transgender status, the U.S. Supreme "Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender." *Ondo*, 795 F.3d at 609.

The Act is entitled to rational-basis review because it does not discriminate on the basis of any suspect or quasi-suspect trait. Under the Act, private parties have a right of action if public schools allow members of the opposite sex into multi-occupancy restrooms, changing facilities, or sleeping quarters. 2021 Tenn. Pub. Ch. 452. The Act does not "target transgender individuals" by encouraging schools to treat them consistent with their biological sex, and, even if it did, intermediate scrutiny does not apply to classifications on the basis of gender identity. (Mem. in Supp of TRO Mot., PageID# 62). Nevertheless, the Act satisfies both intermediate scrutiny and rational-basis review because it substantially relates to achieving important government interests.

*First*, the Act encourages public schools to protect the privacy interests of students, teachers, and employees. This Court has agreed that being "forced to share changing, shower, and

bathroom space with members of the opposite sex" does not provide the same "level of privacy and comfort that" someone could "expect" in facilities separated based on biological sex. *Stuart v. Metro. Gov't of Nashville & Davidson Cnty.*, 679 F. Supp. 2d 851, 854, 859 (M.D. Tenn. 2009), *vacated after settlement*. Numerous courts have ruled that each individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" is "particularly" strong "while in the presence of members of the opposite sex." *Doe v. Luzerne Cty.*, 660 F.3d 169, 176-77 (3d Cir. 2011); *see also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"). The U.S. Supreme Court and American society in general "have long acknowledged a privacy interest in using the bathroom away from the opposite sex." *Adams*, 2021 WL 2944396, at *20 (Pryor, C.J., dissenting) (citing sources including *United States v. Virginia*, 518 U.S. at 550 n.19 ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements."); Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 ("Separate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy.")).

A student's right to privacy includes not only the right to shield the student's own body from members of the opposite sex, but to avoid being exposed to the unclothed bodies of members of the opposite sex. Significantly, Plaintiffs did not include any allegation that the anatomy of A.S. and A.B. differs from that of their respective biological sex. Plaintiffs' position, then, is that the Equal Protection Clause gives them the right to expose children *as young as the first grade* to the anatomy of the opposite sex.

The Act is "substantially related to the achievement" of the State's interest in student privacy, *Virginia*, 518 U.S. at 533, because it encourages schools to protect students from being forced to share restrooms, locker rooms, showers, and sleeping facilities with members of the opposite sex. Those are precisely the facilities where students' reasonable expectations of privacy from the opposite sex are most acute. Even if the Court were to accept that gender identity, not biological sex, determines whether someone really is a boy or a girl, the policy encouraged in the Act would still correctly separate living facilities for well over 99% of students. *See Adams*, 2021 WL 2944396, at *21 (Pryor, C.J., dissenting). Plaintiffs emphasize that they are "one of few, if not the only, students in their respective schools who cannot use facilities that correspond with their gender identities." (Mem. in Supp of TRO Mot., PageID# 61). . If that is so, then the sex-separation policy encouraged in the Act nearly perfectly separates students on the basis of gender identity as well.[10] It does not violate the Equal Protection Clause for a school to acknowledge that "[p]hysical differences between men and women . . . are enduring," including for first and ninth grade students. *Virginia*, 518 U.S. at 533.

*Second*, the Act is substantially related to protecting the safety of all students, teachers, and employees in restrooms, locker rooms, showers, and sleeping facilities. Despite Plaintiffs' disregard for students who are not transgender, the State must consider the safety of *all* students regardless of their gender identity. With a laser focus only on what Plaintiffs deem best "for *their* children's physical safety," Plaintiffs encourage this court to "reject[]" the argument that the State has an interest in "protecting cisgender students' safety." (Mem. in Supp of TRO Mot., PageID# 66 (emphasis added)). (emphasis added). In effect, Plaintiffs are asking that transgender students

---

[10] While not necessary to satisfy intermediate scrutiny, the Act's reasonable single-occupancy accommodation provision mitigates concerns in the small fraction of cases where students do not want to use facilities that match their biological sex.

be treated *more favorably* than other students.  This Court should reject that topsy-turvy view of the Equal Protection Clause.

