IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| A.S., a minor, by his next friends AMY A., mother and JEFF S., father; and A.B., a minor, by her next friends JULIE B., mother and ROSS B., father,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>BILL LEE, in his official capacity as Governor of Tennessee, et al.,<br><br>　　　　Defendants. | NO. 3:21-cv-00600<br>JUDGE RICHARDSON |

# **MEMORANDUM OPINION**

Pending before the Court is Plaintiffs' Motion for a Temporary Restraining Order (Doc. No. 2, "Motion"), supported by an accompanying memorandum in support of the Motion (Doc. No. 3, "Memorandum in Support").[1] Via the Motion, Plaintiffs seek an order from the Court temporarily enjoining Defendants

> [f]rom taking any actions to enforce the Tennessee Accommodations for All Children Act, 2021 Tenn. Pub. Ch. 452 [("School Facilities Law")]; and [permitting] A.S. and A.B. to use (i) multi-occupancy restrooms and changing facilities located within a public school building that correspond with their gender identity, rather than their gender assigned a birth; and (ii) multi-occupancy sleeping quarters while attending a public school-sponsored activity that correspond with their gender identity, rather than their gender assigned at birth.

(Doc. No. 2-1 at 2). The School Facilities Law requires public schools to make "reasonable accommodation" for a person who cannot or will not use a restroom or changing facility designated

---

[1] The Motion also encompasses a request for a preliminary injunction. This Memorandum Opinion pertains only to Plaintiffs' request for a temporary restraining order, and not Plaintiffs' request for a preliminary injunction. References below to the Motion, therefore, are for the most part intended as references only to the aspect of the Motion seeking a temporary restraining order.

for their sex in a public-school building or at a school-sponsored activity. *See* School Facilities Law § 4(a). The Law defines a person's sex as "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth." § 3(4). It defines "reasonable accommodation" as having access to a "single-occupancy restroom or changing facility" or "use of an employee restroom or changing facility. . . . A reasonable accommodation does not include access to a restroom or changing facility that is designated for use by members of the opposite sex while persons of the opposite sex are present or could be present." § 3(2).

Tennessee Governor Bill Lee signed the School Facilities Law on May 14, 2021, and it went into effect on July 1, 2021. Plaintiffs filed their lawsuit, and the Motion on August 2, 2021. The undersigned has been advised that this occurred at 10:51 p.m. on that date. The school year for public schools in Wilson County, Tennessee (where Plaintiffs attend school) begins on August 5, 2021. (Doc. No. 4 at ¶ 31; Doc. No. 5 at ¶ 19). The Court perceived, in mathematical terms, that (if one treats Plaintiffs' filings as having occurred on August 3, which for all intents and purposes they were) Plaintiffs' filings occurred two days before the start of the school year and after 98 percent of the time had passed between the passage of the School Facilities Law and the start of the school year. Thus, the Court ordered the parties to file briefs addressing the possible application of laches to this matter no later than 3:00 p.m. on August 4 (Doc. No. 19), and the parties did so (Doc. Nos. 25, 26, and 27).[2] Later on August 4, the Court issued a short order denying the Motion on the basis of laches, with a notation that a corresponding opinion would be forthcoming. This is

---

[2] Defendants filed a total of two briefs. Defendants Jeff Luttrell, in his official capacity as Director of Wilson County Schools, and the Wilson County Board of Education ("School Board Defendants") filed a brief (Doc. No. 25), and Defendants Bill Lee, in his official capacity as Governor of Tennessee, and Herbert Slatery, III, in his official capacity as Attorney General of Tennessee, ("State Defendants") filed a brief (Doc. No. 27).

that opinion. Herein, the Court provides its reasons for invoking the doctrine of laches and denying the Motion.

