**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **A.S., a minor, by his next friends AMY A., mother And JEFF S., father; and A.B., a minor, by her next Friends, JULIE B., mother and ROSS B., father,** )<br>)<br>)<br>) | |
| **PLAINTIFFS** ) | |
| **V.** ) **No. 3:21-cv-00600** | |
| ) | |
| **BILL LEE, in his official capacity as Governor of Tennessee; HERBERT SLATERY, III, in his official Capacity as Attorney General of Tennessee; WILSON COUNTY BOARD OF EDUCATION; JEFF LUTTRELL, In his official capacity as Director of the Wilson County Schools; and DOES 1-10,** )<br>)<br>)<br>)<br>)<br>) | |
| **DEFENDANTS.** ) | |

**WILSON COUNTY BOARD OF EDUCATION AND JEFF LUTTRELL'S
RESPONSE IN OPPOSITION TO PLAINTIFFS' REQUEST FOR
PRELIMINARY INJUNCTION**

Come now the Defendants, Wilson County Board of Education and Jeff Luttrell

(hereinafter "WCBOE"), and file this Response in Opposition to the Plaintiffs' Motion

for Preliminary Injunction. Specifically, in this Response, the WCBOE shows unto the

Court that the Defendants' actions violate neither Title IX nor the Equal Protection

Clause and that subsequently the Plaintiffs do not meet the preliminary injunctive

standards housed in applicable statutory and case law. Furthermore, the WCBOE

suggests that granting the Plaintiffs' Motion as to the WCBOE alone would work a grave

1

injustice to the WCBOE as so doing would compel the WCBOE to act in contravention of the Tennessee Accommodations for all Children Act (hereinafter "TAACA") which in turn would render the WCBOE, as well as all other schools in the state, vulnerable to innumerable private rights of action under that same Act.

## I.    Procedural Background

This matter was initially filed on August 2, 2021.[1]  At that time, pursuant to the Plaintiffs' Complaint, the minor Plaintiffs, who are both transgender students within the WCBOE school system, sought a declaration and subsequent injunction on the enforcement of the TAACA as well requiring the Defendants, including the WCBOE, to allow individuals to use restrooms, changing facilities, and multi-occupancy sleeping quarters in correspondence with those individuals' gender identity as opposed to their biological or birth sex as it is defined in the TAACA.[2]  In so doing, the Plaintiffs sued the WCBOE as well as Governor Bill Lee and Attorney General Herbert Slatery III (hereinafter "state defendants") under 42 U.S.C. § 1983 alleging violations of the Equal

---

[1] Plaintiffs' Complaint, DE 1.
[2] *Id* at ¶¶ 1-9.

Protection Clause of the 14th Amendment to the United States Constitution.[3] The

Plaintiffs further alleged a violation of Title IX, located at 20 U.S.C. § 1681, as to the

WCBOE.[4] The Plaintiffs initially requested relief via a Temporary Restraining Order.[5]

This request was denied by this Court on laches grounds.[6] As a result, this matter is

now before the Court on the Plaintiffs' request for a preliminary injunction as described

above.

## II.    Legal Standard

Prior to obtaining a preliminary injunction, the Plaintiffs must first meet the

standards housed in applicable statutory and case law to earn a favorable ruling on their

petition for injunctive relief. As the Court knows, when deciding whether to grant a

petition for pretrial injunctive relief, District Courts in the Sixth Circuit reference four

factors that act as guideposts in this decision making process.[7] These four factors are:

(1) whether the movant has a strong likelihood of success on the merits;

---

[3] *Id at ¶¶* 95-117.
[4] *Id* at ¶¶ 118-22.
[5] Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, DE 2.
[6] Order, DE 31.
[7] *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015).

3

(2) whether the movant will suffer irreparable harm if the injunction is not issued;

(3) whether the injunction will cause substantial harm to others if it is issued; and

(4) whether granting the injunction will serve the public interest.[8]

At this juncture, it is important to note that injunctive relief such as that requested in this instant matter is an "'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."[9]

### III.    Argument

#### a.  The Plaintiffs are unable to demonstrate a strong likelihood of success on the merits.

The first factor requires the demonstration of a likelihood of success on the merits of the action by the movant prior to the preliminary injunctive relief being granted.[10]  Importantly, Courts within the Sixth Circuit have construed this requirement

---

[8] *Id.*

[9] *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC.*, 958 F.3d 532, 539 (6th Cir. 2020) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1977).

[10] *Am. Civil Liberties Union*, 796 F.3d at p. 642.