Examples abound of individuals taking advantage of permissive restroom, shower, and locker room policies to perpetrate harassment and assault.  One of the advocacy pieces that Plaintiffs cite chronicles twenty incidents in which transgender or almost entirely cross-dressing individuals sexually harassed or spied on others in living facilities.  Brian S. Barnett et al., *The Transgender Bathroom Debate at the Intersection of Politics, Law, Ethics, and Science*, 46 J. of the Am. Academy of Psychiatry and the Law 232, 235 (2018), http://jaapl.org/content/jaapl/46/2/232.full.pdf.  Protecting children in public school living facilities is an important government interest, and the Act substantially relates to that interest by decreasing opportunities for malicious actors to enter such intimate areas.

## II.     Plaintiffs are Unlikely to Suffer Irreparable Injury Absent Injunctive Relief.

An injunction is likewise inappropriate as Plaintiffs have failed to make the requisite showing of irreparable harm.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is likely in the absence of the requested injunction.  *Lyons*, 461 U.S. at 103; *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  The showing of likely irreparable harm is the single most important prerequisite for issuance of a preliminary injunction.  *See* 11A C. Wright, A. Miller, & M. Kane, Fed. Practice and Procedure § 2948.1 (3d ed.).  Speculative injury, then, is not sufficient.  *Id.*  And a preliminary injunction is not warranted to prevent the possibility of some remote future injury—a presently existing actual threat must be shown.  *Id.*  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." *Mazurek*, 520 U.S. at 972.

As discussed above, the Act accomplishes two things: 1) it requires a public school to provide a safe, private restroom for a person who desires greater privacy; and 2) creates a cause of action against the school by a student, parent, legal guardian, teacher, or employee for damages related to psychological, emotional, or physical harm caused by exposure to a member of the opposite sex in a multi-occupancy restroom or changing facility. (DE 6-1). But neither of these provisions violates Title IX or the Equal Protection Clause. So even if Plaintiffs will experience the harms they allege, injunctive relief is still improper because there is no constitutional violation for this Court to remedy. In any event, enjoining the Governor and the Attorney General would not remedy these harms because they do not enforce the Act.

It is also far from clear that Plaintiffs will actually suffer irreparable harm. The Act does not require transgender students to use the restroom that corresponds to their biological sex. To the contrary, the Act requires schools to provide transgender students with access to a private restroom or changing facility if they so request. If A.S. and A.L. nevertheless choose to refrain from using the restroom at school altogether, that harm is not attributable to the Act. *See* 11A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2948.1 (3d ed. Oct. 2020 update).

Even if Plaintiffs' alleged harm were attributable to State Defendants or the challenged Act, it would not meet the required standard of irreparable harm. Plaintiffs allege that they would be "othered" and stigmatized if they were precluded from using their preferred bathroom. But Plaintiffs fail to offer any competent proof of harm solely attributable to their alleged inability to use their preferred bathroom. Indeed, the bullying described by Plaintiff A.S.'s mother due to A.S.'s transgender status is not attributed to the bathroom A.S. uses. (DE 4, ¶¶ 27-30.) Nor is there any indication that the students at A.S.'s new school will be similarly unkind. Nor does A.S.

offer competent medical proof of a likelihood or psychological or emotional harm based upon which bathroom A.S. uses. Indeed, the declaration of A.S's mother about the Act's effects demonstrates that the alleged harm is speculative. (DE 4, ¶ 34 ("I am worried;" "A.S. may also be subject to bullying.").)

Much the same is true for Plaintiff A.B. A.B. is attending a new elementary school and the declaration of A.B.'s mother does not indicate whether A.B. is likely to be stigmatized or bullied because of the bathroom A.B. uses. (DE 5, ¶ 20.) Nor is there competent medical proof of any likelihood of emotional or psychological harm. Any alleged harm to A.B. is thus likewise speculative.