## LEGAL STANDARD

The applicability of laches[3] in a particular context often is, to say the least, an unpredictable matter. What the undersigned wrote decades ago about this general reality remains true today:

> [T]he law has long embraced a subjective, unpredictable and ad hoc approach to determining whether a claimant's remedy is barred by the lapse of time: laches. "Laches is an equitable doctrine which may be applied to deny relief to a party whose 'unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted.' " Laches generally applies only to equitable claims, although in some cases it will be applied to actions at law. Inevitably, laches has been compared to statutes of limitations, even to the point of being deemed a "quasi statute of limitations." Nevertheless, the two differ markedly in their mode of operation. Unlike statutes of limitations, laches is a flexible concept which eschews mechanical rules and instead is based on fairness.
>
> In deciding whether to apply laches, most courts consider several factors, such as the nature and cause of the plaintiff's delay in asserting a claim despite the opportunity to assert it, the nature of the relief requested, the extent of the defendant's knowledge that the claim would be asserted, and the prejudice to the defendant if the claim is allowed. Other factors include the length of the delay, the loss of evidence, the opportunity of the plaintiff to have acted sooner, and whether the defendant or the plaintiff possessed the property in dispute, if any, during the delay. In a larger sense, " 'laches is principally a question of the inequity of permitting a [particular] claim to be enforced.' "
>
> Moreover, application of laches clearly is discretionary with the trial court. To be sure, a trial court's discretion to apply laches is not limitless. Even courts that use a balancing approach recognize the requirements that the plaintiff " 'unreasonably

---

[3] To promote clarity of analysis, the Court must pause to explain its terminology, which may differ substantially from the terminology used by cited cases or the parties herein. As the term is used herein by the undersigned, laches is "applicable" when a court rules that laches bars the particular equitable relief at issue, whereas laches is only "potentially applicable" when the court is not prohibited *ab initio* from applying laches by threshold considerations—such as laches being entirely supplanted by a particular statute of limitation or the fact that the kind of requested relief at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227 (6th Cir. 2007), cited below, actually used the phrase "is even applicable," *id.* at 231, without including "potentially"; in context, however, the phrase clearly was meant to mean *potentially* applicable as that term is used herein. Notably, even where laches is "potentially applicable" as the Court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds that its two required elements exist. Where the terminology of Plaintiff or Defendants, or of a cited case, for these concepts differs from the Court's terminology, the Court will convert such terminology into the Court's terminology.

delayed in [filing suit] and that the delay harmed the defendant.'" Some courts even frame their test for laches in terms of required elements rather than flexible factors. Those elements, however, are the same requirements referenced above. Those requirements are patently subjective and flexible.

Clearly, laches provides courts with considerable flexibility to decide whether to bar equitable remedies due to a delay in commencing suit. The law permits courts to use laches notwithstanding its ad hoc, subjective and unpredictable nature.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L. J. 1015, 1065–67 (1997) (footnotes omitted). A district court thus enjoys considerable discretion to apply or decline to apply laches to a particular equitable remedy[4] under particular case-specific circumstances; flexibility exists, albeit to a lesser extent, even in jurisdictions recognizing required elements of laches. Thus, there is no magic formula to foretell whether the court should or will apply laches.

Turning to specific applicable legal standards binding upon it, the Court first notes that "[i]n this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)); *see also Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941) (explaining that the doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights."). Although this description of laches sounds relatively broad and conceptual, the Sixth Circuit is one of those courts that does prescribe particular required elements of laches. Assuming that laches is potentially applicable, the "party asserting laches must show: (1) lack of diligence by the party against whom the defense

---

[4] Laches generally is potentially applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions. *See Obiukwu v. United States*, 14 F. App'x 368, 369 (6th Cir. 2001); *Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 795 n.8 (M.D. Tenn. 2020). By contrast, laches generally is not potentially applicable to claims for money damages, although there are exceptions. As explained by another district court in this circuit, "[l]aches is an equitable doctrine and, as a general rule, remains inapplicable to legal claims for damages." *United States v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993) (citations omitted). On the other hand, "[c]laims in equity, of course, invite equitable defenses, including laches." *Id.* at n.2.

is asserted, and (2) prejudice to the party asserting it." *City of Loveland*, 621 F.3d at 473. The first element sometimes is described in terms not of lack of diligence, but rather of unreasonable delay. *See, e.g.*, *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000) ("Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party."). Assuming these elements are met, "[a] constitutional claim can become time-barred [by laches] just as any other claim can." *Mich. Chamber of Commerce v. Land*, 725 F. Supp. 2d 665, 681 (W.D. Mich. 2010) (quoting *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 9 (2008)).