4

as not just requiring "some" chance of success on the merits of the action. Rather, Sixth Circuit Courts have consistently found that the grant of injunctive relief requires movants to demonstrate a "strong" likelihood of success on the merits of the action prior to obtaining that requested relief.[11]

### i. The Defendants' actions do not violate Title IX.

Simply put, the Plaintiffs in this action are unable to meet this burden. As discussed *supra,* the Plaintiffs have alleged that they are entitled to injunctive relief against the WCBOE on both Title IX and Equal Protection grounds.[12] Turning first to Title IX, as the Court knows, the text of Title IX explains that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[13] However, as the State Defendants explain in their Response in Opposition to the Plaintiffs' Motion for Temporary Restraining Order and a Preliminary Injunction, an accompanying provision in that same statute states that "nothing contained herein shall be construed to prohibit any educational institution receiving

---

[11] *Id.*
[12] Plaintiff's Complaint, DE 1 at ¶¶ 1-9.
[13] 20 U.S.C. § 1681(a).

funds under this Act, from maintaining separate living facilities for the different sexes."[14]

This is important because the text of Title IX makes it clear that Title IX, in speaking of "sex" refers to "sex" in the sense of "biological" or "birth" sex as opposed to the concept of "gender identity" which, as proffered in the Plaintiffs' Complaint, is divorced from the traditional understanding of "biological sex." Indeed, in addition to 20 U.S.C. § 1686 explicitly authorizing separate living facilities for the "different sexes" elsewhere in the statute, "Boy or Girl conferences" as well as "Father-son or mother-daughter activities" are discussed and it is additionally contemplated that schools, in admitting students, either admit students of "one sex" or "both sexes."[15] It is for this reason that courts such as the District Court for the Western District of Pennsylvania, when faced with the same question, found that "Title IX and its implementing regulations clearly permit schools to provide students with certain sex-segregated

---

[14] 20 U.S.C. § 1686.
[15] 20 U.S.C. § 1681(a)(7); (a)(8); (a)(2).

spaces, including bathroom and locker room facilities, to perform certain private activities and bodily functions consistent with an individual's birth sex."[16]

Indeed, while the Plaintiffs' position, as elucidated through their filings in this action, suggests otherwise, there is no applicable **controlling** authority, either in statute or common law, that supports the Plaintiffs' interpretation of Title IX. As noted *supra*, the actual text of Title IX is directly inapposite to the Plaintiffs' position that allowing the Plaintiffs to choose the living facilities that they use based upon their currently expressed gender identity, instead of their biological or birth gender, is required by Title IX. Likewise, there is no statute that demands this treatment. Instead, the TAACA, as enacted in Tennessee by popularly elected representatives, cuts the other way, subjecting the WCBOE, or any other school system, to potential civil liability for complying with the Plaintiffs' demands.[17]

Likewise, Plaintiffs' interpretation of Title IX is not grounded in Tennessee, Sixth Circuit, or United States Supreme Court jurisprudence. The Plaintiffs cannot advance a single **controlling** case that supports their position. Instead, they rely upon the

---

[16] *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 677-78 (W.D. Pa. 2015).
[17] DE 6-1 § 6(a)-(e).

7

*Bostock* decision as claimed evidence that the United States Supreme Court's view of

Title IX comports with the Plaintiffs' own.[18]  However, as this Court knows, *Bostock*

dealt with Title VII and not Title IX.

To the contrary, to the degree that *Bostock* addresses matters at issue in this

instant action, it supports the position of the Defendants and not the Plaintiffs.  For

instance, when discussing the definition of "sex", the Supreme Court conformed to the

textual definition inherent in Title IX as referenced *supra* by stating that "we proceed on

the assumption that 'sex' . . . refer[s] only to biological distinctions between male and

female."[19]  Furthermore, in an attempt to preemptively address inevitable situations

such as the present in which parties would try to expand the Court's reasoning beyond

what is explicitly stated in its opinion the Court explained that, due to differing

linguistics between Title VII and other similar statutes, questions regarding those other

statutes, such as Title IX, were not properly before the Court and as a result, the Court

refused to "prejudge any such question" under statutes other than Title VII.[20]  In fact, to

clear up any remaining ambiguity, the Court specifically explained that its opinion in

---

[18] *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020).
[19] *Id.* at p. 1739.
[20] *Id.* at p. 1753.