Speculative harm is an insufficient basis for preliminary relief. "Issuing a preliminary injunction" here "based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek*, 520 U.S. at 972.

And absent any indication as to the severity and longevity of the harm that Plaintiffs allege, their claims do not even rise to the level of "serious or substantial" harm, much less the higher standard of "irreparable" harm that is necessary for injunctive relief. *See, e.g.*, *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 525 (3d Cir. 1976) ("[T]he requisite is that the feared injury or harm be irreparable—not merely serious or substantial."); *Becton v. Thomas*, 48 F. Supp. 2d 747, 762 (W.D. Tenn. 1999) ("A plaintiff's harm is not considered irreparable if "it is fully compensable by money damages.")

Moreover, by waiting until the last minute, Plaintiffs have failed to mitigate their harm. Knowing that the law would become effective on July 1, 2021, Plaintiffs waited more than two months before filing this lawsuit—seeking judicial intervention a mere three days before the first

day of school. Surely if the harm they feared was immediate and irreparable, Plaintiffs would have sought judicial intervention as soon as possible. But dilatoriness militates against emergency injunctive relief. Accordingly, Plaintiffs have failed to demonstrate the immediate, irreparable harm necessary for a preliminary injunction.

## III. Issuance of an Injunction Would Harm the State and the Public Interest.

An injunction that prevents a State from upholding a duly enacted law necessarily irreparably harms the State. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *Detroit Newspaper Publisher Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cert. denied*, 411 U.S. 967 (1973); *MLZ, Inc. v. Fourco Glass Co*., 470 F. Supp. 273, 278 (M.D. Tenn. 1978). And where the party opposing equitable relief is the government, consideration of the public interest "merge[s]" with irreparable harm to the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The public has a strong interest in laws duly passed by its representative branch of government, and thus the public interest and harm to the State militate against injunctive relief. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

As explained above, moreover, the Act furthers important government interests in privacy and safety that would be undermined if the Act is enjoined. That additional harm further counsels against injunctive relief.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Plaintiffs'

motion for a temporary restraining order and preliminary injunction.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER
Senior Assistant Attorney General
Public Interest Division
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-2408
BPR No. 029362
Alex.rieger@ag.tn.gov

/s/ Matthew D. Cloutier
MATTHEW D. CLOUTIER
Assistant Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7908
Matt.Cloutier@ag.tn.gov

## CERTIFICATE OF SERVICE

I certify that I filed the above document using the Court's CM/ECF system on August 4, 2021, which electronically served a copy to all counsel of record:

Tricia Herzfeld
BRANSTETTER STRANCH & JENNINGS PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville TN, 37203
triciah@bsjfirm.com

Adam S. Lurie
Erez Liebermann
Andrew Pak
Sean Mooney
Andreane Reynolds
Kunal Kanodia
Rebecca Zeldin
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Adam.lurie@linklaters.com
Erez.liebermann@linklaters.com
Andrew.pak@linklaters.com
Sean.mooney@linklaters.com
Andy.reynolds@linklaters.com
Kunal.kanodia@linklaters.com
Rebecca.zeldin@linklaters.com

Sarah Warbelow
Jason Starr
HUMAN RIGHTS CAMPAIGN FUND
1640 Rhode Island Avenue NW
Washington, DC 20036
Sarah.warbelow@hrc.org
Jason.starr@hrc.org

Rachel Hogan
Thomas William A. Caldwell
W. Carl Spining
Ortale Kelley Law Firm
330 Commerce Street
Suite 110
P.O. Box 198985
rhogan@ortalekelley.com
wcaldwell@ortalekelley.com

cspining@ortalekelley.com


/s/*Alexander S. Rieger*
ALEXANDER S. RIEGER
Senior Assistant Attorney General