But even if the party can show both required elements of laches, the court is not required to apply laches; "dismissal under the laches doctrine 'is not mandatory and is appropriate only in the sound discretion of the court.'" *Stiltner v. Hart*, No. 5:13-CV-203-KKC-HAI, 2018 WL 3717209, at *1 (E.D. Ky. Jan. 24, 2018) (quoting *Towns v. Smith*, 395 F.3d 251, 256-57 (6th Cir. 2005), *report and recommendation adopted*, No. CV 5:13-203, 2018 WL 3716314 (E.D. Ky. Aug. 3, 2018)).

In other words, the decision whether to apply laches is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews "a district court's resolution of a laches question for an abuse of discretion." *Chirco*, 474 F.3d at 231 (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir. 2001)); *see also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956) ("'[T]he [application] of laches is a question primarily addressed to the discretion of the trial court'" (quoting *Gardner v. Panama R. Co.*, 342 U.S. 29, 30, (1951))). Notably, from a review of Sixth Circuit case law as a whole, it appears implicit that the district court is vested with discretion both as to the determination of whether the two elements of laches exist and to the subsequent decision (if it is even reached) whether to apply laches.

## ANALYSIS

As just noted, to apply the doctrine of laches, two elements must be present: lack of diligence on the part of the plaintiff, and prejudice to the other party. The Court will explore whether these two elements are met in turn.

**I. Element One: Lack of Diligence**

As discussed, public school in Wilson County, Tennessee, is scheduled to begin on August 5, 2021. Plaintiffs were aware of sufficient facts and a supporting theory to at least file suit and seek a temporary restraining order ("TRO") on July 1, 2021 at the very latest; indeed, as discussed below, the record supports that Plaintiffs were aware of the bill that became the School Facilities Law as early as February 2021. Plaintiffs nevertheless waited over one month before filing suit (and the Motion) on August 2 at 10:51 p.m.—a mere *two business days* before public school is scheduled to begin in Wilson County, Tennessee. This constitutes unreasonable delay in the seeking of the extraordinary remedy of a temporary restraining order.[5]

The declarations of A.B.'s mother and A.S.'s mother reveal that both contacted members of the Tennessee legislature to express opposition to the School Facilities Law prior to its passage. A.B.'s mother specifically averred that she reached out to her representative for the Tennessee House of Representatives (meaning, presumably, the elected representative for the district in which she resides) when voting on the School Facilities Law occurred in March 2021. (Doc. No. 5 at ¶ 23). And A.S.'s mother detailed her efforts to contact members of the Tennessee House of Representatives, as well as the Governor and his Chief Counsel, about the School Facilities Law.

---

[5] That is not to say that Plaintiffs' families delayed unreasonably in making any other decisions as to how they would respond to the School Facilities Law (for example, whether to move out of Tennessee). The Court would not presume to lecture the families about what their timing should have been as to such decisions. The Court here is concerned only with the unreasonableness of the delay in the decision to seek to enjoin, statewide, the implementation of legislation passed by the elected representatives of the citizens of Tennessee.

(Doc. No. 4 at ¶ 38). Although her declaration does not say when these activities commenced, it suggests that they commenced substantially in advance of the execution of her declaration that was filed in this Court on August 2.[6] In fact, elsewhere the record is quite clear that A.S.'s mother, as well as A.B.'s mother, was aware of the School Facilities Law's content and progress through the Tennessee legislature for at least six months prior to the filing of the Motion. Indeed, in Plaintiffs' brief regarding the applicability (or, in their view, the lack of applicability) of laches, they confirm that not only were Plaintiffs familiar with the School Facilities Law prior to its passing, but "[b]oth Plaintiffs' families made concerted and repeated effort with the legislature to prevent enact[ment] of the Law in the first place." (Doc. No. 26 at 3); (*see also* Doc. No. 1 at ¶¶ 70, 72) (Plaintiffs allege in the Verified Complaint that Plaintiffs' "made repeated attempts to contact state legislators regarding the law" as early as February 2021). Accordingly, the record supports that Plaintiffs did not suddenly become aware of the existence of the School Facilities Law just before August 2.