*Bostock* did "not purport to address bathrooms, locker rooms, or anything else of the kind."[21]

Unsurprisingly, when the Sixth Circuit Court of Appeals had the opportunity to address *Bostock's* impact upon Title IX jurisprudence, it did so by explaining the many differences between Title VII and Title IX. In fact, in so doing, the Sixth Circuit Court of Appeals specifically cited § 1686 of Title IX, which as addressed *supra* specifically states that schools may "maintain...separate living facilities for the different sexes" as one of the significant ways in which the statutes differed.[22] As a result, the Sixth Circuit Court of Appeals explained that "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."[23]

Additionally, the expansive interpretation of Title IX that the Plaintiffs urge the Court to adopt completely ignores the Spending Clause considerations as elucidated by the State Defendants in their Response in Opposition to the Plaintiff's Motion for

---

[21] *Id.*
[22] *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).
[23] *Id.*

9

Temporary Restraining Order and a Preliminary Injunction.[24]  As the Court knows, the

United States Congress enacted Title IX pursuant to its Spending Clause power and, as a

result, any alleged violation by the WCBOE of Title IX must be unambiguous to trigger

liability under the Clause.  This is because, while Congress may "attach conditions on

the receipt of federal funds"[25] under the Clause, "[t]he legitimacy of Congress' power to

legislate under the spending power . . . rests on whether the State voluntarily and

knowingly accepts the terms of the 'contract.'"[26]  Thus, "if Congress intends to impose a

condition on the grant of federal moneys, it must do so unambiguously."[27]  The United

States Supreme Court has been clear that this requirement applies specifically to Courts

interpreting Title IX.[28]

As a result, Plaintiffs completely disregard Spending Clause considerations when

they argue that the definition of "sex" under Title IX, as interpreted through a modern

day lens employed approximately 50 years after Title IX's passage, *could* support an

interpretation that includes transgender individuals.  The Plaintiffs have advanced no

---

[24] State Defendants' Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, DE 27.
[25] *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).
[26] *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).
[27] *Id.*
[28] *See Davis ex rel. D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 649–50 (1999).

proof that when the WCBOE began accepting federal funding provided subject to the provisions of Title IX approximately 50 years ago, the WCBOE's acceptance of that funding was contingent upon an interpretation of "sex" under Title IX which unambiguously included transgender individuals. Instead, the Plaintiffs continue to rely on arguments that the interpretation of Title IX in 2021 *should* or *could* include transgender individuals within its protections from discrimination on the basis of sex. Asserting that a statute *should* or *could* be interpreted in a certain way is a far cry from the "unambiguous" requirement tied to legislation enacted under the authority provided the legislature by the Spending Clause. This does not pass muster under the Spending Clause and the request should be denied as a result.

In summation then, the Plaintiffs are unable to establish a "strong likelihood" of success on the merits as to the WCBOE's alleged violation of Title IX regarding the Plaintiffs such that a preliminary injunction against the WCBOE's actions is warranted. Nothing within the text of Title IX confers upon the Plaintiffs the ability to patronize the living facilities of their choice. The text of Title IX consistently provides for separate living facilities for the "two sexes" with the understanding that those "sexes" are defined

11

as an individual's biological or birth sex.  To retroactively interpret Title IX otherwise is to read meaning into the statute that was not explicitly placed there at the time of WCBOE's initial acceptance of federal funding conditioned upon it in violation of the United States Constitution's Spending Clause. Furthermore, there is no other statute or **controlling** jurisprudence that compels this Court to adopt the Plaintiffs' preferred interpretation of Title IX.  It is for these reasons that the Plaintiffs' request for a preliminary injunction should be denied as to these Defendants.

### ii.  The Defendants' actions do not violate the Equal Protection Clause.

In addition to the relief sought pursuant to Title IX against the WCBOE, the Plaintiffs allege that the Court should issue a preliminary injunction against all Defendants under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.[29]  In so doing, the Plaintiffs allege that they have been denied equal protection under the law based upon their

---

[29] Plaintiffs' Complaint, DE 1 at ¶¶ 1-9.

inability to use the living facilities of their choice consistent with their presently expressed gender identity.[30]

As the Court knows, there are three levels of scrutiny applied to equal protection challenges based upon the suspect class of the Plaintiffs or the fundamental right implemented.[31] The first, strict scrutiny, is the most exacting level of review and applies when a statute or action complained of implicates a suspect classification based upon race, alienage, or national origin.[32] For the challenged statute or governmental action to survive this level of review, it must be narrowly tailored to serve a compelling state interest.[33]

The second, intermediate scrutiny, applies to statutes or governmental actions dealing with the quasi suspect classes of sex and illegitimacy.[34] For the challenged statute or governmental action to remain standing in this instance, the statute or action must be substantially related to achieving an important governmental interest.[35]

---

[30] *Id.*
[31] *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).
[32] *Id.*
[33] *Id.*
[34] *Craig v. Boren*, 429 U.S. 190, 197 (1976).
[35] *Id.*

13

Finally, the last level of review, rational basis scrutiny, is the most lenient and applies to all other equal protection claims.[36]   Under this level of review, the government need only have a rational basis for its action in that its classification is rationally related to a legitimate state interest.[37]

Thus, the first matter to ascertain when conducting an analysis of a claim under the equal protection clause is the alleged classification implicated by the challenged statute or governmental action.   In this case, the Plaintiffs have alleged disparate treatment based upon their status as transgender individuals.[38]  Transgenderism, since it does not implicate race, alienage, or national origin, is indisputably not a suspect class that triggers strict scrutiny review.  Likewise, transgenderism does not implicate sex or illegitimacy and thus is also not entitled to quasi suspect or intermediate scrutiny.