Plaintiffs now assert that the delay in filing the lawsuit and the Motion is reasonable because "it was not until approximately a week and a half before filing the Complaint and Motion that both Plaintiff's families affirmatively decided to send their children to public school in the Wilson County School District." (Doc. No. 26 at 2). And so, according to Plaintiffs, "it was not until the end of last month (approximately one and a half weeks before filing the motion for a TRO) that Plaintiffs really knew that the law would apply to them as public school students in Tennessee." (*Id*. at 4).

Plaintiffs support this argument with the filing of supplemental declarations of A.S.'s mother and A.B.'s mother. In A.S.'s mother's supplemental declaration, she now avers that "through the end of July, moving out of Tennessee was still a prevalent discussion in our

---

[6] For example, she refers to setting up a Zoom call with one member of the Tennessee House of Representatives, then states that "on the day of the meeting no one showed up." (Doc. No. 4 at ¶ 38).

household." (Doc. No. 28 at ¶ 4). However, in her first declaration—filed before the issue of laches had been raised by the Court—A.S.'s mother discussed in detail how, although they had considered the possibility of moving from Tennessee, "it would be very difficult to move because of all the new relationships" they have formed in Tennessee, and because they had moved into their "dream home." (Doc. No. 4 at ¶ 28, 39). Additionally, A.S.'s mother stated in the declaration that A.S.'s father had spoken to his supervisor about the possibility of moving but had not yet spoken with the CEO about moving or working remotely. (*Id*. at ¶ 42) ("We don't want to move, and we don't want to send A.S. away from us."). And she indicated that her husband's employment situation provided additional disincentives to moving out of Tennessee. A.S.'s mother's first declaration, although by no means directly contradictory to her supplemental declaration, does not exactly square with her current position in the supplemental declaration that the family was seriously considering moving from Tennessee until two weeks ago.

And it must be remembered that the key date here is August 5. A.S.'s declarations collectively suggest that it would have been clear to A.S.'s family more than a week and a half prior to August 2 that A.S.'s family very likely would not choose an alternative to Wilson County public schools by virtue of either moving out of Tennessee or enrolling A.S. in private school.

Additionally, in A.B.'s mother's supplemental declaration, she now avers that she and her husband "decided only on July 21, 2021 that [they] would not send A.B. to private school, and would instead enroll A.B. in first grade at the public elementary" in Wilson County. (Doc. No. 29 at ¶ 4). However, in her prior declaration, A.B.'s mother does not discuss the possibility of sending A.B. to private school. Instead, she details her efforts to "reach out to the Principal at the elementary school [A.B.] will attend" as early as January 2021 to discuss accommodations that could be made for A.B. (Doc. No. 5 at ¶ 5). She further details the efforts she put forth in trying to

secure accommodations for A.B. from the public elementary school. (*Id*. at ¶¶ 25-28). In short, there is simply no indication in her originally filed affidavit that A.B.'s parents had any plans other than to send A.B. to the public elementary school.