While it is anticipated that the Plaintiffs will take an opposing position by claiming that transgenderism is included in the definition of sex for intermediate scrutiny review, the fact of the matter is that, as with the Title IX analysis in this action, there is no **controlling** precedent to support this position.  Specifically, there is no

---

[36] *City of Cleburne*, 473 U.S at p. 440.
[37] *Id.*
[38] Plaintiffs' Complaint, DE 1 at ¶¶ 1-9.

14

United States Supreme Court or Sixth Circuit Court of Appeals jurisprudence to substantiate these claims. Instead, as the Sixth Circuit Court of Appeals recently explained, the United States Supreme "Court has never defined a suspect or quasi-suspect class on anything other than a trait that is definitively ascertainable at the moment of birth, such as race or biological gender."[39]

As a result, it is clear that this challenged governmental action, which involves an alleged classification of transgender individuals, is subject to review at the most lenient rational basis level. At that level of review, the TAACA certainly passes constitutional muster.

The TAACA, as it is currently drafted, is essentially divided into two parts, both of which are challenged by the Plaintiffs. The first provides the right of "reasonable accommodation" to any WCBOE student, teacher, or employee whom:

> Desires greater privacy when using a multi-occupancy restroom or changing facility designated for the student's, teacher's, or employee's sex and located within a public school building, or when using multi-occupancy sleeping quarters designated for the student's, teacher's, or employee's sex while the student, teacher, or employee is attending a public school-sponsored activity.[40]

---

[39] *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015).
[40] DE 6-1, § 4(a)(1).

Importantly, the term "reasonable accommodation" in the act can include "access to a single-occupancy restroom or changing facility or use of an employee restroom or changing facility."[41] It cannot include "[a]ccess to a restroom or changing facility that is designated for use by members of the opposite sex while members of the opposite sex are present or could be present."[42] Further prohibited is "[r]equesting that a school construct, remodel, or in any way perform physical or structural changes to a school facility; or [r]equesting that a school limit access to a restroom or changing facility that is designated for use by members of the opposite sex."[43] Also important is the definition of "sex" in the act which is defined as "a person's immutable biological sex as determined by anatomy and genetics existing at the time of birth."[44]

The second portion of the TAACA, and the part that is most concerning to the WCBOE and all other public schools across the state, provides that any individual can have a private right of action for monetary damages against the school system if:

> The person encounters a member of the opposite sex in a multi-occupancy restroom or changing facility located in a public school building; the person is in a multi-occupancy

---

[41] DE 6-1, § 3(2).
[42] DE 6-1 § 3(2)(A).
[43] DE 6-1, § 3(2)(B)–(C).
[44] DE 6-1, § 3(4).

> restroom or changing facility designated for the person's sex;
> and the LEA or public school intentionally allowed a member
> of the opposite sex to enter the multi-occupancy restroom or
> changing facility while other persons were present.[45]

Thus, at the outset, it is apparent from the verbiage of the statute that the TAACA

applies to all Tennessee students and in fact does not mention transgender individuals

anywhere within the statute.  As to the accommodative portion of the statute, it simply

states that individuals requiring "greater privacy", such as the instant minor Plaintiffs,

can request accommodations such as the usage of individual restrooms, which they have

done and which the WCBOE has allowed.[46]

However, even assuming arguendo that the statute does distinguish transgender

individuals from cisgender or other non-transgender individuals, pursuant to 6th Circuit

jurisprudence, this classification would only warrant rational basis review since sex, as a

quasi-suspect class, by definition is limited to the traditional definition of sex as being

anatomically or biologically ascertainable at the moment of birth.[47]  Under that rational

basis review, the TAACA must be upheld, and an injunction not issued against the

---

[45] DE 6-1, § 6(a)-(e).
[46] DE 6-1, § 4(a)(1).
[47] *Ondo*, 795 F.3d at 609.

17

WCBOE, unless there is neither a rational basis for, nor a legitimate government interest involved with, the Defendants' actions.