The upshot although the Court does not doubt the literal veracity of the statements in the supplemental declarations of A.S.'s mother and A.B.'s mother, or the mothers' commitment to being truthful in their supplemental declarations, the Court declines to afford these statements much weight towards supporting the proposition that Plaintiffs (and their next friends) were unaware until a week and a half prior to August 2 that Plaintiffs very likely would be students at Wilson County public schools. For one thing, the supplemental declarations are self-serving,[7] meaning that the declarants (even if sincere) may overstate their points, since after all they have every incentive to put their best foot forward on such points. Second, the supplemental declarations are less persuasive to the extent that they suggest more uncertainty about plans to attend Wilson County public schools than is reflected in the first declarations. Finally, although the supplemental declarations suggest what the Court accepts as at least some degree of sincere uncertainty prior to a week and half before August 2, the declarations do not serve to refute that during this earlier period, there was great likelihood that Plaintiffs would be attending Wilson County public schools. This is because, among other things, the Court cannot determine (especially absent cross examination) what exactly A.B.'s mother means in stating that they "decided" only on July 21 to send A.B. to public school; in the Court's view, it would be truthful for her to have said this even if they were in their own minds, for example, 98 percent sure prior to July 21 that they would make

---

[7] The Court does not mean to suggest that there is anything wrong with filing a self-serving declaration; after all, obviously a party files a declaration precisely because it serves the party's interests. The Court's point instead is that statements in a declaration typically are entitled to less weight to the extent that they are self-serving (and, for that matter not subject to cross-examination).

this decision. And if they were 98 percent sure at that time, the residual two percent doubt would add little towards the reasonableness of any delay.

As for A.S.'s mother, her supplemental declaration, unlike A.B.'s mother, refers to the family's consideration of the alternative (to Wilson County public schools) of moving out of state. According to A.S.'s mother, it was only at the end of July (which elsewhere Plaintiffs have made clear means a week and a half prior to August 2), that the family "decided" to stay in Tennessee and pursue this action. (Doc. No. 28 at 2). As before, the Court cannot place much weight on this declaration's assertion—which the Court certainly accepts at face value—that the family "decided" this on a particular date. A.S.'s mother further notes that until this time, moving out of Tennessee "was still a prevalent discussion in our household." (*Id.*). Again, the Court accepts this representation, but it does not go very far towards refuting that A.S. was by that time likely to attend school *on August 5*, at least until the family moved if indeed it were to move at some point.

Furthermore, part of Plaintiffs' excuse for their delay in filing is that their (or their next friends') decision whether to attend Wilson County schools was delayed based on their attempts to understand "in what way the Law would be applied to them" and "how the schools were planning on implementing the Law". (Doc. No. 26 at 2). However, throughout the Complaint and the Memorandum in Support, Plaintiffs take the position—which appears indeed to be their primary (though not only) position in this litigation—that the School Facilities Law is unconstitutional on its face and should be struck down in its entirety, irrespective of how, or against which particular transgender people, it may or may not be applied in any particular context. The Court could cite myriad parts of the Complaint and the Memorandum in Support that reflect this, but suffice it to say that in their proposed order granting a TRO, Plaintiffs' first (proposed) provision is a temporary injunction against Defendants "taking any actions" to enforce the Public

Facilities Law, period. (Doc. No. 2-1 at 2). Moreover, the record strongly suggest that Plaintiffs long have believed that the Schools Facilities Law was invidiously and illegally discriminatory in all respects from its inception, so that naturally their objection was to the School Facilities Law as it applies to all transgender people, all public schools in Tennessee, and all manner of implementation—and not just to Plaintiffs, to Wilson County schools, or to some specific implementation procedure. (Doc. No. 1 at 18-20). Thus, Plaintiffs' primary position on this Motion is what they apparently have believed (or at least been told repeatedly by various like-minded members of the Tennessee General Assembly) for any months. Any specific decisions from (or related to) Wilson County schools would not affect the nature or validity of Plaintiffs' primary position, and thus Plaintiffs' awaiting such decisions does not explain or excuse the delay in filing for a TRO to seek the primary relief of complete temporary enjoinment of the School Facilities Law.