As the state Defendants explain in their filings with this Court, there is no doubt but that a rational basis exists for the Defendants' actions. WCBOE's actions, in complying with the TAACA, are intended to protect the privacy interests of all students and employees of the WCBOE, regardless of whether those students or employees identify as cisgender, transgender, or some other classification. Indeed, as this instant Court has previously explained, if an individual is "forced to share changing, shower, and bathroom space with members of the opposite sex" then they do not receive the "level of privacy and comfort that" they otherwise would in living facilities separated by biological gender as contemplated by Title IX.[48]

By the same token, the TAACA, and the WCBOE's actions, implicate the legitimate government interest of providing students and employees both privacy and safety during their patronage of the living facilities operated by the WCBOE. Certainly, it is well established that individuals enjoy a significant right of bodily privacy in both

---

[48] *Stuart v. Metro. Gov't of Nashville & Davidson Cnty.*, 679 F. Supp. 2d 851, 854, 859 (M.D. Tenn. 2009), *vacated after settlement.*

shielding their unclothed body from the opposite biological gender as well as being protected from the undesired viewing of the unclothed bodies of others of the opposite biological gender, especially in this case in which the minor Plaintiffs are both school aged children.

Likewise, applicable statutory and case law guidance is clear on the point that Tennessee schools stand *in loco parentis* during the school day for their students and are charged with the utmost care in safeguarding those students from harm. The Tennessee legislature explained this well when it wrote "[t]he general assembly recognizes the position of the schools in loco parentis and the responsibility this places on principals and teachers within each school to secure order and to protect students from harm while in their custody."[49] Courts have long agreed with this precept as well since, over half a century ago, the Tennessee Supreme Court stated that "[a]ll authorities seem to agree upon the general principle that the teacher stands in the stead, in a somewhat limited sense, of the parent, in loco parentis, and may exercise such powers of control and correction, including physical punishment, as may be reasonably

---

[49] Tenn. Code Ann. § 46-6-4203(b) (1988).

necessary."[50]  Courts within the Sixth Circuit have uniformly agreed with this precept as

well with the United States Court of Appeals for the Sixth Circuit recently holding that

"[w]e can imagine few governmental interests more important to a community than that

of insuring the safety and security of its children while they are entrusted to the care of

teachers and administrators."[51]  Allowing students of different anatomical genders to

share the same living facilities while in various states of undress in isolated

circumstances where there are often few bystanders invites the potential for abuse and

assault that schools attempt so desperately to avoid under their *in loco parentis*

responsibilities.

### b. The Plaintiffs will not suffer irreparable harm if the injunction is not issued.

The second factor that the Court examines in determining whether to grant a

preliminary injunction is whether the Plaintiffs will suffer irreparable harm if the

---

[50] *Marlar v. Bill*, 178 S.W.2d 634, 635 (Tenn. 1944).

[51] *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361, 374 (6th Cir. 1998); *see also Seal v. Morgan*, 229 F.3d 567, 582 (6th Cir. 2000) ("In addition to their duty to educate, schools act in loco parentis."); *Smith Cnty. Educ. Ass'n v. Smith Cnty. Bd. of Educ.*, 2:08-0076 at *20  (M.D. Tenn. 2011) (According to the Sixth Circuit, the "unique" role of teachers is codified in Tennessee because teachers serve "in an in loco parentis capacity and are charged with the responsibility to secure order and to protect students from harm while in their custody.'"); *Hearring v. Sliwowski*, 872 F. Supp. 2d 647, 669 (M.D. Tenn. 2012) ("School officials act in loco parentis for school children*...");* *Brooklyn T. v. Knox Cnty*. 3:20-CV-0005 at *7 (E.D. Tenn. 2020) ("For many purposes school authorities act in loco parentis...").

injunction is not issued. In this instant action, as the Court knows there are two minor Plaintiffs, A.S. and A.B. As a result, the Court must consider in turn whether the situation of each minor would give rise to irreparable harm if the court does not enjoin the TAACA and the WCBOE's subsequent policies based upon it. However, at the outset, we must specify that at the present time, this entire action revolves around restroom access for the minor Plaintiffs. As the Affidavit of Ms. Bush, which is attached to this Response, demonstrates, neither Plaintiff is involved in any sport or other activity that requires locker room access.[52] Likewise, neither Plaintiff is involved in a club or is otherwise eligible to attend an overnight trip in which the sleeping situation of that minor would be an issue.[53] As a result, the School Defendants respectfully suggest that the Court must consider each Plaintiff's request in light of the sole issue of restroom access.