And even if Plaintiffs were, based on the timing of their families' decision to send them to Wilson County public schools, excused for the delay until a week and a half before August 2, that does not mean that they are excused for the delay in filing all the way up until late in the night of August 2. With August 5 bearing down, every day matters—to the Court's ability to properly and thoroughly adjudicate a motion for a TRO and to Defendants' ability to respond to that motion and to react in advance of August 5 to a TRO if it were granted. The Court does not accept that if a delay until a week and a half before August 2 is not unreasonable, a delay until (effectively) August 3, 2021 is reasonable. The Court does not see anywhere in the record any information about when Plaintiffs retained counsel and what counsel did and when they did it. The Court will not speculate on these matters. But because the Court will not so speculate, it will not presume that Plaintiffs retained counsel only within that one-and-a-half week period; indeed, the Court sees no reason to

presume this, given that by August 2, two law firms and in-house counsel for a major national advocacy organization were able to finalize the Complaint and the Motion and all documents in support thereof.[8]

This leads to the next point, regarding the timing of the filing of the fruits of Plaintiffs' counsel's labors. The Court appreciates that drafting of complaints and motions, especially over more complex matters takes considerable time. However, it is beyond question that Plaintiffs had counsel (in substantial numbers), and that at least some of them have considerable expertise and experience in the relevant issues and thus would not likely have been starting from scratch in drafting the relevant documents. From decades of experience, the Court can say that qualified counsel, in such numbers, can put together filings of this nature quickly—within a few days. That is true even when counsel is aiming to have professional-looking, well-organized, typo-free filings as, commendably, Plaintiffs' counsel clearly were aiming to have here. All of which is to say that from this record, the Court cannot say that a delay until the night of August 2 was reasonable in light of what counsel had to do to file the Complaint (and Motion). The Court does not see why counsel could not have filed (and would not have realized the imperative to file) at least a few days before then; if they had, it might have made all the difference as to laches, since every day counts when it comes to the potential enjoining —and the litigative process regarding the potential enjoining—of the implementation of a state law both statewide and in a particular school district.

In addition, the amount of time truly required to draft some of the documents was less than it actually appears from the length of the documents. For example, the Complaint, contains far more information than was necessary to attempt to make a short and plain statement that the School

---

[8] The Court does not mean to suggest that there is anything wrong with Plaintiffs retaining the counsel they have retained; Plaintiffs are entitled to have counsel of their choice, in large numbers if desired, represent them.

Facilities Law on its face violated the Equal Protection Clause or violated Plaintiffs' rights under Title IX.[9] Moreover, such short notice does not demonstrate that Plaintiffs were reasonably diligent in pursing the *extraordinary* relief of a temporary restraining order.

Accordingly, the Court finds that the lack of diligence element exists here.

**II. Element Two: Prejudice**

The second element of laches is prejudice to the defendant(s). *See Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 800 (M.D. Tenn. 2020). "There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support the defendant's position; or (2) the defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Lichtenstein v. Hargett*, 489 F. Supp. 3d 742, 754 (M.D. Tenn. 2020). Elaborating on the two kinds of prejudice, the Ninth Circuit has noted:

> Courts have recognized two chief forms of prejudice in the laches context—evidentiary and expectations-based. Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died. A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.

*Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001) (citations omitted). *See also Vineberg v. Bissonnette*, 548 F.3d 50, 57 (1st Cir. 2008) (noting that "prejudice in this context is normally either evidence-based or expectations-based") (citing *Danjaq*, 263 F.3d at 955).

As suggested, not just any kind of prejudice will suffice to satisfy this element. For example, if a delay in the filing of a motion for TRO inconvenienced the non-movant, or required

---

[9] In so stating, the Court is not opining as to whether Count I (alleged violation of the Equal Protection Clause) or Count II (alleged violation of Title IX) states a valid claim for relief; its point here is that the Complaint contains a good deal of information that (at least some of which, for many persons, would perhaps be of interest and welcomed for the general background it provides) clearly does not advance the ball towards stating a valid claim under applicable federal pleading standards.

it to concentrate more resources on responding to the motion than it otherwise would have had to, that would fairly be characterized as "prejudice" but probably would not constitute a cognizable kind of prejudice in this context. However, as courts have pointed out, "[t]he greater the delay, the less the prejudice required to show laches." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va.), *aff'd*, 471 F. App'x 219 (4th Cir. 2012) (citing *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (internal citation omitted)); *see also Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d at 800 ("Although Goins' declaration does not provide overwhelming evidence of actual prejudice, not much prejudice is required given the substantial delay here close to the primary election."); *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) ("The time element is most important. . . . Under the delay/prejudice ratio, prejudice need not be so severe where, as here, delay is conscious and substantial.").[10] Here, the delay was so great, given when the Motion was filed vis-à-vis August 5, that not much prejudice is required.