First we turn to minor Plaintiff A.S. At the time of the filing of the Complaint, A.S. was a ninth grade student within the WCBOE school system.[54] Pursuant to that Complaint, A.S. is a transgender boy in that A.S. is a biological girl but possess a gender

---

[52] Ex.A, Affidavit of Lauren Bush at ¶¶ 7, 9.
[53] Ex.A, Affidavit of Lauren Bush at ¶¶ 7, 10.
[54] Plaintiffs' Complaint, DE 1 at ¶ 10.

identity consistent with that of a male.[55]  In the Plaintiffs' Complaint, A.S. alleges that,

in previous school years, he was offered restroom accommodations by WCBOE of "using

the girls' bathroom, the nurse's office bathroom, the guidance office bathroom, or a

locked faculty bathroom."[56]  However, these accommodations did not prove satisfactory

since "[n]one of these bathrooms were close to any of A.S.'s classrooms, and using them

made A.S. feel like he stood out, seemed 'different,' and made him feel further

alienated."[57]

However, since the Plaintiffs' Complaint was filed prior to the beginning of the

current school year, based upon the allegations contained within the Plaintiffs'

Complaint it appears that the Plaintiffs were unaware of the details as to the particular

accommodations to be offered by the WCBOE.  Specifically, at the beginning of the

school year the WCBOE offered A.S. the opportunity to use controlled access single

facility bathrooms that are used by both students and staff.[58]  Importantly, these

bathrooms are actually closer and thus more convenient to A.S.'s classes at A.S's high

---

[55] *Id* at ¶ 21.
[56] *Id* at ¶ 31.
[57] *Id.*
[58] Ex.A, Affidavit of Lauren Bush at ¶ 8.

school than the multi facility boy's bathrooms.[59]   For this reason, A.S.'s complaints about not being able to use a bathroom convenient to him no longer ring true since the proposed accommodation allows access to a bathroom that is even more convenient to him than the other bathroom would be.   Further, by providing A.S. credentials to use these controlled access single facility bathrooms, he is not being singled out since other students with those same credentials are also able to use this bathroom.   As a result, the School Defendants submit that A.S. will not suffer any irreparable harm if the WCBOE's proposed accommodations for A.S. under the TAACA are allowed to remain in place pending the final outcome of this action.

Next comes Plaintiff A.B.   Pursuant to the Plaintiffs' Complaint, A.B. is a first grade student within the WCBOE school system.[60]   A.B. is a transgender girl which means that she is an anatomical male whose gender identity is female.[61]   At present, A.B. is under a "Student Support and Inclusion Plan" which allows A.B. to use the girl's restroom as is consistent with her gender identity.[62]   As a result, A.B. has already

---

[59] *Id.*
[60] Plaintiffs' Complaint, DE 1 at ¶ 4.
[61] *Id.*
[62] Ex.A, Affidavit of Lauren Bush at ¶ 5.

received the relief requested in the Complaint as to A.B. since she has access to her desired living facilities under the Plan.[63] While the Plaintiffs claim in their Complaint that "A.B.'s Elementary School has Offered to Allow Her to Use the Girls' Bathroom for the First Month of School, After Which Time That Privilege Will be Revoked," as Ms. Bush's affidavit illustrates, this accommodation will remain in place until A.B. transitions to a portable classroom with a single restroom.[64] At that time all children in A.B.'s classroom will use the single restroom in the portable classroom, regardless of gender or gender identity, for the remainder of the school year.[65] As a result, not only will A.B. not suffer irreparable harm if the injunction is not granted, but A.B.'s petition is moot since A.B. is already receiving the accommodations requested in her Complaint in that she is already being accommodated by being allowed to use the general usage bathroom that other anatomical girls at her school use.

Thus, neither A.S. nor A.B. will suffer irreparable harm if the sought after preliminary injunction is not issued by this Court. Beginning this school year, A.S. is able to use a private restroom also used by other students that is more convenient to his

---

[63] Plaintiffs' Complaint, DE 1 at ¶ 90; Ex.A, Affidavit of Lauren Bush at ¶ 5.
[64] Ex.A, Affidavit of Lauren Bush at ¶¶ 5-6.
[65] Ex.A, Affidavit of Lauren Bush at ¶ 6.

24

class schedule than the general usage boy's restroom would be.[66]  A.B., pursuant to her

coverage under a Student Support and Inclusion Plan, already receives the

accommodation requested of using the bathroom consistent with her gender identity.[67]

As a result, A.B.'s claim is moot since she already receives the accommodations

requested in her Complaint whereas A.S. is able to attend a convenient single facility

bathroom available to other students as well.  A preliminary injunction will have no

effect whatsoever upon A.B., whereas it will simply allow A.S. to access an additional

bathroom that is further from his class, which does nothing to alleviate the

"inconvenience" issue complained of in the Plaintiffs' Complaint.  The Plaintiffs will not

be harmed by the Court's decision not to grant the requested injunction.