Plaintiffs argue that Defendants cannot show either type of prejudice that would support application of laches because "the first ground is not relevant here" and "Defendants cannot argue or demonstrate that they have changed their position 'in a way that would not have occurred if the plaintiff had not delayed.'" (Doc. No. 26 at 7-9 (quoting *Lichtenstein*, 489 F. Supp. 3d at 754)). The Court agrees that the first ground (evidence-based prejudice) is not relevant here; the Court perceives no reason to believe that Plaintiffs' delay has resulted in any loss of evidence that could bear on this matter.[11]

---

[10] It has also been stated that "[p]rejudice can be inferred simply from the plaintiff's delay, or from evidence of specific harm." *Perry*, 840 F. Supp. 2d at 954. Although not disagreeing with this proposition, the Court notes that: (i) even if prejudice is inferable merely from the plaintiff's delay, the Court should be looking for inferable prejudice of a kind cognizable in the laches context; and (ii) in this case it declines to infer prejudice based solely on Plaintiffs' delay in any event.

[11] The Court notes that it is inclined to believe that this case is less likely than most to turn on disputed factual issues that must be resolved via admissible evidence. It is follows that this case is less likely than most to turn on the evidence

But the Court disagrees with Plaintiffs that there is no expectations-based prejudice. As indicated above, it can exist when the defendants have not changed their position in a way, or taken actions, that would not have occurred if the plaintiffs had not delayed in filing suit. Similarly, expectations-based prejudice can be found based on the defendants' "expenditure of resources in reliance upon the status quo ante." *Vineberg*, 548 F.3d 50 at 57.

The record suggests actions taken, and resources expended, by at least one Defendant (Jeffrey Luttrell in his official capacity of Director of Wilson County Schools) in reliance upon the status quo, *i.e.,* the School Facilities Law being in effect. Plaintiffs' declarations demonstrate that Plaintiffs' parents were reaching out to school administrators regarding reasonable accommodations for their transgender students, and that these administrators were putting specific plans into place in response to the School Facilities Law. (Doc. No. 4 at 9; Doc. No. 5 at 7-8, 8-9). In other words, school administrators were committing to specific plans to implement the School Facilities Law.

Plaintiffs conceivably could argue that such administrators and the State should have expected that the School Facilities Law would be challenged in Court such that they should have planned accordingly and refrained from going all in on their planning to implement the School Facilities Law. But the Court is unaware that prejudice to a defendant from taking actions in reliance on the status quo is not cognizable merely because the defendant supposedly should have anticipated a challenge to the status quo. And the Court does not see why such actors, prior to the filing of a motion for a TRO, are not allowed to rely on the status quo under such circumstances; to the contrary, especially with no pending TRO, they would be entitled to expect that a law passed

that would resolve such factual disputes. It would seem, although the Court need not say definitively, that Count I at least will turn on determinations of constitutional law as applied to mostly undisputed facts, such as the text of the School Facilities Law.

by the Tennessee legislature will go into effect and remain in effect. In the context of the School Facilities Law, this expectation grew ever more justifiable and more realistic as the first day of school approached without the law being challenged. And in the case of Wilson County school administrators, the law was not challenged until two business days before the first day of school.