### c.  The injunction will cause substantial harm to others if it is issued.

The third factor for the Court to consider in this multifactorial analysis is the

determination of whether others in the school will suffer substantial harm if the

injunction is issued.  At the outset, the WCBOE must note that issuance of such an

injunction would put the WCBOE at grave risk of almost unlimited litigation, and the

---

[66] Ex.A, Affidavit of Lauren Bush at ¶ 8.
[67] *Id.* at ¶ 5.

concurrent payment of monetary damages, at the hands of other cisgender students and their parents through the application of TAACA.

As discussed *supra*, the TAACA is essentially bifurcated into two parts. The first deals with the types of accommodations that are and are not acceptable for individuals desiring additional privacy during their usage of living facilities at Tennessee public schools. The second provides that any individual can have a private right of action for monetary damages against the WCBOE if:

> The person encounters a member of the opposite sex in a multi-occupancy restroom or changing facility located in a public school building; the person is in a multi-occupancy restroom or changing facility designated for the person's sex; and the LEA or public school intentionally allowed a member of the opposite sex to enter the multi-occupancy restroom or changing facility while other persons were present.[68]

Should the Court enter an injunction forcing the LCBOE to allow students to use the living facilities that corresponds to their gender identity instead of their biological or birth gender, such an Order will be tantamount to publically announcing to all of the parents of WCBOE students, as well as their attorneys, that this private right of action and accompanying opportunity to obtain monetary damages from WCBOE under TAACA will be available to all interested parties since the WCBOE will have no choice

---

[68] DE 6-1, § 6(a)-(e).

but to "intentionally" allow students to patronize the living facilities of their choice, so long as they claim that that choice is consistent with their present gender identity. In so doing, the Court will open the WCBOE, and in practice every other public school in the state based upon the precedential nature of such a decision, to potentially unlimited civil liability based upon these private rights of action.

Furthermore, as addressed *supra*, and as the State Defendants discuss in their response in opposition to the Plaintiffs' Motion for Preliminary Injunction, all individuals, regardless of gender identity, possess significant privacy rights when inhabiting living facilities as the very usage of these facilities typically entails the removal of some, or potentially all, of an individual's clothing. Indeed, one of the most fundamental privacy rights that an individual possesses is the protection of their bodily integrity by the prevention of its exposure to members of the opposite biological sex. An equally important privacy interest that individuals maintain is that to be shielded from exposure to the unclothed bodies of others, and especially that of the opposite biological sex. Should the Court order that the WCBOE, and in effect all of the public schools in

Tennessee, are forbidden from maintaining the sex segregated living facilities envisioned and sanctioned by Title IX, these privacy rights will be eviscerated.

In addition to these privacy rights, sex segregated living facilities provide immeasurable security to their users. Sex segregated living facilities, by their very nature, are private and isolated areas so as to allow their users safety while attending to various bodily functions, bathing, and changing clothes. Again, should the Court enjoin the sex segregated nature of these facilities as it was intended under Title IX, the destruction of that segregated nature invites untold harm and predation to be visited upon the occupants of those facilities. This is especially troubling since, as the Court knows, Tennessee schools are understood to stand *in loco parentis* for the students in their care. As a result, it is incumbent upon Tennessee schools, such as the WCBOE, to take every measure possible, including the accommodations it currently offers the Plaintiffs, to safeguard their wards from harm. Since the WCBOE holds this obligation to stand *in loco parentis* for the safety and wellbeing of these students, this dangerous situation cannot come to pass.

**d. Granting the injunction will not serve the public interest.**

Finally, in deciding whether to grant the Plaintiff's Motion for Preliminary injunction, the Court must take into account whether its granting will serve the public interest. The WCBOE respectfully submits to the Court that the granting of such an injunction will not serve the public interest. The reasoning underlying this position is much the same as that underlying the WCBOE's stance regarding the harm visited upon other students within the school system if the injunction is granted as requested. Specifically, the granting of this injunction will be prioritizing the desires of the Plaintiffs, whom represent two students within the WCBOE school system, over the remaining student population within the WCBOE school system, which presently number 19,397 students and all of whom, as discussed *supra*, have a significant privacy interest during their usage of living facilities and on overnight trips pursuant to Title IX.[69]

As the Court is balancing the request of the two Plaintiffs with the privacy rights of over 19,000 students, the WCBOE submits to the Court that the students within the school system, and their families, constitute the public population of that school system

---

[69] Ex.A, Affidavit of Lauren Bush at ¶ 4.

and thus, the same principles that serve them also serve that public interest for purposes of this analysis. Furthermore, it does not strain credulity to suggest that the Court's decision in this action will have wide reaching implications, both within the State of Tennessee and beyond. Unless the Plaintiffs are able to advance proof to the contrary, individuals that identify as transgender in other Tennessee schools and that desire access to the living facilities inconsistent with their anatomical gender likely exist in similar proportion to the general student population in other school systems in Tennessee.

The two Plaintiffs in this action, as a proportion of the student population of the students in the WCBOE, are approximately .001% of the student population for the WCBOE. If we extrapolate that to the entire state, we find that there were 980,619 students in the state public schools for the 2019-2020 school year pursuant to Tennessee Department of Education data.[70] Again, assuming the same proportion of transgender individuals in those schools as there are in the WCBOE pursuant to the Plaintiffs' Complaint, there are approximately 98 transgender students requesting such

---

[70] https://www.tn.gov/content/dam/tn/education/data/district-profile-with-staff-2019-20.xlsx

accommodations across the state. If that is the case, the issuance of an Order in favor of the Plaintiffs in this instant matter would prioritize the preferences of those 98 students over the privacy rights of approximately one million other students across the state. The WCBOE humbly submits that in no way advances the public interest of the citizens of Tennessee.

Finally, as discussed *supra*, should the Court enjoin the WCBOE from its current practice of accommodation in compliance with the TAACA, the Court potentially sentences every public school system in the state to unlimited liability under the TAACA by providing a private right of action to the students, or the students' parents, that occupy school living facilities or overnight sleeping quarters alongside transgender individuals. As a result, the WCBOE respectfully requests that the Court deny the Plaintiff's request for a preliminary injunction in its entirety so that this untenable result can be avoided in its entirety. However, in the alternative, should the Court decide to grant the Plaintiffs' request for a preliminary injunction against the WCBOE, the WCBOE requests that the Court also grant the Plaintiffs' request for a preliminary injunction against the entirety of the TAACA as well. This total injunction would be the

only way to ensure that schools' compliance with the Court's Order, should the Court order such injunctive relief, does not cause a torrent of litigation that places Tennessee schools in an indefensible position pursuant to TAACA's private right of action provision.

## IV.    Conclusion

The Plaintiffs' Motion for Preliminary Injunction should be denied.  The Plaintiffs do not possess a strong likelihood of success on the merits of the action since the statutory language of Title IX, as well as applicable jurisprudence surrounding it, does not support the Plaintiffs' broad interpretation of the term "sex" within the context of Title IX.  The interpretation also conflicts with the "Spending Powers" clause of the United States Constitution since it attaches conditions to the acceptance of federal funding that are not unambiguously stated in the text of Title IX.  Likewise, the Plaintiffs' challenge is only entitled to rational basis review pursuant to the 14th Amendment's Equal Protection Clause and under which there is clearly a rational basis for WCBOE's actions that are rationally related to a legitimate governmental interest of protecting the privacy rights and bodily integrity of all of WCBOE's students.  The

injunction, if issued, will result in substantial harm to the general population of the WCBOE, as well as the general school going population in Tennessee at large. In contrast, should the Court not issue the requested injunction, Plaintiff A.B. will not be affected at all since she is already receiving the accommodations requested in the Plaintiffs' Complaint while A.S., though receiving a different accommodation than that requested in the Complaint, is already the recipient of an accommodation that addresses A.S.' concerns as elucidated in the Complaint. Based upon the foregoing, the WCBOE respectfully submits unto the Court that the requested injunctive relief is improper and should be denied.

This the 3rd day of September, 2021.

Respectfully submitted,

PURCELL, SELLERS & CRAIG, INC.

By: s/Christopher C. Hayden
Christopher C. Hayden (#028220)
Andrew V. Sellers (#019586)
Attorneys for Defendant Wilson County
Board of Education and Jeff Luttrell
P.O. Box 10547
Jackson, Tennessee 38308
(731) 300-0737
Chris@psclegal.com
Andrew@psclegal.com

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the Motion to Page Limitation was forwarded by electronic means via the Court's electronic filing system.

s/Christopher C. Hayden

Date:      September 3, 2021

PERSONS SERVED:

Tricia Herzfeld
Branstetter Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203

Adam S. Lurie
Erez Liebermann
Andrew Pak
Sean Mooney
Andreane Reynolds
Kunal Kanodia
Rebecca Zeldin
Linklaters, LLP
1290 Avenue of the Americas
New York, NY 10104

Sarah Warbelow
Jason Starr
Human Rights Campaign Fund
1640 Rhode Island Avenue NW
Washington, DC 20036

34