In this regard, State Defendants assert that prejudice also exists because the advance warning given by Plaintiffs as to (what they hoped would be) an imminent change (enjoinment) of state law and corresponding local school procedures—less than 72 hours—"is far too short for the 'nuanced policy decisions' that [Plaintiffs'] requested relief requires." (Doc. No. 27 at 6 (citing *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016)). The Court agrees that the requested relief would mandate nuanced policy decisions occasioned by a sudden change in state law on a sensitive and widely impactful topic. And the Court draws a relevant lesson from *Crookston*, even if it is not precisely the one State Defendants were suggesting: when at the so-called eleventh hour a TRO movant requests changes to state law that would require nuanced policy decisions, that disturbs expectations reasonably formed based on the status quo and imparts expectations-based prejudice.[12]

For all of these reasons, the Court finds the existence of expectations-based prejudice sufficient to support application of laches in this case.

### III. Court's Discretion

As noted above, even though it found both elements of laches to exist here, the Court does have discretion not to apply laches. But it does not see a good reason to exercise that discretion.

---

[12] Notably, the Court is hesitant to conclude that in and of itself, the lack of time for defendants or the presiding court, to adequately respond to a motion for TRO is a kind of either evidence-based prejudice or expectation-based prejudice. The insufficiency of response time simply does not seem to fit either of these categories. However, such insufficiency, since it was caused by Plaintiffs, can and does impact the Court's exercise of its discretion, as discussed below.

To the contrary, the Court finds that it should exercise its discretion to apply laches in the present case. This is based in no small part on the fact—relevant to the Court's exercise of discretion even if not relevant to whether there is cognizable prejudice for purposes of laches—that the Court would have inadequate time to do the issues full justice in the extremely limited amount of time it would have to decide the TRO motion on the merits had it declined to apply laches despite its applicability. The four-part test for the issuance of a preliminary injunction is not easily applied in this case. Just the first part (likelihood of success on the merits) would have been (and may yet prove to be, in the preliminary injunction context) quite involved. Indeed, State Defendants have raised not only merits-based defenses, but also multiple defenses (including alleged sovereign immunity, lack of standing, and lack of ripeness) that are not merits-based and thus have not been addressed by Plaintiffs.[13] Under these circumstances, the Court was not well-situated to opine (even preliminarily, under a "likelihood" standard) on the merits of Plaintiffs' claims prior to August 5.

Regarding his discretion, the undersigned concludes here as it concluded in a previous decision on a motion for temporary restraining order:

> Admittedly, as suggested above, a court generally cannot claim to know the "right" answer to the question of whether to apply laches in a particular context; indeed, this generally is a question that does not have a "right" answer. But it often has an answer that strikes the Court as particularly sound. And here the Court is more than satisfied, for the reasons discussed, that laches should apply in the present case.

*Corizon, LLC v. Wainwright*, No. 3:20-CV-00892, 2020 WL 6323134, at *12 (M.D. Tenn. Oct. 28, 2020).

---

[13] It is understandable that Plaintiffs would not have addressed these defenses in their Memorandum in Support; Plaintiffs therein understandably focused on the merits of their two claims and cannot be faulted for not identifying and attempting to refute defenses before Defendants even made them. But this just serves to prove the Court's point: on such a compressed timeframe, the Court would not have had adequate input, and otherwise would not have been in a good position to make a decision prior to August 5 regarding Plaintiffs' likelihood of success on the merits.

## CONCLUSION

Although, as suggested above, the undersigned recognizes the relative subjectivity and ambiguity of the elements, the Court finds decisively that the elements of laches do exist in this case. The Court finds unreasonable delay with no sufficient excuse by Plaintiffs in waiting to file the instant lawsuit until less than two business days before school in Wilson County, Tennessee was set to start. The Court additionally finds that this delay visited upon at least one Defendant a sufficient amount of cognizable prejudice. Accordingly, as stated in the Court's previously issued Order (Doc. No. 31), the Motion (Doc. No. 2) is denied to the extent that it seeks a temporary restraining order.

The Court is prepared to conduct a hearing on the Motion's request for a preliminary injunction as soon as reasonably feasibly. The Court DIRECTS the parties to confer in an attempt to propose to the Court a briefing schedule and potential hearing dates with respect to such request. If the parties do not do so by August 19, 2021, the Court will act on its own to set a hearing date and briefing schedule on the motion for preliminary injunction.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE